# EXHIBIT N

# LYLES v. MARYLAND

NO. 1536

COURT OF SPECIAL APPEALS OF MARYLAND

June 19, 2020

**Reporter**

2020 MD SP. APP. CT. BRIEFS LEXIS 1753 *

GREGORY LEE LYLES, Appellant, v. STATE OF MARYLAND, Appellee.

**Prior History:** APPEAL FROM THE CIRCUIT COURT FOR MONTGOMERY COUNTY. (Hon. James A. Bonifant, Motions Judge), (Hon. Anne K. Albright, Trial Judge).

## Counsel

BRIAN E. FROSH, Attorney General of Maryland, BRENDA GRUSS, Assistant Attorney General, CPF No. 0512120009, Office of the Attorney General, Criminal Appeals Division, Baltimore, Maryland, Counsel for Appellee .

## Title

### BRIEF OF APPELLEE

## Text

[*1] STATEMENT OF THE CASE

Appellee, the State of Maryland, accepts the Statement of the Case in Appellant Gregory Lee Lyles's brief.

QUESTIONS PRESENTED

1. Did the suppression court correctly deny Lyles's motion to suppress evidence seized pursuant to a search warrant?

2. Did the trial court soundly exercise its discretion in denying Lyles's day-of-trial request for a postponement to obtain new counsel?

3. Did the trial court properly exercise its discretion in refusing to require the recitation of outdated phrases as a condition precedent to admitting expert testimony?

STATEMENT OF FACTS

The State of Maryland accepts the Statement of Facts in Lyles's brief, as supplemented and modified in the following Argument.

ARGUMENT

I.

THE SUPPRESSION COURT CORRECTLY DENIED LYLES'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A SEARCH WARRANT.

Lyles claims error resulting from the circuit court's denial of his motion to suppress evidence seized pursuant to a search warrant [1] on three grounds: (1) the judge who issued the search warrant erroneously applied a "reasonable grounds," not a "probable cause" standard; (2) there was no substantial basis for issuing the warrant; and (3) there was no good faith exception to the warrant requirement. (Appellant's Br. at 6-19). All of these claims lack merit.

**A. The suppression judge correctly concluded that the issuing judge applied the legally correct "probable cause" standard in issuing the warrant**.

Lyles claims that the District Court judge applied the wrong standard in issuing the warrant because, in stating that there was "probable cause" for the warrant, she inserted the phrase "reasonable grounds" in parentheses:

> AND it appearing to me, from the Application and the Affidavit attached to the Application and incorporated in it, that   *Probable Cause (reasonable grounds)* exists to believe that on or in the following described premises, person, and vehicle, to wit:

(State's Mo. Ex. 1, Warrant, p. 4) (emphasis added).

Below, the circuit judge rejected this argument:

> Okay. With regard to the first issue that's before me that the State was prepared to address was the use of the words reasonable grounds [*3]  within parentheses right after probable cause. The Defense makes the argument that that suggests that the judge who signed that warrant was using the incorrect standard for issuing a warrant. I don't know why those words are there. I will make reference to the actual affidavit where the affiant does use simply the words probable cause. This is a District Court judge issuing this, and   *I've got to assume that a District Court judge knows the standard for probable cause*. It's not reasonable grounds, so making that assumption, I hear your argument. I don't know why the words are there, Mr. Witkop, but   *I believe that Judge Broten understood that the warrant could only issue on probable cause, not on reasonable grounds, so I deny that argument*.

(T.1 45) (emphasis added). [2]

The State agrees with Lyles that a warrant may issue only upon "probable cause," and that "reasonable grounds" is a lesser standard than "probable cause." (Appellant's Br. at 8-9). Nevertheless, the suppression judge was correct for the two reasons stated in her ruling.

First, there is a presumption that [*4]  a judge "understands and carries out his or her obligation to follow the law." *Attorney Grievance Comm'n of Maryland v. Keiner*, 421 Md. 492, 508 (2011). This

---

[1] The evidence at issue was (1) cocaine, cocaine cutting agent, and scales seized from 13605 Sir Thomas Way, storage unit #2; and (2) cocaine seized from a 2002 gold Chevrolet Silverado. (T.1 19). [*2]

[2] The State adopts the method of referring to the transcripts found in Appellant's Brief at page 3, footnote 2.

presumption is especially strong where, as here, the law is not some arcane proposition pertaining to a specialized area of practice, but hornbook law taught in every basic criminal law class.

Second, in the application for search warrant and supporting materials, the term "probable cause" appears without the parenthetical "reasonable grounds" or similar language. The application states: "Application is herewith made for a search and seizure warrant in that there is *probable cause* to believe that the laws relating to the illegal possession of controlled dangerous substance(s) . . . are being violated." (State's Mo. Ex. 1, p. 6) (emphasis added). Then for the next 10 pages, the affiant describes the facts that formed the basis for his belief, based on his knowledge, training, and experience, that Irfan Iftikhar and Lyles were involved in the illegal drug trade and that they were using certain premises and motor vehicles for that illegal activity Finally, on the page signed by the affiant, page 17, he avers "that there is *probable cause* to believe" [*5] that the criminal laws of Maryland are being violated at the premises and with the vehicles in question. (State's Motion Ex. 1, p. 17) (emphasis added). This page, which set forth the correct probable cause standard without qualification, was signed by the District Court judge. Under all of the circumstances, it is reasonable to conclude that, in issuing the search warrant, the District Court judge applied the requisite probable cause standard and that the inclusion of "(reasonable grounds)" was an immaterial drafting or typographical error.

