## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

-------------------------------------------------------X

DONALD S. WILLEY and THE SECOND
AMENDMENT FOUNDATION,

           Plaintiffs,                        Case No.: 1:23-cv-2299

       -against-                       **<u>AMENDED COMPLAINT</u>**

ANTHONY G. BROWN, in his
official capacity as Attorney General of
Maryland, DORCHESTER COUNTY,           **Jury Trial Demanded**
Maryland, SUSAN E. WEBB, personally
and in her official capacity as Director of
Planning & Zoning for Dorchester County,
Maryland, and JAMES W. PHILLIPS, JR.,
personally and in his official capacity as
Sheriff of Dorchester County, Maryland,

           Defendants.

-------------------------------------------------------X

       Plaintiffs, Donald S. Willey ("Willey") and The Second Amendment Foundation ("SAF"),

by and through their attorneys, bring this action against Defendants Anthony G. Brown ("Brown"),

as Attorney General ("AG") of Maryland, Dorchester County, Susan E. Webb, personally and as

Director of Planning & Zoning for Dorchester County ("Webb"), and James W. Phillips, Jr.,

personally and as Sheriff of Dorchester County ("Phillips"), and allege as follows:

## <u>INTRODUCTION</u>

       1.     "Red flag laws"—which lack any "distinctly similar" or "relevantly similar"

historical analogue, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131-32 (2022),

and which did not exist until 1999—authorize a state *civil* court, upon commencement petition by

a law enforcement officer or private citizen, to issue an *ex parte* **<u>Warrant</u>** ("RFL Warrant")

(a) directing the respondent named in the petition to immediately surrender to law enforcement all firearms and ammunition owned or otherwise possessed by the respondent; (b) prohibiting the respondent from purchasing or possessing firearms or ammunition for the duration of the RFL Warrant; and (c) directing law enforcement to serve and enforce the RFL Warrant. If the respondent does not comply with the RFL Warrant, law enforcement will seize the respondent's firearms and ammunition anyway, and the respondent will face arrest and severe criminal penalties including imprisonment, fines, or both.

2.      Maryland's red flag law (the "Maryland RFL" or the "RFL") (a) violates the Fourth Amendment to the United States Constitution because the RFL authorizes state District Court commissioners and judges to issue RFL Warrants, defined in Maryland as "extreme risk protective orders" ("ERPOs" or an "ERPO"), on a standard **less than "probable cause"** called "**reasonable grounds**," (b) violates the Fourth Amendment for the separate reason that, unlike other laws authorizing searches and seizures, the RFL authorizes searches and seizures based upon finding of a subjective and undefined forbidden *personal characteristic* of the targeted individual (being a **"danger"**), rather than upon the objective and defined metric of *an alleged underlying violation of one or more laws*; and (c) violates the Second Amendment to the United States Constitution because the RFL has no historical analogue.

3.      In 1999, Connecticut enacted the nation's first red flag law, joined only by Indiana in 2005. This changed when nineteen other states and the District of Columbia frantically rushed to enact their own red flag laws from 2014 to 2023, all of them conceptually identical and structurally similar. Maryland joined the frantic rush and enacted the RFL in 2018. (2018 Maryland HB 1302,[1] codified at Md. Code Ann., Pub. Safety §§ 5-601 *et seq*.). In addition, the Department

---

1  https://mgaleg.maryland.gov/2018RS/chapters_noln/Ch_250_hb1302E.pdf

of Justice published model red flag legislation on June 7, 2021.[2]

4.      The knee-jerk burst of copycat red flag legislative activity over the last decade was fueled substantially by the non-empirical belief espoused by many gun control proponents that red flag laws could be used to identify and stop would-be mass shooters. However, this belief is inherently Orwellian, since red flag laws authorize seizure and punishment for conduct that *hasn't* occurred but that the government predicts *could* occur at an unknown place and time in the future.

5.      Until the advent of red flag laws, predictive seizure and punishment were limited to dystopian science fiction, perhaps most notably in the widely acclaimed 2002 Steven Spielberg film *Minority Report*, in which "Precrime," a specialized police department and its Chief (Tom Cruise), apprehend criminals by use of "foreknowledge" provided by three unquestioned and purportedly infallible psychics called "precogs."

6.      Red flag laws function on the same principle as *Minority Report*—prediction of dangerousness. But, unlike the fictional and purportedly infallible "Precrime" unit, real courts don't have the benefit of "precogs" to predict the future. Ironically, the *Minority Report* principle was articulated during a March 23, 2018 videorecorded debate on HB 1302 in the Maryland Senate, when the Bill's sponsor, then-Delegate Geraldine Valentino-Smith (D), admitted that dan"[i]t's the respondents *possible* actions that we are worried about."[3]  (Emphasis added).

7.      The RFL turns the Maryland Court system into a modern-day Star Chamber by authorizing the infliction of arbitrary seizure and punishment on less than "probable cause" in order to stop *possible* conduct. This Star Chamber reality was foreshadowed during the aforementioned videorecorded debate, when Valentino-Smith—questioned by a colleague who

---

2  https://www.justice.gov/opa/pr/justice-department-issues-proposed-rule-and-model-legislation-reduce-gun-violence
3  https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* remarks at 2:51:54).

expressed concerns that RFL respondents would be forced to prove a negative (that they are not dangerous), shockingly asserted that RFL respondents would bear the burden of proof: "Well, then they're [RFL respondents] going to have to prove why they're *not* based on the evidence presented."[4] (Emphasis added). This was no mistake: several minutes later, Valentino-Smith again asserted that "you [RFL respondents] have to convince a court that you're not [dangerous]."[5] Valentino-Smith's brazen assertions were evocative of colonial Massachusetts's infamous Salem Witch Trials, at which

> [i]t was virtually impossible to disprove charges of witchcraft . . . and defendants were convicted with no evidence other than personal accusations, the presence of a 'devil's mark' on their bodies, or because they failed one of the so-called 'witch tests.' " *See, e.g.*, Elizabeth R. Purdy, *Salem Witch Trials*, The First Amendment Encyclopedia Presented By The John Seigenthaler Chair of Excellence In First Amendment Studies at Middle Tennessee State University.[6]

8.    The unconstitutionality of the Maryland RFL is illustrated by the disturbing story told in this Amended Complaint about Webb's weaponization of the RFL against Willey through the artifice of a false RFL petition—a story which, unlike the fictional *Minority Report*, is completely true. This cautionary tale about the perils of an unconstitutional law wielded by an abusive and dishonest public official, proves the old adage that truth is sometimes stranger than fiction, even fiction as strange as *Minority Report*.

9.    Webb's false RFL Petition against Willey—a decorated combat veteran who selflessly served the United States of America as a Marine with distinction and honor for over twenty-five years across multiple tours of duty—was ultimately dismissed, but the damage had already been done: as a result of Webb's false RFL Petition, a state District Court judge issued an

---

4 https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* exchange beginning at 2:40:53).
5 https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* remarks at 2:51:23).
6 https://www.mtsu.edu/first-amendment/article/1098/salem-witch-trials

ERPO against Willey based upon the unconstitutional "**reasonable grounds**" standard and a finding of the subjective and undefined forbidden personal characteristic of being a "**danger.**" Next, Phillips's deputies served the ERPO on Willey at his home, leaving Willey with no realistic choice except to surrender to the state's show of authority by handing over his firearms and ammunition, on pain of arrest and criminal penalties. The deputies, invoking a related provision of the RFL, then forced Willey to endure an involuntary, torturous, and traumatizing mental health evaluation at a local hospital.

10.     During this Kafkaesque ordeal, Willey experienced deprivation of his fundamental and clearly established constitutional rights, and basic human dignity; and the ordeal also demonstrated that the Maryland RFL unquestionably infringes upon the fundamental and clearly established constitutional rights of *all* individuals who own or otherwise possess firearms in Maryland, by (a) authorizing seizures of their firearms and ammunition upon **less than "probable cause,"** (b) separately, authorizing seizures of their firearms and ammunition based upon finding of a subjective and undefined forbidden personal characteristic (being a "**danger"**), rather than upon the objective and defined metric of an alleged underlying violation of one or more laws, and (c) by infringing upon their right to keep and bear arms in a manner without historical analogue.

11.     And, as Valentino-Smith and her colleagues failed to recognize: "More than just 'model citizen[s]' [such as Willey] enjoy the right to bear arms." *United States v. Daniels*, No. 22-60596 at *7 (5th Cir. August 9, 2023) (quoting *United States v. Rahimi*, 61 F. 4th 443, 453 (5th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2132), *cert. granted* No. 22-918, 2023 U.S. LEXIS 2830 (June 30, 2023).