**B. There was a substantial basis to believe that Lyles was engaged in criminal conduct and that evidence of criminal activity would be found in his pickup truck and storage unit**.

The Fourth Amendment to the United States Constitution permits the issuance of a warrant "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "As a predicate for the issuance of a search warrant," probable cause "simply means 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Holmes v. State*, 368 Md. 506, 519 (2002) (quoting [*6] *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The existence of probable cause for a search warrant is determined by the contents of the warrant application and its attachments. 368 Md. at 519.

Police are not required to possess personal knowledge or direct evidence that the items sought are located in the place to be searched. *Id.* at 522. ["R]ather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items." *Id.*

Although the warrant-issuing judge must determine whether the application establishes probable cause, that decision is reviewed under a deferential and "tightly confined" standard. *State v. Johnson*, 208 Md. App. 573, 577 (2012); *State v. Jenkins*, 178 Md. App. 156, 170 (2008). That is, the reviewing court is limited to determining whether a "substantial basis" existed for the magistrate's finding of probable cause. *Johnson*, 208 Md. App. at 585. "'[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.'" *Id.* at 584 (quoting *Gates*, 462 U.S. at 236).

The reason for this deferential treatment is "to encourage the police to resort to warrants [*7] rather than to warrantless searches." *Jenkins*, 178 Md. App. at 164-65. "A grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant[.]" *Gates*, 462 U.S. at 236 (internal citation and quotation marks omitted). Thus, "the resolution of doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants." *Id.* at 237 n.10 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Here, there was a substantial basis to infer from the affidavit that Lyles was engaged in criminal conduct.

First, the affidavit showed that Iftikhar dealt in CDS. Among other averments, the affidavit described controlled buys of cocaine from Iftakhar in September and October 2018. (State's Mo. Ex. 1, pp. 9-10, 11).

Second, the affidavit showed that Lyles also dealt in CDS. In June 2017, a source told Detective Kevin Hussle that Lyles was involved in selling cocaine. Moreover, Lyles had multiple criminal charges, including for PWID and CDS distribution. (State's Mo. Ex. 1, p. 12)

Third, the affidavit showed that Lyles's and Iftikhar's phones had numerous [*8] contacts with each other. The affidavit also described phone contacts and physical surveillance of the two men, which gave rise to an inference that, on several occasions in September, October, and November, 2018, they visited an apartment complex at 13605 Sir Thomas Way in Silver Spring at the same time:

   . Between August 30, 2018, and October 21, 2018, Lyles's and Iftakhar's phones had 111 contacts, many of which often took place on the same day. These contacts stopped when Iftikhar arrived at Sir Thomas Way, giving rise to the inference that at these times, Iftikhar met face-to-face there with Lyles. (State's Mo. Ex. 1, p. 12).

   . On October 16, 2018, after several contacts between Iftikhar's phone and Lyles's phone, Corporal Jastrzebski [3] observed Lyles ) in the parking lot of 13605 Sir Thomas Way near a gold Chevy Silverado registered to his business (Final Touch Detailing. Corporal Jastrzebski also saw him walk into the building. (State's Mo. Ex. 1, p. 12).

   . On the morning of October 20, 2018, there were four phone calls between Lyles's and Iftikhar's phones during a 45-minute period, after which Iftikhar's [*9] vehicle was seen in the area of 13605 Sir Thomas Way while Lyles's phone briefly visited that area also. (State's Mo. Ex. 1, p. 13).

   . On November 1, 2018, at 8:30 a.m., detectives saw Lyles leave his home, place items in a motorcycle cargo space, drive the motorcycle to 13605 Sir Thomas Way, open the motorcycle cargo space, enter the premises, exit with a white bag, place the bag in the motorcycle cargo space, and drive throughout Maryland. Later in the day, and fewer than five minutes after contact between Lyles's and Iftikhar's phones, Detective Francoeur [4] observed Lyles's gold Silverado parked directly in front of 13605 Sir Thomas Way and a gold Land Rover registered to Iftikhar in the parking lot. Detectives then saw Iftikhar drive the Land Rover out of the parking lot. (State's Mo. Ex. 1, pp. 13-14).

   . On November 2, 2018, after several contacts between Lyles's and Iftikhar's phones, Detective Hussle saw Iftikhar arrive at 13605 Sir Thomas Way, park in the apartment complex lot, and remain in his truck. Five minutes later, Detective Hussle saw Lyles arrive in the apartment complex lot in the gold Silverado [*10] registered to his business. Upon Lyles's arrival, Detective Hussle saw Iftikhar leave his truck, approach Lyles's vehicle, and lean through the open passenger window. Lyles's

---

[3] The affidavit does not disclose Corporal Jastrzebski's first name.