12.     The Maryland RFL is unconstitutional as applied to Willey and unconstitutional on its face. Accordingly, Plaintiffs bring this challenge to vindicate their rights under the Second, Fourth, and Fourteenth Amendments to the United States Constitution, and to immediately and

permanently enjoin enforcement of the RFL as required to conform to the Constitution's text as informed by our Nation's history and tradition.

## PARTIES

13.     Plaintiff Willey is a sixty-four-year-old natural person and a citizen of the United States, residing in Fishing Creek, Maryland, an unincorporated community in Dorchester County located on Upper Hoopers Island in the Chesapeake Bay, where Willey's ancestors worked for generations in the crabbing industry. Willey has no history of contact with the justice system, other than in relation to the pattern of harassing nuisance and zoning citations and violations issued by County officials as described below, has never been adjudicated as a mental defective or committed to a mental institution, and is otherwise lawfully permitted to own and possess firearms and ammunition, and is in fact a lawful owner of numerous firearms and corresponding ammunition. He is a certified antique firearms collector and holds a lawfully issued Maryland wear and carry permit. Willey is also a decorated combat veteran who served the United States Marine Corps for over 25 years, concluding with an honorable discharge. He served multiple tours of duty, including Operations Desert Storm and Desert Shield. By way of his training in the Marine Corps and subsequent combat experience, Willey developed substantial expertise in the safe handling and use of firearms and served as a marksmanship instructor. Willey is a lifetime member of SAF. (True and accurate copies of photographs of Willey in uniform, his Marines rifle and pistol expert awards, and other awards earned by Willey are attached hereto as **Exhibit A**).

14.     Plaintiff SAF is a 501(c)(3) nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutional right to keep and bear arms, to possess firearms and firearms ammunition, and the consequences of gun control. SAF has over 720,000

members and supporters nationwide, including thousands of members in Maryland. SAF brings this action on behalf of those members, which include Willey. SAF's members are adversely and directly harmed by Defendants' enforcement of the laws challenged herein.

15.     Defendant Brown, sued in his official capacity, is the AG of Maryland, having assumed office on January 3, 2023. Brown is the chief legal officer of Maryland and supervises the AG's Office, which is responsible for enforcing and upholding Maryland's laws, including the RFL and its derivative regulations, policies, procedures, enforcement practices, customs, and forms. As stated on the AG's website, "[i]n all matters in which the interests of the State of Maryland are involved, the [AG] and assistant [AGs] represent the State."[7]

16.     Defendant Dorchester County is a county and governmental subdivision of Maryland, and employs Webb and Phillips, and their subordinates.

17.     Defendant Webb, sued personally and in her official capacity, is the Director of Planning and Zoning for Dorchester County, having assumed office in October 2020. Webb supervises the Office of Planning and Zoning, and is the County's final policymaker with respect to enforcement of the nuisance and zoning provisions of the County Code.

18.     Defendant Phillips, sued personally and in his official capacity, is the Sheriff of Dorchester County, having assumed office in 2002. Phillips supervises the County Sheriff's Office, which operates within the Judicial Branch, and is the County's final policymaker with respect to enforcement of Maryland's criminal laws and certain civil laws, such as the RFL.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28

---

[7]   https://www.marylandattorneygeneral.gov/Pages/About.aspx

U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

20.     This action, based on violations of the constitutional rights of Plaintiffs and all Maryland citizens, arises under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, damages, and fees and costs under 42 U.S.C. § 1988.

21.     This Court has personal jurisdiction over the individual Defendants since they are Maryland state or local officials in this District, and over Dorchester County as a governmental subdivision of Maryland.

22.     Venue is proper under 28 U.S.C. § 1391(b)(1), because all Defendants are residents of the state and federal District of Maryland; or, alternatively, under 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The Maryland RFL

#### a.  Background

23.     On April 24, 2018, then-Maryland Governor Larry Hogan signed the RFL into law (HB 1302, codified at Md. Code Ann., Pub. Safety §§ 5-601 *et seq*.), effective October 1, 2018.

24.     The Maryland RFL defines an ERPO as "a civil interim, temporary, or final protective order issued in accordance with this subtitle." (Md. Code Ann., Pub. Safety § 5-601(c)).

25.     The RFL allows a wide range of individuals to petition for an ERPO, defining the term "petitioner" to encompass medical providers, law enforcement officers, spouses, family members, co-parents, dating or intimate partners, cohabitants, and guardians. (*Id*. § 5-601(e)(2)).

26.     An ERPO petition must "be signed and sworn to by the petitioner under the penalty of perjury" (*Id*. § 5-602(a)(1)(i)), and "include information known to the petitioner that the

respondent poses an immediate and present **danger** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm" (*Id*. § 5-602(a)(1)(ii)) (bold and underline added), together with supporting facts (*Id*. § 5-602(a)(1)(iii)), the basis for such facts (*Id*. § 5-602(a)(1)(iv)), and supporting documents or information regarding "unlawful, reckless, or negligent use, display, storage, possession, or brandishing of a firearm by the respondent," violent acts or threats, any violation of a peace order or protective order, or abuse of controlled substances or alcohol (*Id*. § 5-602(a)(1)(vi)), together with a description of "the number, types, and location of any known firearms believed to be possessed by the respondent (*Id*. § 5-602(a)(1)(v)).

27. ERPO petitions must be filed with the court clerk of a state District Court, or, when the court clerk's office is closed (after hours, or during holidays or weekends), with a state District Court commissioner (judicial officer). (*Id*. § 5-602(b)).

28. Following Governor Hogan's signing of HB 1302, Maryland court officials created a form to be used by petitioners, known as "Form DC-ERPO-001 (10/2018), Petition for Extreme Risk Protective Order (Public Safety Title 5, Subtitle 6)" ("Form DC-ERPO").

29. Within the first ten months of the Maryland RFL effective date (October 1, 2018), 788 petitions were filed statewide, with over 400 granted. *See* Sheriff Darren M. Popkin, *Montgomery County Sheriff's Office – Estimates of Extreme Risk Protective Orders – Md. Code, Public Safety Article § 5-601-610* (August 5, 2019).[8]

30. According to *The Baltimore Sun*, as of October 2020 (by which point twenty jurisdictions had enacted red flag laws), "[a]djusted per capita and per day in effect, Maryland courts [had] issued the second most [RFL Warrants] out of the wave of states that [had]

---

8  https://opendata.maryland.gov/Demographic/Choose-Maryland-Compare-Counties-Demographics/pa7d-u6hs/data

implemented similar laws since 2016 . . . ."[9]  Furthermore:

> In the two years since the law took effect on Oct. 1, 2018, Maryland courts have granted 989 extreme risk protective orders, an average of about 8.2 orders per year 100,000 residents. Only Florida has used it more, about 9.4 orders per 100,000 residents. Maryland has used it twice as much as the next-highest state, New Jersey.[10]

31.     Subsequently, Maryland Courts compiled detailed ERPO statistics categorized by judicial district for every month in 2021[11]  and 2022.[12]  These statistics demonstrate that Maryland operates a veritable "red flag assembly line" that functions on a scale second only to Florida, as ERPO petitions were filed at a rate of over two per day in both years with over 1000 combined Interim and Temporary ERPOs issued each year (the "Red Flag Assembly Line"). Indeed, in 2021, 754 ERPO petitions were filed, resulting in 540 Interim ERPOs and 554 Temporary ERPOs issued statewide.  In 2022, 741 ERPO petitions were filed, resulting in 508 Interim ERPOs and 548 Temporary ERPOs issued statewide. As per the statutory language of the RFL, *all* of these ERPOs issued on the Red Flag Assembly Line were issued upon less than "probable cause" and upon the characteristic of being a "danger".

**b. Interim ERPOs**

32.     Interim ERPOs, which "prohibit the respondent from possessing a firearm," are issued by state District Court commissioners after ordinary business hours, or during holidays or weekends, *without a hearing and without the respondent present*:

> if the commissioner finds that there are **<u>reasonable grounds</u>** to believe that the respondent poses an immediate and present **<u>danger</u>** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm. (*Id*. § 5-603(a)(1)) (bold and underline added).