[4] The affidavit does not disclose Detective Francoeur's first name.

driverside door was ajar and he appeared to manipulate something near his waist. Iftikhar returned to his vehicle and drove home, as shown by electronic surveillance, while Lyles entered 13605 Sir Thomas Way. (State's Mo. Ex. 1, pp. 14-15).

Fourth, the affidavit established a connection between Lyles and 13605 Sir Thomas Way: Apartment 13 in that complex is the address supplied to the MVA by Robert Lewis Falls, Jr., a former employee of Lyles's business, Final Touch Detailing. Falls was also listed as a witness to an incident that occurred in September 2008 where Lyles was abducted in Prince George's County. (State's Mo. Ex. 1, p. 15).

Lyles claims that the affidavit did not provide a substantial basis to conclude that Lyles was engaging in criminal activity because it did not allege that Lyles possessed CDS, engaged in an "exchange" with Iftikhar, or exchanged incriminating text messages with Iftikhar. (Appellant's Br. at 17). Contrary to Lyles's claim, the averments that described the affiant's training [*11] and experience provided context for the factual averments that, in turn, established a substantial basis for the conclusion that Lyles's phone calls, movements, and meetings with Iftakhar were not for an innocent purpose, but for the criminal purpose of distributing CDS.

Specifically, the affidavit stated:

. "It is common for traffickers to use vehicles to transport drugs to residences or other structures for the purpose of storage, use, preparing for distribution, and/or sale, as well as to transport large amounts of currency (derived from the sale of CDS) for the purpose of purchase and/or storage." (State's Mo. Ex. 1, p. 6).

. "Drug dealers must use telephones and other forms of communication such as pagers, text messages or email messages, to keep in frequent communication with their criminal associates, including their suppliers and customers . . . ." (State's Motion Ex. No. 1, p. 7).

. "[I]ndviduals involved in the sale of CDS will often utilize locations not associated with them, to store CDS and to prevent its detection by other individuals and Police. These locations are commonly referred to as 'stash houses.'" (State's Mo. Ex. 1, p. 13).

Applying this general [*12] knowledge to his specific observations, Detective Hussle stated: "Because of these previous location records and observations made involving the Sir Thomas Way address, Dfc. Hussle believes that LYLES may be using an apartment in the 13605 Sir Thomas Way address as a stash location which he then utilizes to distribute CDS to IFTIKHAR." (State's Mo. Ex. 1, p. 13). Viewed in light of Detective Hussle's descriptions of drug dealers' habits and methods, including his explanation regarding "stash houses," the factual allegations about Lyles's and Iftikhar's communications and locations provided a substantial basis to conclude that a search of 13605 Sir Thomas Way, storage unit #2, and the gold Chevrolet Silverado would yield evidence of criminal activity.

Other information in the affidavit bolstered the conclusion that Lyles was involved in the distribution of cocaine, and that evidence of this crime would be found in the gold Chevrolet Silverado and in storage unit #2 at 13605 Thomas Way. The Silverado was registered to Lyles's business, Final Touch Detailing, (State's Motion Ex. No. 1, p. 12), and Lyles was observed at or near the vehicle when he was at 13605 Sir Thomas Way. (State's [*13] Motion Ex. No. 1, pp. 12, 14, 15). On November 8, 2018, within a two-

minute time-span, Lyles used keys to open both storage unit #2 and Apartment #13 at 13605 Sir Thomas Way. A half-hour later, he left the premises. (State's Mo. Ex. 1, p. 15). As the suppression judge observed: "Sir Thomas Way is not owned by or leased by the defendant. It is being leased by an individual who was a prior employee of the defendant, so *it does strike me as odd that the defendant would have a key to enter the storage unit for premises that are either leased or owned by someone else*." (T.1 46) (emphasis added). There is a substantial basis, therefore, for the inference that Lyles stored CDS at 13605 Sir Thomas Way, and in particular, in storage unit #2.

Lyles cites only *Agurs v. State*, 415 Md. 62 (2010), in support of his claim that a nexus was lacking. (Appellant's Br. at 17-18). But *Agurs*'s nexus analysis is non-binding because it failed to garner majority support. *See Johnson*, 208 Md. App. at 599-600.

*Agurs* is also distinguishable on its facts because that case involved the search of a residence belonging to a person under investigation and the affidavit there "'described no drug transaction that had any connection with the residence [searched].'" 415 Md. at 88 (quoting this Court's unreported opinion). *Agurs* relied on the "deductive approach, based on reasonable factual assumptions, [*14] [of] a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be *found in the defendant's car or home*." *See Holmes*, 368 Md. at 521 (emphasis added).

Here, there was a strong inference that Lyles and Iftakhar, who had engaged in two controlled sales of CDS, met several times at a location that was *not* Lyles's residence, but was a location listed in the name of Lyles's former employee, and to which Lyles had a key. It was the "odd" circumstance of Lyles's access to an apartment and storage bin owned by someone else that provided substantial evidence of nexus here, not the *Agurs* factors cited by Lyles, (Appellant's Br. at 18), that pertain to the probability that contraband would be found in the suspect's home (drug sale near the suspected dealer's home, drugs on the suspect before the search, and entry and exit to and from the home near the time of the drug sale).