---

9   https://www.baltimoresun.com/politics/bs-md-pol-red-flag-extreme-risk-erpo-maryland-20201022-piawdaqnbffv7etagy2lhqaopq-story.html
10  *Id*.
11  https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2021.pdf
12  https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2022.pdf

33.     An Interim ERPO shall:

(i) order the respondent to surrender to law enforcement authorities any firearm and ammunition in the respondent's possession; and (ii) prohibit the respondent from purchasing or possessing any firearm or ammunition for the duration of the interim [ERPO]. (*Id*. § 5-603(a)(3)).

34.     In addition to the seizure of firearms and ammunition via Interim ERPO, § 5-603 contains a provision vesting the commissioner and law enforcement with the discretion to subject the respondent to an involuntary mental health evaluation; critically, unlike seizure of firearms and ammunition, which occurs pursuant to the vague "reasonable grounds" standard, evaluation occurs pursuant to the constitutional standard of "probable cause":

If, based on the petition, the commissioner finds **probable cause** to believe that the respondent meets the requirements for emergency evaluation under [Maryland Code Health – General], the commissioner shall refer the respondent to law enforcement for a determination of whether the respondent should be taken for an emergency evaluation. (*Id*. § 5-603(a)(4)) (bold and underline added).

35.     An Interim ERPO must provide notice to respondent in that it "shall state the date, time, and location for a [Temporary ERPO] hearing and a tentative date, time, and location for a [Final ERPO] hearing" (*Id*. § 5-603(b)(1)(i)), with the Temporary ERPO hearing on the first or second day in which a District Court judge is available after issuance of the Interim ERPO (*Id*. § 5-603(b)(1)(ii)); and various other notices to respondent of rights and obligations, including "the requirements for surrendering firearms and ammunition in the respondent's possession to law enforcement authorities" (*Id*. § 5-603(b)(1)(v)); and, notably:

a warning to the respondent that violation of an [Interim ERPO] is a crime and that a law enforcement officer will arrest the respondent, with our without a warrant . . . if the officer has **probable cause** to believe that the respondent has violated . . . the [Interim ERPO]. (*Id*. § 5-603(b)(1)(vi)) (bold and underline added).

36.     When a commissioner issues an Interim ERPO:

the commissioner shall: immediately forward a copy of the petition and [Interim ERPO] to

the appropriate law enforcement agency for service on the respondent (*Id*. § 5-603(c)), [and] [a] law enforcement officer shall: immediately on receipt of an [Interim ERPO], serve it on the respondent . . . ." (*Id*. § 5-603(d)(1)).

**c. Temporary ERPOs**

37.     The procedures governing Temporary ERPOs are similar, although not identical.

38.     Temporary ERPOs, like Interim ERPOS, "prohibit the respondent from possessing a firearm"; but unlike Interim ERPOS, are issued by a state District Court judge during ordinary business hours. Like Interim ERPOs, Temporary ERPOs are issued if the judge:

> finds that there are **<u>reasonable grounds</u>** to believe that the respondent poses an immediate and present **<u>danger</u>** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm. (*Id*. § 5-604(a)(1)) (bold and underline added).

39.     Like an Interim ERPO, a Temporary ERPO can be issued *without the respondent present*, but unlike an Interim ERPO, shall be issued "[a]fter a hearing . . . . whether ex parte or otherwise . . . ." (*Id*.).

40.     A Temporary ERPO also requires surrender of all firearms and ammunition and imposes prohibition of any purchases or possession. (*Id*. § 5-604(a)(3)).

41.     § 5-604 contains the same involuntary mental health evaluation provision as § 5-603, also based on "**<u>probable cause</u>** to believe that the respondent meets the requirements for emergency evaluation . . . ." (*Id*. § 5-604(a)(4)) (bold and underline added).

42.     The notice provisions of § 5-604 vary somewhat from § 5-603, since the respondent is sometimes present during a Temporary ERPO hearing (in situations where the respondent has previously been served with an Interim ERPO), unlike the invariably *ex parte* process of an Interim ERPO. After a judge issues a Temporary ERPO, a law enforcement officer must "immediately serve the [Temporary ERPO] on the respondent." (*Id*. § 5-604(b)(1)(i)). If the respondent is present in court (having previously been served with an Interim ERPO), the respondent shall be served "in

open court" and if the respondent is not present (in situations where there was no previous Interim

ERPO), the respondent shall be served "by first-class mail at the respondent's last known address."

(*Id*. § 5-604(b)(2)). The Temporary ERPO "shall state the date and time of the [Final ERPO]

hearing." (*Id*. § 5-605(b)(1)(i)).

43.     A Temporary ERPO "shall be effective for not more than 7 days after service of

the order." (*Id*. § 5-604(c)(1)). However, the ERPO may be extended for a period "not to exceed

6 months" to effectuate service, for safety reasons, or for "good cause." (*Id*. § 5-604(c)(2)).

### d. Process for Surrender of Firearms and Ammunition Pursuant to an Interim or Temporary ERPO

44.     Interim and Temporary ERPOs are generally issued on a standard form known as

Form CC-DC-ERPO-003JO (Rev 03/2022) ("Form CC-DC-ERPO"). This includes the Temporary

ERPO issued against Willey and discussed below (the "Willey ERPO"). (A true and accurate copy

of the Willey ERPO is attached hereto as **Exhibit B**). Under a heading entitled "**Process for**

**Surrendering the Firearm(s) and ammunition**" (bold in original), Form CC-DC-ERPO states:

> If a law enforcement officer is serving you personally with the [ERPO], you must
> immediately surrender all firearms and ammunition to the officer. If you have received this
> [ERPO] by mail, you must contact the law enforcement agency designated in the order and
> arrange for the immediate surrender of all firearms and ammunition in your possession.
> (**Exhibit B** at p. 4).

### e. Final ERPOs

45.     Following a hearing, the court may enter a Final ERPO, "not to exceed 1 year,"

(Md. Code Ann., Pub. Safety § 5-605(b)(2)(iii)), in order:

> [T]o prohibit the respondent from possessing a firearm if the judge finds by clear and
> convincing evidence that the respondent poses a danger of causing personal injury to the
> respondent, the petitioner, or another by possessing a firearm. (*Id*. § 5-605(c)(1)(ii)).

### f. Criminal Penalties

46.     A person who fails to comply with an ERPO (Interim, Temporary, or Final) "is guilty of a misdemeanor" and subject to penalties of "a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both" (first offense), and "a fine not exceeding $2,500 or imprisonment not exceeding 1 year or both" (subsequent offenses). (*Id*. §§ 5-610(a)(1), (a)(2)). These penalties are also set forth on Form CC-DC-ERPO under a heading entitled "**NOTICE TO RESPONDENT: PENALTIES**." (**Exhibit C** at p. 1) (bold and capitalization in original). This Notice informs respondents that "violation of an [ERPO] is a crime and law enforcement shall arrest the respondent . . . . [v]iolation of this [ERPO] may result in criminal prosecution, imprisonment or fine or both." (*Id*.).

### g. Other Warrants Under the Maryland RFL

47.     The RFL allows for the issuance of Warrants aside from ERPOs, but unlike ERPOs, these other Warrants issue only on "probable cause." First, law enforcement or prosecutors "with **probable cause** to believe that a respondent who is subject to an [ERPO] . . . failed to surrender [a] firearm" may apply for "a search warrant for the removal of [a] firearm . . . ." (*Id*. § 5-607). Second, "[a] law enforcement officer shall arrest with or without a warrant . . . a person who the officer has **probable cause** to believe is in violation of an [ERPO] in effect at the time of the violation." (*Id*. §§ 5-610(b)) (bold and underline added in both).

### II.     Facts Specific to Willey

### a. Dorchester County's Relentless Pursuit of Willey

48.     For nearly two decades, Dorchester County officials have relentlessly pursued Willey for *de minimis* nuisance and zoning infractions under the County Code, all of which related to the condition of his property. Webb's predecessors even had Willey jailed for such infractions.

49.     On May 3, 2021, Webb launched a new campaign of harassment by letter from one

14

of her inspectors to Willey advising that he was in violation of the County Code due to "storage of Untagged/unregistered/expired vehicles and junk, rubble, and trash" in his yard. Webb then issued three "Uniform Civil Citations" (the "Citations") to Willey requiring him to pay fines: one relating to the condition of his yard, one for allegedly running an illegal business on his property, and one for purported "unpermitted disturbance to 100-foot tidewater buffer." (True and accurate copies of the May 3 Letter together with the Citations are attached hereto as **Exhibit C**). Webb soon realized that the condition of Willey's yard was not properly addressed in this manner and withdrew the yard infraction Citation. But, at a meeting with Willey without his attorney about the two remaining Citations, an incensed Webb attempted to intimidate him by aggressively pushing copies of the Citations toward Willey on a table and threatening to fine him $5,000 a day for the "business" infraction and $5,000 a day for the "tidewater buffer" infraction.