The evidence of criminal activity is also stronger here than in *Agurs*. There, all in one day, police saw Agurs leave his residence, talk on a cell phone, and then meet briefly in a clothing store with an unknown male. Agurs then drove [*15] to an auto detail shop, waited for an hour while talking on his phone and with passers-by, got into the car of a man, from whom police had made controlled CDS buys, and exited the car two minutes later. 415 Md. at 71-72. As a result of these observations (as well as information from confidential informants and financial information), police sought to search Agurs's home. *Id.* at 72-73.

By contrast, in this case, detectives tracked numerous phone contacts over more than two months between Lyles and Iftakhar, from whom they had observed two controlled CDS buys. On four of these occasions, through direct observation or phone-tracking, detectives placed Lyles in the vicinity of 13605 Sir Thomas Way after phone contact with Iftikhar. On three of these occasions, (October 20, November 1, and November 2), detectives also saw Iftakhar there. "Substantial basis" exists here, but not in *Agurs*, because the proffered evidence showed more contacts between Lyles and a confirmed drug dealer and more contacts between a Lyles, a confirmed drug dealer, and the place to be searched than was the case in *Agurs*.

**C. Suppression is unwarranted because police relied on the warrant in objective good** [*16] **faith**.

Finally, even if the district court judge did not have a substantial basis for issuing the warrant, the good-faith exception to the exclusionary rule applies. "Under the good faith doctrine, evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." *State v. Faulkner*, 190 Md. App. 37, 60 (2010) (internal quotation marks omitted). There are only four sets of circumstances under which the good-faith exception does not apply:

> (1) when the judicial officer issuing the warrant was misled by an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) when the magistrate wholly abandoned his judicial role; (3) when a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is facially deficient (e.g., failing to particularize the place to be searched).

*Id.* at 61 (internal quotation marks omitted).

Here, Lyles invokes the third circumstance, arguing, again by analogy to *Agurs*, that the police could not [*17] have reasonably believed that Lyles was involved in drug activity and that there was a sufficient nexus between drug dealing and the locations to be searched. (Appellant's Br. at 18-19). For the reasons already discussed, that assessment is incorrect.

The third exemption from the good-faith doctrine is "intended to deal with warrant applications which [are] nothing beyond mere conclusions and [is] not intended to deal with fuller warrant applications that turn[] out, on further legal examination, to be somehow flawed." *Jenkins*, 178 Md. App. at 203. Whatever flaws may exist in this warrant application-and none stand out-it contains considerably more than "mere conclusions." Given the pattern of communications between Iftakhar, a confirmed drug dealer, and Lyles, and given the pattern of their coincident trips to 13605 Sir Thomas Way and Lyles's drives there in the gold Chevrolet Silvorado, the police could reasonably have believed that the warrant application established probable cause to search the storage unit and the vehicle, and thus acted in good faith in relying on the warrant issued based upon that application. Even if this Court were to hold that the application did not [*18] satisfy the substantial-basis test, suppression is unwarranted because of the officers' good faith reliance.

II.

THE TRIAL COURT SOUNDLY EXERCISED ITS DISCRETION IN DENYING LYLES'S DAY-OFTRIAL REQUEST FOR A POSTPONEMENT TO OBTAIN NEW COUNSEL.

On the day of trial, Lyles sought to discharge defense counsel Thomas Witkop and hire a different lawyer, Tilman Dunbar, in part because of Lyles's dissatisfaction with Mr. Witkop's performance at the suppression hearing four weeks earlier. Mr. Witkop represented that Mr. Dunbar would be available at 1:30 p.m. that afternoon, but predicted he would not be ready to proceed then, as the case involved 800 pages of discovery and 10 witnesses. (T.2 12-13). On Lyles's behalf, Mr. Witkop requested that the court order him discharged and grant a brief postponement of unspecified duration so that Lyles could retain Mr. Dunbar and Mr. Dunbar could "get up to speed." (T.2 6, 11). The court found the motion to discharge non-meritorious, and denied the request for postponement:

>   This case has already been continued twice. The State is prepared to move forward, and I agree with Mr. Witkop that he cannot nor could I imagine that he would be able to [*19] represent that Mr. Dunbar would be ready to represent you today in this trial at 1:30. So I'm not going to continue it for that purpose.

(T.2 18). Lyles proceeded to trial that day, represented by Mr. Witkop.

Lyles does not challenge the trial court's ruling that the motion to discharge counsel was without merit. Rather, he contends that the trial court abused its discretion by denying his request for a postponement of "brief," but unspecified, duration so that, on the very day that trial was scheduled to begin, he could substitute Mr. Dunbar for Mr. Witkop.

Lyles's argument lacks merit. The right to counsel of choice has limits. The trial court did not abuse its discretion in determining that, where Lyles waited to discharge counsel until the day of trial for reasons that arose at the suppression hearnig weeks earlier, postponement so that new counsel could be retained and prepare for trial was not warranted.

"The Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'" *Wheat v. United States*, 486 U.S. 153, 158 (1988). The right to assistance of counsel "'includes the right of [*20] a defendant, who does not require court-appointed counsel, to select the counsel of his or her choosing." *State v. Taylor*, 431 Md. 615, 644 (2013) (quoting *State v. Goldsberry*, 419 Md. 100, 117-18 (2011)).