50.     After this initial meeting, Willey's attorney confronted Webb with the reality that Willey never operated a business on his property and that the "tidewater buffer" infraction was not applicable to Willey. Webb reluctantly withdrew these remaining Citations.

51.     Undeterred, on July 6, 2022, by "Writ of Summons" accompanied by "Complaint to Abate Violations of Title 121 of the Dorchester County Code," Webb commenced a civil enforcement proceeding against Willey in Dorchester County Circuit Court relating to the alleged condition of his yard. (A true and accurate copy of the Summons and Complaint with attorney notations redacted are attached hereto as **Exhibit D**). The parties resolved this proceeding by Consent Order dated November 3, 2022, whereby Willey agreed to remediate any alleged yard infractions by May 31, 2023 and that Webb's inspectors could enter to assess compliance, but only after notice to his attorney. (A true and accurate copy of the Consent Order is attached hereto as **Exhibit E**).

52.     Accordingly, on May 30, 2023, Webb and one of her inspectors, Tyler Bennett ("Bennett"), conducted an inspection. Although Willey had made substantial and costly efforts to ensure compliance, and in fact had achieved substantial compliance, Webb was not satisfied.

53.     According to a Notice of Violation issued to Willey on June 1, 2023, "the inspection revealed tall grass/weeds/vegetation 12" or higher, which is in violation of the Dorchester County Nuisance Ordinance," with correction required by June 7, 2023 on pain of fines.

54.     According to a second Notice of Violation issued to Willey and dated June 1, 2023, "the inspection revealed that this property is in violation of the Dorchester County Nuisance Ordinance" based on "[s]torage of Untagged/unregistered/expired/vehicles, trailers, junk, rubble, and or trash," with correction required by June 15, 2023 on pain of fines.

55.     According to a third Notice of Violation issued to Willey and dated June 6, 2023 (but upon information and belief, issued to Willey on June 2), "the inspection revealed a fence of various heights from 4 feet to 10 feet, which is in violation of the Dorchester County Zoning Code for a non-compliant fence and vision obstruction," with removal of the allegedly noncompliant fence required by July 6, 2023 on pain of fines. (True and accurate copies of the Notices of Violation are attached hereto as **Exhibit F**).

56.     Numerous properties in Dorchester County generally, and Fishing Creek specifically, have fences of varying heights, vehicles, rubble, junk, and vegetation over 12", but are not the subject of harassing and relentless "enforcement" by Webb and her inspectors, including their fabricated allegations of running a business and a "tidewater buffer" violation.

57.     Willey, having undertaken substantial and costly compliance efforts, disputes the validity of all of the Notices of Violation and the allegations contained therein.

**b. Webb's False RFL Petition**

16

58.     On June 2, 2023, Webb and Bennett drove to Willey's property in Fishing Creek without notice to his attorney as required by the Consent Order, in order to serve him with one or more of the Notices of Violation. When Webb and Bennett arrived in a marked County vehicle, he was outside in his yard. Willey respectfully declined to accept in-hand service of the Notices and politely asked Webb to communicate with his attorney. Instead, an irate Webb refused to leave, berated Willey, and yelled at him that his fence had to be taken down. In response, Willey told Webb: "you're stupid." Webb, apparently not satisfied, lingered, and far angrier after being called "stupid," continued to loudly berate Willey even after he said "bye" several times.

59.     Webb, now even angrier, walked with Bennett over to Willey's boat, which he was storing in his yard, and caused the Notices of Violation to be violently affixed to the fiberglass covering of the boat using a staple gun or other tool, damaging the cover in the process, before storming off the property. This entire interaction was witnessed by Willey's neighbors.

60.     Willey promptly filed a complaint against Webb with the Sheriff's Office, which Phillips ultimately failed to act upon. (A true and accurate copy of the Sheriff's Incident Report is attached hereto as **Exhibit G**).

61.     As reflected in the Incident Report, Willey initially estimated the boat damage at approximately $1,000, but he later obtained a more accurate professional estimate reflecting nearly $3,000 of damage. (A true and accurate copy of this estimate is attached hereto as **Exhibit H**).

62.     At no time on June 2, nor during multiple prior interactions with Webb and her inspectors, did Willey ever (a) brandish or otherwise display a firearm or any other weapon, (b) have a firearm or any other weapon on his person or immediately accessible, or (c) make any verbal threats or even raise his voice. Willey has never misused or threatened with a firearm.

63.     Webb, unable to inflict what she believed to be sufficient punishment upon Willey

for his alleged property infractions and perceived insolence, decided on a different approach to get

her pound of flesh. On June 15, 2023, Webb made the short trip from her office at County

headquarters to nearby County District Court in order to file her false RFL Petition against Willey.

64.      Webb filled out Form DC-ERPO-001 (A true and accurate copy of Webb's DC-

ERPO-001 Petition is attached hereto as **Exhibit I**) (hereinafter the "Webb Petition" or the "false

RFL Petition"). The proceeding was captioned "*Susan E. Webb v. Donald S. Willey*, Case No. D-

021-FM-23-817452, District Court of Maryland for Dorchester County."

65.      In the first section of DC-ERPO-001, the Webb Petition stated:

I, Susan E. Webb, request that this court issue an Extreme Risk Protective Order against
Donald S. Willey, as the respondent poses an immediate and present **danger** of causing
personal injury to himself/herself, to me, or to another by possessing a firearm. (Bold and
underline added).

66.      As to section two of DC-ERPO-001—the alleged behavior supporting Webb's

request—she stated that Willey had been "making threats of violence by firearms to myself and

other departmental employees on numerous occasions." Although section two specifically asks the

petitioner to "[i]nclude a description of the behavior and/or statements made by the respondent,

date(s) of occurrences, and any other information," Webb provided no such description. This

statement, made under oath, was categorically false and therefore perjured, as Willey had never

threatened violence by firearms against Webb or her subordinates on *any* occasion, let alone

numerous occasions.

67.      Under section three—a listing of firearms and number of firearms—Webb alleged

that Willey possessed an unknown number of handguns, shotguns, rifles, and assault weapons,

without providing any description. These allegations were nothing more than a guess—Webb had

never spoken to Willey about his firearms, and had no other lawful method of determining which

18

firearms Willey possessed. In making this statement, Webb perjured herself. Webb's inability to describe any of Willey's firearms was particularly strange since the entire substance of her false RFL Petition was that Willey had threatened her and colleagues with firearms.

68.     Also under another subheading of section three—requiring a description of how "respondent has unlawfully, recklessly, or negligently used, displayed, stored, possessed, or brandished a firearm"—Webb stated only: "June 8, 2023, June 9, 2023, June 12, 2023." Although this subheading specifically asks the petitioner to "[i]nclude a description of the action(s) and date(s) of occurrence(s)," Webb only included alleged dates without any description whatsoever. This statement, made under oath, was also categorically false and therefore perjured, as Willey had never threatened violence by firearms against Webb or her subordinates on *any* occasion, let alone three occasions in June 2023. Critically, Willey did not interact with Webb or any of her inspectors on June 8, June 9, or June 12, 2023. These encounters *never* occurred—their most recent interaction occurred on June 2, 2023.

69.     Under section four of DC-ERPO-001—whether "respondent has committed or threatened violence against himself/herself or others, whether or not the threat of violence involved a firearm"—Webb stated only: "On three recent occasions myself and staff were warned of threats of violence from Mr. Willey." This statement, made under oath, was also categorically false and therefore perjured, as Willey had never threatened violence of any kind against Webb or her subordinates on *any* occasion, let alone three occasions, and Webb knew this.

70.     Webb dated her false RFL Petition June 15, 2023 and signed her name under the line "Petitioner." Above the date and the signature line was the following language: "I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief." The entire Webb Petition was perjured, containing not

even one shred of truth, and Webb knew her statements were categorically false when made.

71.     Webb's false and malicious allegations fell far short of "probable cause," in multiple respects: (a) Webb stated that Willey had been "making threats of violence by firearms to myself and other departmental employees on numerous occasions" without describing what threats were allegedly made or when, where and to whom the threats were allegedly made, (b) Webb was unable to state how many firearms Willey possessed or describe any of his firearms; (c) Webb stated "June 8, 2023, June 9, 2023, June 12, 2023" in lieu of actually describing *any* threats or misconduct with firearms; and (d) Webb stated that "on three recent occasions myself and staff were warned of threats of violence from Mr. Willey," again, without describing what threats were allegedly made or when, where and to whom the threats were allegedly made.