However, the defendant's right to counsel of choice is a limited right. The Supreme Court has made clear that a trial court is afforded "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar" and retains discretion to "make scheduling and other decisions that effectively exclude the defendant's first choice of counsel." *United States v. Gonzales-Lopez*, 548 U.S. 140, 152 (2006). In *Morris v. Slappy*, 461 U.S. 1 (1983), the Supreme Court observed that scheduling criminal trials requires reconciling a number of logistical challenges, and trial courts must be afforded broad discretion to deny continuances in light of such realities:

>   Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; [*21] *only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel*.

*Id.* at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)) (emphasis added).

Professor LaFave has noted that, in balancing the right to counsel of choice against the trial court's broad discretion in controlling its calendar, there are several factors that merit consideration, such as the following:

>   (1) whether the request came at a point sufficiently in advance of trial to permit the trial court to readily adjust its calendar; (2) the length of the continuance requested; (3) whether the continuance would carry the trial date beyond the period specified in the state speedy trial act; (4) whether the court had granted previous continuances at defendant's request; (5) whether the continuance would

seriously inconvenience the witnesses; (6) whether the continuance request was made promptly after the defendant first became aware of the grounds advanced for discharging counsel; (7) whether the defendant's own negligence placed him in a situation where he needed a continuance to obtain new counsel; (8) whether the defendant had some legitimate [*22] cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation; (9) whether there was a "rational basis" for believing that defendant was seeking to change counsel "primarily for the purpose of delay"; (10) whether the current counsel was prepared to go to trial; and (11) whether denial of the motion was likely to result in "identifiable prejudicial to the defendant's case of a material or substantial nature."

Wayne R. LaFave, *et al., Criminal Procedure* § 11.4(c), at 718-20 (3d ed. 2007 & 2009-10 Supp.) (footnotes omitted).

In accordance with all of the above, the Court of Appeals has admonished "that the right to counsel does not give an accused the unfettered right to discharge current counsel and demand different counsel shortly before or at trial." *Taylor*, 431 Md. at 645. "The presumption in favor of a defendant's counsel of choice may be balanced against the demands of the court's calendar, namely, the need for an orderly administration of criminal justice." *Id.* (internal quotations omitted). The Court in *Taylor* concluded:

> While a defendant's fundamental right to counsel of choice ordinarily enjoys a strong presumption, the [*23] trial court is not required to submit to this qualified constitutional right when, as here, it finds the defendant provides no meritorious reason under Md. Rule 4-215(e) for his request to substitute counsel, and the 'demands of the court calendar' did not allow for further delay.

*Id.* at 646.

The grant or refusal of a request for a continuance is a matter entrusted to the sound discretion of the trial court, and will not be overturned on appeal absent an abuse of that discretion. *Abeokuto v. State*, 391 Md. 298, 329 (2006). The burden of demonstrating "a *clear* abuse of discretion" is on the party challenging the ruling. *Taylor*, 431 Md. at 646 (quoting *State v. Frazier*, 298 Md. 422, 452 (1984) (emphasis in *Taylor*)).

Here, the trial court soundly exercised its discretion in denying Lyles's last-minute request for a postponement, after considering the extent to which the orderly administration of justice would be frustrated by granting the postponement against the court's finding that Lyles lacked any meritorious reason for his request to substitute counsel in the first place.

Mr. Witkop entered his appearance on March 4, 2019. (R. Docket Entries). Lyles's trial was originally scheduled for June 26, 2019, but was postponed [*24] first at Lyles's instance to August 7, 2019, and then at the State's instance to August 27, 2019, three days before the *Hicks* date. (R. Docket Entries, T.2 7). Lyles's motion to suppress was heard on July 26, 2019. (R. Docket Entries).

Lyles's last-minute request to discharge Mr. Witkop had two ostensible bases: Lyles's disappointment with Mr. Witkop's performance at the suppression hearing, and his general feeling of discomfort with Mr. Witkop's representation. (*See* T.2 7-8, 13). Lyles admitted that he complained to Mr. Witkop about his performance at the suppression hearing a week or two weeks before the trial date. (T.2 7-8, 13). Even so, by the day of trial, Lyles had not retained Mr. Dunbar, ascertained when he could arrive in the courthouse, or when he could be prepared for trial. *See Miller v. Blacketter*, 525 F.3d 890, 896-97 (9th Cir. 2008)

(holding that right to counsel of choice was not violated by denial of postponement request made on the morning of trial where no substitute counsel had been retained, and "it was unclear how much time a new attorney, once hired, would have needed to prepare for [trial].").

Moreover, Lyles's argument that "there were no civilian witnesses who would have been inconvenienced [*25] by the postponement," (Appellant's Br. at 23), leaves unmentioned the *eleven* law enforcement and forensic witnesses, eight of whom were in the courthouse on the trial date, who *would* be inconvenienced were trial postponed. Lyles's argument also leaves unmentioned that four of the eleven law enforcement and forensic witnesses (Sergeant Brad Cornwall, Detective David Metzler, forensic specialist Adrienne Hill, and Detective Hussle) were from outside Montgomery County.[5]

Where Lyles lacked any meritorious reason for his request to seek substitute counsel on the morning of trial, and where the reason he proffered for his request arose several weeks prior, the trial court soundly exercised its discretion in denying Lyles's request for an unspecified postponement The judgment below must therefore be affirmed.