72.     However, because the standard applicable to Webb's Petition was "reasonable grounds" rather than "probable cause," state District Court Judge Melvin James Jews ("Judge Jews") issued a Temporary ERPO (the Willey ERPO) directing Willey to immediately surrender to law enforcement all of his firearms and ammunition, prohibiting him from purchasing or possessing firearms or ammunition, and directing law enforcement to serve and enforce the ERPO. Judge Jews also ordered Willey to undergo an involuntary mental health evaluation. (**Exhibit B**).

### c. Phillips's Seizure of Willey's Firearms & Involuntary Mental Health Evaluation

73.     Later in the day on June 15, shortly after the Court issued the Willey ERPO, several Dorchester County Sheriff's deputies arrived at Willey's property to serve and enforce the ERPO.

74.     Willey, completely bewildered by the sudden appearance of Phillips's deputies for no apparent reason, read and respectfully objected to the ERPO, and attempted to understand what was happening. Nonetheless, Willey cooperated fully and permitted the deputies to seize his firearms and ammunition, given that the alternatives were arrest and severe criminal penalties.

75.    According to a "Receipt of Seized Firearms/Ammunition," Phillips's deputies removed three rifles, three handguns, two shotguns, and various ammunition from the residence. (A true and accurate copy of the Receipt is attached hereto as **Exhibit J**).

76.    Although Willey cooperated fully with Phillips's deputies in order to avoid arrest, criminal charges, and the undignified spectacle that would have otherwise ensued (which would have included deputies forcibly grabbing firearms and ammunition out of his home), the nightmare was just beginning. The deputies informed Willey that he was being taken to University of Maryland Shore Medical Center at Cambridge ("Shore Medical Center") for an involuntary mental health evaluation. Willey again objected and calmly attempted to explain that there was nothing wrong with him, but the deputies reiterated to Willey that he had no choice in the matter.

77.    Phillips's deputies then transported Willey to Shore Medical Center in the front seat of a marked Sheriff's vehicle. Meanwhile, Willey struggled to comprehend the surreal turn of events set in motion by Webb and briefly reflected upon the routine day he had been enjoying in the bucolic surroundings of Upper Hoopers Island prior to the seizure of his person and property.

78.    Once at Shore Medical Center, Willey was admitted and evaluated without his consent by David Christopher White, M.D. This "evaluation" consisted of multiple non-consensual tests, including but not limited to a blood-alcohol test, comprehensive metabolic panel, and a urinalysis drug screen. Willey was also forced to remove his clothes and don a hospital gown.

79.    Dr. White's discharge diagnosis of Willey was "acute stress reaction." Indeed, the totality of the Kafkaesque experience—having his firearms seized as though he were a criminal, without a hearing or notice of any kind, and then having his person seized and transported to a hospital for involuntary evaluation and unwanted testing—was beyond stressful, even for a retired Marine and combat veteran.

21

**d. Dismissal of the Webb Petition & Subsequent Events**

80.     On June 22, 2023, Willey appeared at District Court for his Final ERPO hearing. Webb also appeared, joined by Interim County Manager Jeff Powell. Numerous friends, community members, and others submitted letters of support on behalf of Willey. (True and accurate copies of examples of these letters of support are attached hereto as **Exhibit K**).

81.     During the June 22 Court appearance, both Willey and Webb were sworn in. However, before Webb could perjure herself again, Powell and Webb informed the Court that the County and Webb would not be pursuing the case. Consequently, the proceeding was terminated in Willey's favor on the record but without any opportunity to make legal arguments or offer substantive testimony. Judge Jews then issued an "Order of Denial/Dismissal of Petition for Extreme Risk Protection," which stated as follows: "After the appearance of the petitioner, respondent, respondent's counsel, the court makes the following determination: Petition is Dismissed. PETITIONER REQUESTED DISMISSAL." (A true and accurate copy is attached hereto as **Exhibit L**). (Capitalization in original.).

82.     On June 27, 2023, after a twelve-day deprivation of Willey's right to keep and bear arms, Phillips's deputies returned Willey's firearms and ammunition. (A true and accurate copy of a Property Inventory Form reflecting the return is attached hereto as **Exhibit M**).

83.     Willey remains at imminent risk of further unconstitutional harassment and selective enforcement by Webb, Phillips, their subordinates, and other County officials, in various forms and with impunity, including but not limited to additional malicious abuse of the Maryland RFL, absent judicial intervention. Thus, the concrete injuries suffered by Willey, and Defendants' specific actions causing same, are capable of repetition and likely to reoccur. Moreover, Willey, SAF and its other members, and all other individuals who own or otherwise possess firearms in

Maryland, face the *certainty* that the unconstitutional issuance of Interim and Temporary ERPOs upon less than "probable cause" and upon the characteristic of being a "danger" characteristic will be repeated, since Maryland's formidable and prolific Red Flag Assembly Line operates at a pace of over two ERPO petitions filed per day statewide, and over 1000 combined Interim and Temporary ERPOs issued per year, with *all* of these ERPOs issued upon less than "probable cause" and upon finding of the subjective and undefined characteristic of being a "danger". Thus, the issuance of RFL Warrants in Maryland upon less than "probable cause" and upon the characteristic of being a "danger" is not only capable of repetition, but will *certainly* be repeated with impunity, thereby causing **irreparable harm** that is actual and imminent, absent judicial intervention.

## CLAIMS FOR RELIEF

84.      As to all claims for relief set forth below, Plaintiffs reallege and incorporate by reference every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

85.      As to all claims for relief set forth below, to the extent they are personal to Willey, the deprivations of and infringements upon his fundamental and clearly established constitutional rights occurred pursuant to official policies or customs of Dorchester County, to wit: selective enforcement of the County Code against Willey and the targeted use of the Webb Petition to retaliate against him for his legal resistance to said selective enforcement. These policies or customs were sanctioned by Webb and by Phillips, as the highest-ranking Code enforcement and state law enforcement officials, respectively, in the County, both of whom had final policymaking authority; and both of whom knew in all instances that Willey had fundamental and clearly established constitutional rights that any objectively reasonable person would have known.

86.      As to *all* claims for relief set forth below, Plaintiffs have been and continue to be harmed by Defendants' unconstitutional conduct; as to Willey, he is entitled to monetary damages

as set forth in the "prayer for relief" concluding this Amended Complaint; and as to Counts One

and Two, all of the Plaintiffs are entitled to declaratory and injunctive relief as set forth in the

"prayer for relief."

**COUNT ONE**
**Violation of the United States Constitution**
**Fourth & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**As-Applied to Plaintiff Willey and Facial**
**(All Plaintiffs v. All Defendants)**

87.     The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and **no Warrants shall issue, but upon probable cause**, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. CONST. amend. IV. (Bold and underline added).

88.     The Fourteenth Amendment to the United States Constitution provides, in pertinent

part: ". . . nor shall any State deprive any person of life, liberty, or property, without due process

of law [the Due Process Clause of the Fourteenth Amendment]." U.S. CONST. amend. XIV, § 1.

89.     A "**Warrant**" is a "writ directing or authorizing someone to do an act, esp. one

directing a law enforcer to make an arrest, a search, or a seizure . . . ." *See, e.g., Yith v. Nielsen*,

881 F.3d 1155, 1166 (9th Cir. 2018) (quoting *Black's Law Dictionary* (10th ed. 2014)).

90.     Interim and Temporary ERPOs are plainly "**Warrants**" within the meaning of the

Fourth Amendment, as they are judicially issued writs that direct and authorize law enforcement

to serve and enforce an ERPO on a RFL respondent, then arrest the respondent and seize the

respondent's firearms and ammunition if the respondent does not immediately surrender the

firearms and ammunition to law enforcement, all arising upon **less than "probable cause**."

91.     Even where respondents (understandably) surrender their firearms and ammunition

24

rather than face the arrest and severe criminal penalties plainly advertised on Form CC-DC-ERPO (as Willey chose to do), the result is still a seizure of firearms and ammunition within the meaning of the Fourth Amendment. (*See, e.g., Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("[S]urrender to the State's show of authority constituted a seizure for the purposes of the Fourth Amendment.").