III.

THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION IN REFUSING TO REQUIRE THE RECITATION OF OUTDATED PHRASES AS A CONDITION PRECEDENT TO ADMITTING EXPERT TESTIMONY.

DNA analyst Chandra Christenson testified [*26] that Lyles was a major contributor to certain mixed DNA profiles obtained from swabs that she had been asked to test. (T.2. 170-73). In response to the prosecutor's question whether "[t]he opinions and conclusions you just testified to, do you hold those opinions within a reasonable degree of scientific certainty?" Christenson stated: "That phrasing is no longer recommended for use in courts." (T.2 179). Christenson explained that the currently recommended phrasing is that "my opinions and conclusions were made through my training, knowledge and experience." (T.2 179-80).

Lyles objected to admission of Christenson's report, and asked that her testimony be stricken, on the ground that "talismanic language" that an opinion is to a "reasonable degree of scientific certainty" is a necessary foundation for admission. (T.2 181-82, T.3 122-27). The trial court overruled Lyles's objection, (T.2 183), and later declined to reconsider its ruling. (T.3 130). The trial court reasoned that use of the phrase "to a reasonable degree of certainty" is but one way to assure that scientific evidence is not "speculative," and that Christenson's statistical results and conclusions showed that her opinions [*27] were not speculative. (T.3 128-29). The trial court soundly exercised its discretion in admitting Christenson's expert testimony and report.

The admission of scientific opinion testimony is governed by Rule 5-702. That rule reads, in its entirety:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an

---

[5] Ms. Hill testified regarding work she did as a Montgomery County employee. At the time of trial, however, she was employed by the U.S. Capitol Police. (T.3 5).

expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Md. Rule 5-702 (Westlaw). The phrase "reasonable degree of scientific certainty" appears nowhere in the Rule.

Trial judges are "given broad discretion in ruling on the admissibility of expert testimony." *Simmons v. State*, 313 Md. 33, 43 (1988). "Seldom will the decision in this regard constitute grounds for reversal." *Id. See also Massie v. State*, 349 Md. 834, 850 (1998) (Rule 5-702 "[v]ests trial judges with wide latitude in deciding whether to qualify [*28] a witness as an expert or to admit or exclude particular expert testimony"). "An expert's testimony is admitted because it is based on his special knowledge derived not only from his own experience, but also from the experiments and reasoning of others, communicated by personal association or through books or other sources. It is sufficient if the court is satisfied that the expert has in some way gained such experience in the matter as would entitle his evidence to credit." *Levitas v. Christian*, 454 Md. 233, 245-46 (2017) (cleaned up).

As DNA analyst Christenson explained, forensic scientists have discontinued use of the phrase "reasonable scientific certainty." Indeed, on March 22, 2016, the National Commission on Forensic Science recommended that this misleading phrase-not routinely used in the scientific community-no longer be used by forensic scientists testifying as expert witnesses:

> It is the view of the National Commission on Forensic Science (NCFS) that legal professionals should not require that forensic discipline testimony be admitted conditioned upon the expert witness testifying that a conclusion is held to a "reasonable scientific certainty," a "reasonable degree of scientific certainty," [*29] or a "reasonable degree of [discipline] certainty." The legal community should recognize that forensic scientists, medical professionals and other scientists do not routinely use "to a reasonable scientific certainty" when expressing conclusions outside of a courtroom context. Forensic science service providers and forensic science medical providers should not endorse or promote the use of this terminology. The Commission recognizes the right of each jurisdiction to determine admissibility standards but expresses this view as part of its mandate to "develop proposed guidance concerning the intersection of forensic science and the courtroom."

National Commission on Forensic Science, Views of the Commission, Use of the Term "Reasonable Scientific Certainty," p.1, available at https://www.justice.gov/archives/ncfs/page/file/1004481/download (last visited June 9, 2020). [6] The Commission reviewed the historic background of the use of the "reasonable degree of certainty" terminology and concluded: "The modern view recognizes that the term is not required as a condition of admitting expert evidence." *Id.* at p. 2 (citing cases); *see also* Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty*," 57 Md. L. Rev. 380 (1998).

In response to the recommendation of the National Commission on Forensic Science, the Department of Justice, on September 6, 2016, instructed Department forensic laboratories to ensure that forensic

---

[6] This Court may take judicial notice of this and the other government documents cited. Md. Rule 5-201(b)(1) (Westlaw) (providing that court may take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably [*30] be questioned").

examiners would not use expressions such as "reasonable scientific certainty" in their reports or testimony. The Department also and instructed its prosecutors to abstain from use of those expressions when presenting forensic reports or questioning forensic experts in court unless required by a judge or applicable law. Loretta Lynch, Memorandum for Heads of Department Components re: "Recommendations of the National Commission on Forensic Science," available at https://www.justice.gov/opa/file/891366/download (last visited June 9, 2020).