92.     And, the Fourth Amendment, as incorporated through the Fourteenth Amendment, requires "that where the matter is of such a nature as to require a judicial warrant, it is also of such a nature as to require **<u>probable cause</u>**." *Griffin v. Wisconsin*, 483 U.S. 868, 877 (1987) (bold and underline added). "[I]n the 'ordinary case,' seizures of personal property are 'unreasonable within the meaning of the Fourth Amendment,' without more, 'unless . . . accomplished pursuant to a judicial warrant,' issued by a neutral magistrate after a finding of **<u>probable cause</u>**." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983) (bold and underline added)). In other words, a court may not issue a judicial warrant directing or authorizing seizure of personal property upon less than "probable cause"—**<u>full stop</u>**.

93.     The Supreme Court has held that "[p]robable cause requires . . . a probability or substantial chance of criminal activity" albeit "not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213 (1983). More generally, whether in a criminal or civil context, the Court has articulated that the probable cause standard is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted). "The process does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418 (1981). The assessment "turn[s] on the assessment of probabilities in particular factual contexts . . . ." *Gates*, 462 U.S. at 232.

94.     Notwithstanding the unambiguous language of the Fourth Amendment and Supreme Court precedent, the Maryland RFL authorizes the issuance of two kinds of RFL Warrants—Interim and Temporary ERPOs—upon:

> **reasonable grounds** to believe that the respondent poses an immediate and present **danger** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm. (Md. Code Ann., Pub. Safety §§ 5-603(a)(1), 5-604(a)(1)) (bold and underline added).

95.     The "reasonable grounds" standard is lower than the "probable cause" standard. This is evidenced in multiple respects.

96.     First, the drafters of the Maryland RFL use the term "probable cause" in **five** instances in the RFL: the standard required to compel a mental health evaluation after an Interim or Temporary ERPO is served (twice), the standard required with or without a warrant to arrest a respondent for violating an ERPO (twice), and the standard required to obtain a warrant for seizure of a firearm where a respondent failed to initially surrender a firearm (once). Clearly, the RFL's drafters did not intend for "reasonable grounds" and "probable cause" to be interchangeable or synonymous but rather intended for the terms to have different meanings, otherwise they would not have used the "probable cause" standard in certain instances, while using the "reasonable grounds" standard for issuance of Interim and Temporary ERPOs.

97.     Second, the Maryland AG has explicitly conceded that the "reasonable grounds" standard is lower than the "probable cause" standard. *See Lyles v. State*, 2020 Md. App. LEXIS 1033, 2020 WL 6158444 (Md. Ct. Spec. App. Oct. 21, 2020), *cert. denied Lyles v. State*, 2021 Md. LEXIS 94 (Md. Mar 1, 2021). In *Lyles*, the District Court issued a search warrant mistakenly using the phrase: "Probable Cause (reasonable grounds)." On appeal by the defendant arguing that the warrant had issued on less than "probable cause," the AG submitted a brief in opposition. However,

in its brief, the AG conceded that reasonable grounds" is an insufficient standard under the Fourth Amendment: "**The State agrees with Lyles that a warrant may issue only upon 'probable cause,' and that 'reasonable grounds' is a lesser standard than probable cause**.' " *Lyles*, Brief of the State of Maryland, Appellee, June 19, 2020, at p. 2 (bold and underline added). (A true and accurate copy with this excerpt highlighted is attached hereto as **Exhibit N**).

98.     Third, state and federal courts have consistently held that the "reasonable grounds" standard is similar to the "reasonable suspicion" standard (*See Terry v. Ohio*, 392 U.S. 1 (1968)), and not similar to the higher "probable cause" standard. The Supreme Court of North Carolina, for example, explained that the "reasonable grounds standard is similar to the reasonable suspicion standard applied to brief detentions." *State v. Pearson*, 356 N.C. 22, 28 (2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1968) (bold and underline added). The only requirement under the lower standard of "reasonable suspicion" is a minimal amount of objective justification, something more than an "unparticularized suspicion or 'hunch.' " *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *accord State v. Watkins*, 337 N.C. 437 442 (1994). Therefore, the "reasonable grounds standard . . . is significantly lower than a probable cause standard." *Pearson*, 356 N.C. at 28. (Emphasis added). Moreover, the Supreme Court has also described the difference between "reasonable suspicion" and "probable cause":

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White*, 496 U.S. 325, 333 (1990).

99.     Therefore, based on the foregoing, the Maryland RFL unquestionably violates the Fourth and Fourteenth Amendments because Interim and Temporary ERPOs are warrants within

the meaning of the Fourth Amendment and the vague "reasonable grounds" standard contained in §§ 5-603(a)(1) and 5-604(a)(1) authorizing firearms and ammunition seizures is lower than the constitutionally required "probable cause" standard.

100.    Separately, §§ 5-603(a)(1) and 5-604(a)(1) of the RFL also violate the Fourth Amendment because, unlike in other laws authorizing searches and seizures, these provisions authorize searches and seizures based upon finding of a subjective and undefined forbidden *personal characteristic* of the targeted individual (being a **"danger"**), rather than upon an alleged objective and defined underlying violation of one or more laws. This justification of being a "danger" is all the more suspect since the RFL directs service of some Temporary ERPOs to occur via the glacially slow (by 2023 standards) method of *mailing*, and thus leaves open a window during which individuals who supposedly present immediate "danger" remain armed.

101.    Moreover, because §§ 5-603(a)(1) and 5-604(a)(1) relate to the manner in which RFL Warrants are issued immediately after the filing of a RFL petition, the entire Maryland RFL violates the Fourth and Fourteenth Amendments, since the judicial process that occurs after issuance of an Interim or Temporary ERPO is hopelessly tainted by the lack of "probable cause" and use of the subjective and undefined characteristic of being a "danger" at the beginning.

102.    Defendants, intentionally and acting under color of state law, have deprived and continue to deprive Plaintiffs of their fundamental and clearly established constitutional rights to be free from unreasonable searches and seizures, to not be subjected to searches and seizures via warrant except upon "probable cause," and to not be subjected to searches and seizures absent an alleged underlying violation of one or more laws.

103.    Moreover, the unconstitutional seizure of Willey's firearms and ammunition, and the seizure of Willey himself for an involuntary mental health evaluation, also occurred

28

intentionally and under color of state law, and also occurred in violation of his same fundamental and clearly established constitutional rights under the Fourth and Fourteenth Amendments;

104.    Plaintiffs are entitled to injunctive relief in the form of a preliminary injunction and ultimately a permanent injunction, enjoining Defendants from enforcing the Maryland RFL, because the specific provisions of the Maryland RFL at issue, §§ 5-603(a)(1) and 5-604(a)(1), and by extension, the rest of the RFL, inflict **irreparable harm** that is actual and imminent upon Willey, SAF and its other members, and all other individuals who own or otherwise possess firearms in Maryland, by authorizing issuance of warrants on less than "probable cause," and, separately, based on the characteristic of being a "danger" without any allegation of an underlying violation of one or more laws. Plaintiffs also have a substantial likelihood of success on the merits of their claims under the Fourth and Fourteenth Amendments, lack an adequate remedy at law for the infringement of their fundamental and clearly established constitutional rights, and the harm that Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining the continued enforcement of §§ 5-603(a)(1) and 5-604(a)(1), and, by extension, the entire Maryland RFL, since these provisions hopelessly taint the whole judicial process from the beginning.

105.    And, the existence of ongoing **irreparable harm** that is actual and imminent is clearly evidenced by the continued ceaseless operation of Maryland's formidable and prolific "Red Flag Assembly Line," which functions on a scale second only to Florida in the entire nation.

106.    Plaintiffs are further entitled to a declaration that §§ 5-603(a)(1) and 5-604(a)(1), and by extension the entire RFL, and Defendants' derivative regulations, policies, procedures, enforcement practices, customs, and forms, violate the Fourth and Fourteenth Amendment rights of Willey, SAF and its other members, and all other individuals who own or otherwise possess

firearms in Maryland; and further, that §§ 5-603(a)(1) and 5-604(a)(1), and by extension the entire

RFL, are unconstitutional as applied to Willey and on their face.

**COUNT TWO**
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**As-Applied to Plaintiff Willey and Facial**
**(All Plaintiffs v. All Defendants)**

107.    The Second Amendment to the United States Constitution provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed. U.S. CONST. amend. II.