It appears, therefore, that DNA analyst [*31] Christianson's description of her conclusions as based on her "training, knowledge and experience," without use of the phrase "to a reasonable scientific certainty" is consistent with best practices in the forensic community and sufficient for admissibility in jurisdictions outside Maryland. Lyles claims that, in Maryland, the talismanic phrase a "reasonable degree of scientific certainty" is, nevertheless, a required predicate for admission of an expert opinion. In support of his claim, Lyles block-cites quotations from *Reiss v. American Radiology Services*, 241 Md. App. 316, *cert. granted*, 466 Md. 217 (2019), and *State v. Norton*, 443 Md. 517 (2015).

Lyles's reliance on these cases is misplaced. The issues presented in *Reiss* and *Norton* have nothing to do with the issue in this case: *admissibility* of expert testimony. And, viewed in context of the cases upon which *Reiss* and *Norton* rely, the two block quotations do not stand for the proposition for which Lyles cites them.

The issue in *Reiss* was whether, in a medical malpractice action, certain expert testimony, whose admissibility was not challenged, satisfied the defendants' burden of production on their defense of non-party medical negligence. Although [*32] this expert testimony was critical of the non-party physicians, no expert testified that, to a reasonable degree of medical probability, these non-party physicians breached the standard of care. 241 Md. App. at 336. This Court held that the defense of non-party medical negligence was not generated without expert testimony, to a reasonable degree of medical probability, that the non-party breached the standard of care. *Id.* at 342.

As Lyles's block-cite of *Reiss* shows, the *Reiss* court followed *Karl v. Davis*, 100 Md. App. 42 (1994), also a medical malpractice case that considered the quantum of evidence necessary to generate the issue of breach of the applicable standard of care. In *Karl*, the plaintiff relied exclusively on the deposition of a physician whose opinions "failed to reflect that the standard he was applying was within a reasonable degree of medical probability," and indeed, in most instances, gave "*no* indication" as to what standard he was applying to his opinions. *Id.* at 53 (emphasis in original). This Court concluded that the expert's testimony was insufficient to establish that the defendant breached the appropriate standard of care. *Id.*

In analyzing the expert's testimony, [*33] the *Karl* court observed: "There is no appellate court opinion in Maryland that has held that the mantra 'within a reasonable degree of medical probability' is absolutely required before each and every medical expert opinion," *Id.* at 52. To be sure, the court also quoted Judge Murphy's *Maryland Evidence Handbook*, § 1404 (2d ed. 1993): "It is understood, however, that '[t]hese wooden phrases are required *to make sure that the expert's opinion is more than speculation or conjecture*.'" *Id.* at 52 (emphasis added). The *Karl* court's explanation of the governing policy makes clear that, in quoting Judge Murphy, it did not reinstate a certification requirement for admissibility of an

expert opinion. [7] Rather, by providing in the next sentence that "expert testimony based upon anything less than [*34] a reasonable degree of probability *may* be properly excluded," *id.* at 52-53 (emphasis added), the *Karl* court taught that the decision is confided to the judge's discretion, and that that discretion should be used to exclude only opinion based on conjecture, but not all opinion without the imprimatur of a particular talismanic phrase.

Unlike *Reiss* and this case, the issue in *Norton* concerned neither the admissibility nor the weight of expert testimony. Rather, *Norton* considered whether the expert opinion, set forth in a Forensic DNA Case Report, was "testimonial" for purposes of the Sixth Amendment. 443 Md. at 524. In the context of holding that the Report was "testimonial" within the meaning of Justice Thomas's opinion in *Williams v. Illinois*, 567 U.S. 50 (2012), the Court of Appeals, in dictum, used the language upon which Lyles relies:

> Under the paradigm so articulated, the Forensic DNA Case Report at issue in the instant case is testimonial. With respect to Justice Thomas's formality inquiry, the Report contains a certification in the phrase "within a reasonable degree of scientific certainty". The inclusion of such language, "within a reasonable degree of scientific certainty", [*35] in a DNA report identifying a match between a defendant's profile with that of a perpetrator is key to the acceptance of the expert's testimony into evidence in Maryland. *Young v. State*, 388 Md. 99, 120, 879 A.2d 44, 56 (2005). Without this language certifying the result, the testimony is without foundation. *Id.* The phrase, then, of "within a reasonable degree of scientific certainty", constitutes such "talismanic words" that, without them, the testimony cannot cross the threshold of acceptance by the judge as gatekeeper. *See Mayor & City Council of Baltimore v. Theiss*, 354 Md. 234, 261, 729 A.2d 965, 980 (1999) (Rodowsky, J., concurring).

*Norton*, 443 Md. at 548-49 (footnote omitted).