108.    Incorporated against the states through the Due Process Clause of the Fourteenth

Amendment (*McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Second Amendment

guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental

constitutional right guaranteed to the people," *id*., which is and has always been key to "our scheme

of ordered liberty." *McDonald*, 561 U.S. at 767-68.

109.    "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by

history." *Bruen*, 142 S. Ct. at 2118 (citing *Heller*, 554 U.S. 570). Consistent with this demand, and

because "the Second Amendment extends, prima facie, to all instruments that constitute bearable

arms" (*Heller*, 554 U.S. at 582), "the government must affirmatively prove that its firearms

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and

bear arms."

110.    And, when a challenged regulation addresses a general societal problem that has

persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that

problem is relevant evidence that the challenged regulation is inconsistent with the Second

Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). Thus, "[t]o be compatible with the

Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue." *Range v. Att'y Gen. United States of Am.*, 69 F. 4th 96, 103 (3d Cir. 2023) (en banc).

111.    With respect to the Maryland RFL, this "distinctly similar" standard should apply, because the RFL purports to address a general societal problem that has persisted since the eighteenth century: the possession of firearms by purportedly dangerous individuals. *See, e.g., United States v. Harrison*, No. CR-22-00328-PRW, 2023 U.S. Dist. LEXIS 18397, at *4 (W.D. Okla. Feb. 3, 2023) ("[W]here the societal problem address by [18 U.S.C.] § 922(g)(3)—users of illicit substances possessing guns—is nothing new, the government must identify "distinctly similar" laws in our Nation's history and tradition."). Alternatively, although the "distinctly similar" standard clearly should apply here, the Court may also consider whether there are any historical analogues that are at least "relevantly similar" to the Maryland RFL. *Rahimi*, 61 F. 4th at 460 (quoting *Bruen*, 142 S. Ct. at 2132); *see also Range*, 69 F. 4th at 105.

112.    The proper historical period for the "distinctly similar" and "relevantly similar" analyses is the Founding Era. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142. S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in *Bruen*). The Second Amendment was adopted in 1791. The Supreme Court has explained that 1791 is the controlling time for interpreting the Second Amendment. *See, e.g., Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Gamble v. United States*, 139 S. Ct. 1960, 1975-76 (2019) (explaining that Heller sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (The Second Amendment's "meaning is fixed according to the understandings of those who ratified it.").

113.    Red flag laws, including the Maryland RFL, authorize disarmament of purportedly dangerous individuals in a manner without any "distinctly similar" connection to *any* Founding Era law; nor are there any such "relevantly similar" Founding Era analogues. "What matters is whether a conceptual fit exists between the old law and the new." *Daniels*, No. 22-60596 at *6. In the case at bar, there is no conceptual fit between the Maryland RFL and any old laws. As such, Defendants cannot meet their burden of proving that the Maryland RFL is part of the historical tradition of our right to keep and bear arms.

114.    Throughout the Revolutionary War, "we may safely say that 50,000 soldiers, either regular or militia, were drawn into the service of Great Britain from her American sympathizers." MARK M. BOATNER III, ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 663 (3d ed. 1994). Indeed, "over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES.[13] "Loyalists were thus commonly treated as enemy combatants." Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearms Prohibitions*, 16 Drexel L. Rev. at 53 (2023) (forthcoming).[14]

115.    As a result of the danger presented by loyalists in the military context of the Revolutionary War, disarmament orders were regularly issued in order to prevent danger. *Id*. at 54. One of numerous examples of this disarmament of loyalist enemy combatants occurred on May 8, 1776, nineteen days after the Battles of Lexington and Concord, when Massachusetts's Provincial Congress disarmed loyalists so they could not "join with the open and avowed enemies

---

13  https://www.royalprovincial.com/miliatry/rhist/kar/kar1hist.htm
14  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000

of America" and inflict "ruin and destruction . . . against these Colonies." 2 AMERICAN

ARCHIVES, 4th Ser. at 793. In another such example, New York's Provincial Congress, citing

"the immutable laws of self-defense," first disarmed loyalists on September 1, 1775:

> Resolved, That if any person shall be found guilty, before the Committee of any
> City or County in this Colony, of having furnished the Ministerial Army or Navy
> (after the date of this Resolution) with Provisions or other necessaries, contrary to
> any Resolution of the Continental or of this Congress, such person or persons, so
> found guilty thereof, upon due proof thereof, shall be disarmed . . . . 3 AMERICAN
> ARCHIVES, 4th Ser. at 573.

116.    The Resolution of Massachusetts's and New York's Provincial Congresses, and all

other orders or resolutions to disarm loyalists, were not and are not analogous to red flag laws

because disarmament of loyalists occurred in a military and wartime context. These Revolutionary

War resolutions targeted enemy combatants to accomplish military and wartime objectives:

> Disarmament during the war served the express purpose of neutralizing potential
> enemy combatants. It also served the express purpose of supplying arms to unarmed
> patriot troops. Greenlee, *Disarming the Dangerous*, at 65.

This contrasts starkly with the objective of red flag laws, which is seizure of firearms and

ammunition possessed by purportedly dangerous individuals in a civilian and peacetime context.

117.    Outside of the military and wartime context (other than discriminatory laws

targeting purported "dissidents" such as Catholics, discussed below) even where Founding Era (or

earlier) laws permitted disarmament in some form, they bore no resemblance to red flag laws;

indeed, "no law forbade the disarmed individual from *immediately acquiring new arms*," (*Id*. at

71-72) (emphasis added), and no civil law permitted authorities to effectuate wholesale seizure of

all firearms possessed by an individual, or a wholesale disarmament of that individual.

118.    For example, several laws during the Founding Era prohibited hunting at particular

times or in particular places. Penalties for illegal hunting included, in some instances, forfeiture of

the *individual* firearm used in the hunt, but no more. *See, e.g.*, 1652 N.Y. Laws 138; 1768 N.C. Sess. Laws 168; 23 THE STATE RECORDS OF NORTH CAROLINA 219 (Walter Clark ed., 1904) (1745 North Carolina); ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY 344 (Samuel Allinson ed., 1776) (1771 New Jersey) (only nonresidents had to forfeit the arms used to hunt illegally); 1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS 259 (1805) (1790 Massachusetts).

119.    "[T]hese laws involved the isolated disarmament of the firearm involved in the offense, not a ban on possession." *Range v. Att'y Gen. United States of Am.*, 53 F.4th at 281 n.25 (3d Cir. 2023), *overruled by Range*, 69 F. 4th 96. Red flag laws, in contrast, *effectuate a wholesale ban on possession*, applicable to respondent personally *and* respondent's firearms and ammunition.

120.    Another kind of "disarmament" laws before, during, and after the Founding Era were the so-called "surety" laws, whereby those who committed firearms offenses were in fact not disarmed at all, but instead had to pay a surety to ensure good behavior. For example, in 1759, New Hampshire persons "who shall go armed offensively" were not released "until he or she finds such surities [sic] of the peace and good behavior." Acts and Laws of His Majesty's Province of New-Hampshire in New England 2 (1759).

121.    A post-Founding example that nonetheless illustrates how the surety process worked is Welling's Case, 47 Va. 670 (Va. Gen Ct. 1849):

> The County court has authority to require a party to enter into a recognizance to keep the peace . . . . In February 1848, Edward *Welling*, with two sureties, entered into a recognizance before a justice of the peace of the county, with condition to appear at the next term of the County Court of *Wood,* and in the meantime to keep the peace toward all persons in the Commonwealth, and especially toward *Edward Taggart* . . . . The cause was then tried, and the Court required the defendant to enter into a recognizance, with sureties, to keep the peace for one year from that day.

122. And, in the criminal context, even felons were not automatically stripped of their right to possess firearms. *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barret, K., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons.").

123. The bottom line is that, for the most part, examples of disarmament in the Founding Era or earlier "fall into two general buckets," *Daniels*, No 22-60596 at *21, with a few other types of disarmament occasionally appearing in the historical record (such as the aforementioned hunting laws). As to those "buckets":

> *First*, states barred political dissidents from owning guns during period of conflict. Many American states, for instance, disarmed those who failed to take an oath of allegiance during the Revolutionary War. *Second*, both British and American governments disarmed religious minorities—especially Catholics. *Id*. (Internal citations omitted, italics in original).

124. Indeed, "[a]lmost all the laws disarming dissidents were passed during wartime or periods of unprecedented turmoil." *Id*. at *22. As the Fifth Circuit further observed in *Daniels*:

> Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both [dissidents and Loyalists] were viewed as potential threats to the integrity of the state. The same was true of religious minorities—the perceived threat was as much political as it was religious. *Id*. (internal citations omitted).