Lyles's claim that this passage in *Norton* supports required use of the phrase "to a scientific certainty" is undercut by the two cases that this passage cites: *Young v. State*, 388 Md. 99 (2005), and *Mayor & City Council of Baltimore v. Theiss*, 354 Md. 234 (1999). In *Young*, a sexual offense prosecution, the trial court admitted the testimony of an expert that, "to a reasonable degree of scientific certainty," the defendant's DNA profile "matched" DNA from a swab of the victim's rectal area. 388 Md. at 101-04. On appeal, Young complained that the foundation for admission of this evidence was inadequate where [*36] the expert, unlike DNA analyst Christenson, provided no probability statistics to accompany and support his conclusion. *See id.* at 102, 105. The Court of Appeals rejected that claim, holding that, as a result of advances in DNA analysis technology, DNA matches reach such a "level of infinitesimalness," *id.* at 116, that a conclusion "to a reasonable scientific certainty" adequately substitutes for contextual statistics:

> We conclude that scientific advances in DNA profiling enable an examiner employing particular methods and analyzing genetic markers at a sufficient number of loci to testify, to a reasonable degree of scientific certainty, to the source of the DNA evidence. We hold that in such circumstances, as in the instant case, the expert is not required to accompany his "match" testimony with contextual statistics.

---

[7] Indeed, Judge Murphy did not advocate a required certification. In the paragraph following the sentence quoted in *Karl*, Judge Murphy recognized that the "failure to include th[e] talismanic language ["to a reasonable degree of medical probability"] *should not make the expert's opinion inadmissible*." J. Murphy, *Maryland Evidence Handbook*, § 1404 at 649 (4th ed. 2010) (emphasis added).

*Id.* at 105.

Conversely, the concurring opinion of Judge Rodowsky in *Theiss* cited by the *Norton* Court states that: "An expert opinion that is not rendered with reasonable certainty or reasonable probability *is not necessarily inadmissible*. For example, the opinion may be admissible when, *in conjunction with additional evidence*, the combination amounts to sufficient [*37] probable proof of causation." 354 Md. at 262 (emphasis added). In reaching this conclusion, Judge Rodowsky articulated the same principles the *Karl* court set forth. Although in Maryland, "expert medical witnesses are not required to render their opinions with the talismanic words 'reasonable medical certainty' or 'reasonable medical probability' in order for the opinion to be admissible," expert opinion evidence on issues like causality and damages "must be sufficiently probable *and not be based on speculation or conjecture*." *Id.* at 261-62 (emphasis added).

Viewed in light of the cases upon which *Reiss* and *Norton* rely, DNA analyst Christenson's testimony and report were properly admitted because she set forth the statistical bases for her conclusions. These statistical bases showed that her opinions were more than mere "speculation or conjecture." As the trial court explained:

> And how do we know how sure she is? Because the probability of an unrelated individual matching this profile for No. 1-A-1 is 1 in 130 million, or 1 in 6.6 septillion, or 1 in 13 nonillion. And it goes on. So to me, the point of that statistical analysis is to tell us we're really sure. And that, [*38] to me, says that these opinions are not speculative. And it functions instead of the wooden phrase. It satisfies the same need instead of the wooden phrase.

(T.3 130).

The trial court's exercise of discretion was correct, (or alternatively harmless error), for a second reason. Although DNA analyst Christenson declined to use the phrase "reasonable degree of scientific certainty," when asked to endorse her findings with that phrase, she did not deny her conclusions were reached to a "reasonable degree of scientific certainty." Rather, her explanation of her word choice shows that, while she eschewed outdated and meaningless verbiage, her certification that her "opinions and conclusions were made through [her] training, knowledge and experience," (T.2 24), was equivalent or superior to the phrase "reasonable degree of scientific certainty." Particularly where eminent scientific authority now discourages use of phrases like "to a reasonable scientific certainty," this Court should hold that the foundation for admission of expert opinion evidence is satisfied under Rule 5-702 where the witness sets forth the training, scientific knowledge, and experience underlying her opinion. By [*39] explaining her methodology, and providing the statistical analysis that supported her conclusions, Christenson did so here. Accordingly, the trial court properly exercised it discretion to admit Chirstenson's testimony and report under Rule 5-702.

CONCLUSION

The State respectfully asks the Court to affirm the judgment of the Circuit Court for Montgomery County.

Dated: June 19, 2020

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

BRENDA GRUSS
Assistant Attorney General
CPF No. 0512120009

Counsel for Appellee

CERTIFICATION OF WORD COUNT AND COMPLIANCE WITH THE MARYLAND RULES

This filing was printed in 13-point Century Schoolbook font; complies with the font, line spacing, and margin requirements of Maryland Rule 8-112; and contains 7,383 words, excluding the parts exempted from the word count by Maryland Rule 8-503.

*/s/ Brenda Gruss*
BRENDA GRUSS
Assistant Attorney General
CPF No. 0512120009

Counsel for Appellee

**CERTIFICATE OF SERVICE**

In accordance with Maryland Rule 20-201(g), I certify that on this day, June 19, 2020, I electronically filed the foregoing "Brief of Appellee" using the MDEC System, which sent [*40] electronic notification of filing to all persons entitled to service, including Amy E. Brennan, Assistant Public Defender, Appellate Division, William Donald Schaefer Tower, 6 Saint Paul Street, Suite 1302, Baltimore, Maryland 21202.

*/s/ Brenda Gruss*
BRENDA GRUSS
Assistant Attorney General
CPF No. 0512120009

Counsel for Appellee

**End of Document**