125. Here, Defendants, intentionally and acting under color of state law, deprived and continue to deprive Plaintiffs of their fundamental and clearly established constitutional right to keep and bear arms, entirely inconsistent with any historic tradition of firearms regulation.

126. Moreover, the unconstitutional deprivation of and infringement upon Willey's fundamental and clearly established constitutional right to keep and bear arms also occurred intentionally and under color of state law.

127. Plaintiffs are entitled to injunctive relief in the form of a preliminary injunction and

ultimately a permanent injunction, enjoining Defendants from enforcing the Maryland RFL, because the RFL inflicts ongoing **irreparable harm** that is actual and imminent upon Willey, SAF and its other members, and all other individuals who own or otherwise possess firearms and ammunition in Maryland, by authorizing law enforcement to seize their firearms and ammunition in a manner never before seen in American history and without historical analogue. Plaintiffs have a substantial likelihood of success on the merits of their claims under the Second and Fourteenth Amendments, lack an adequate remedy at law for this infringement upon their fundamental and clearly established constitutional rights, and the harm that Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining enforcement of the Maryland RFL in its entirety.

128.    And, the existence of ongoing **irreparable harm** that is actual and imminent is clearly evidenced by the continued ceaseless operation of Maryland's formidable and prolific "Red Flag Assembly Line," which functions on a scale second only to Florida in the entire nation.

129.    Plaintiffs are further entitled to a declaration that the Maryland RFL—in its entirety—and Defendants' derivative regulations, policies, procedures, enforcement practices, customs, and forms, violate the Second and Fourteenth Amendment rights of Willey, SAF and its other members, and all other individuals who own or otherwise possess firearms in Maryland; and further, that the Maryland RFL is unconstitutional as applied to Willey and on its face.

**COUNT THREE**
**Violation of the United States Constitution**
**First & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Retaliation**
**(Plaintiff Willey v. Defendants Webb and Dorchester County)**

130.    The First Amendment to the United States Constitution, incorporated through the

Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances. U.S. CONST. amend. I.

131.    To state a First Amendment retaliation claim, a plaintiff must allege that:

> (1) []he engaged in a protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) that there was a causal relationship between [his] protected activity and the defendant['s] conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (internal citations omitted).

132.    First, Willey engaged in protected First Amendment activity in two respects. He consistently and over an extended period of time exercised his right "to petition the Government for a redress of grievances," *Kirby v. City of Elizabeth City*, 338 F.3d 440, 448 (4th Cir. 2004) (quoting U.S. CONST. amend. I) by contesting the Citations and Notices of Violation issued by Webb both in and out of court, thereby angering her. He also exercised his right to freedom of speech when, on June 2, 2023, he called Webb "stupid" and told her "bye" multiple times, angering her further. Second, Webb, acting intentionally and under color of state law, then took an action that adversely affected Willey's First Amendment rights when she filed her false red flag petition in order to subject him to seizure of his firearms and ammunition, and an involuntary mental health evaluation, in retaliation for his protected activity, an action that "would likely 'deter a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Third, there was a causal relationship between Willey's protected activity and Webb's conduct; but for Willey's legal resistance to Webb's relentless and harassing Code "enforcement," she wouldn't have filed her false RFL Petition.

**COUNT FOUR**
**Violation of the United States Constitution**
**Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**Equal Protection Class of One**
**(Plaintiff Willey v. Defendants Webb, Phillips, and Dorchester County)**

133.    In a "class-of-one" equal protection case, the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Mezu v. Morgan State Univ.*, No. WMN-11-3072, 2012 U.S. Dist. LEXIS 118020, at *8 (Aug. 21, 2012) (citing *Willowbrook v. Olech*, 528 U.S. 562 (2000) and *Willis v. Town of Marshall*, 275 Fed. Appx. 227 (4th Cir. 2008)). "[The] plaintiff need not prove that [he] was treated differently because [he] is a member of a particular class, but simply that [he] was treated differently . . . ." *Mezu*, 2012 U.S. Dist. LEXIS 118020, at *9.

134.    Here, Willey was treated differently from others similarly situated without rational basis for this disparate treatment. Willey, like some other citizens of Dorchester County or Fishing Creek, received, and later contested, citations or notices of infractions under the County Code. However, Willey was the only citizen of the County or Fishing Creek intentionally targeted by Webb, acting under color of state law, with a red flag proceeding, and by Phillips, also acting under color of state law, with involuntary confinement and service and enforcement of the Willey ERPO, in retaliation for his legal resistance to Code enforcement, and prior to that, was the only citizen of the County or Fishing Creek targeted by Webb and her predecessors with the combination of jail, a fabricated allegation of running an unlawful business, an alleged "tidewater buffer" infraction, repeated allegations of yard infractions, and selective enforcement of 12" vegetation provisions.

**COUNT FIVE**
**Violation of the United States Constitution**
**Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**"Stigma Plus"**
**(Plaintiff Willey v. Defendants Webb and Dorchester County)**

135.    In a "stigma plus" claim, a plaintiff has been deprived of his procedural due process

rights under the Due Process Clause of the Fourteenth Amendment where:

> (1) there has been a "stigmatizing governmental disclosure," *Paul v. Davis*, 424 U.S. 693, 706 (1975), that was false, *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir), *cert. denied* 552 U.S. 1076 (2007); (2) The disclosure was "voluntarily published by the defendants," *Sciolino*, 480 F.3d at 646; (3) There is resulting harm beyond reputational harm (the "stigma plus"), *Paul*, 424 U.S. at 706; *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 309 (4th Cir. 2006); and (4) a deprivation of due process "in that no proper opportunity to be heard and defend was afforded," *Jensen v. W. Carolina Univ.*, No. 2:11-cv-33, 2012 U.S. Dist. LEXIS 182662, at *36-37 (W.D.N.C. Dec. 28, 2012).

136.    Here, Webb, acting intentionally and under color of state law, voluntary published

a false disclosure about Willey (the Webb Petition), which stigmatized him as "dangerous," and

subjected him to the "plus" of unreasonable seizure of his person, and of his firearms and

ammunition, in violation of his fundamental and clearly established constitutional rights.

**COUNT SIX**
**Malicious Use of Process**
**Under Maryland Law**
**(Plaintiff Willey v. Defendants Webb and Dorchester County)**

137.    Under Maryland law, malicious use of process has five elements:

> (1) a civil proceeding instituted against the plaintiff; (2) without probable cause; (3) with malice; (4) that terminated in favor of the plaintiff; and (5) that inflicted a special injury upon the plaintiff which would not necessarily result in all such suits. *One Thousand Fleet Ltd. P'ship v. Guerrero*, 694 A.D. 2d 952, 956 (Md. 1997).

138.    Here, Webb instituted a RFL proceeding against Willey without probable cause and

with malice; that terminated in his favor; and he suffered special injury, to wit: involuntary

confinement, severe and ongoing emotional distress, and substantial reputational harm.

## JURY DEMAND

139.   Plaintiffs hereby demand trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

(a)    On Count One, preliminary and permanent injunctions enjoining enforcement of RFL §§ 5-603(a)(1) and 5-604(a)(1), and by extension, the RFL in its entirety; and a judgment declaring §§ 5-603(a)(1) and 5-604(a)(1)), and by extension, the RFL in its entirety, to be unconstitutional under the Fourth and Fourteenth Amendments;

(b)    On Count Two, preliminary and permanent injunctions enjoining enforcement and implementation of the RFL; and a judgment declaring the RFL to be unconstitutional under the Second and Fourteenth Amendments;

(c)    On Counts One, Two, Three, Four, and Five, compensatory and/or punitive damages, or nominal damages, awarded to Willey in an amount to be determined upon a jury trial;

(d)    On Counts One, Two, Three, Four, and Five, attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(e)    On Count Six, compensatory and punitive damages awarded to Willey in an amount to be determined upon a jury trial.

Dated: August 28, 2023
      New York, NY               Respectfully submitted,

                                    **BOCHNER PLLC**

                                    By: */s/ Edward Andrew Paltzik*
                                    Edward Andrew Paltzik, Esq. (Bar No. 30785)
                                    Serge Krimnus, Esq. (Bar No. 22072)
                                    1040 Avenue of the Americas, 15th Floor
                                    New York, NY 10018
                                    (516) 526-0341
                                    edward@bochner.law
                                    serge@bochner.law

                                    *Attorneys for Plaintiffs*