**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

-------------------------------------------------------X

DONALD S. WILLEY and THE SECOND                   Case No. 1:23-cv-02299-ELH
AMENDMENT FOUNDATION,

        Plaintiffs,

    -against-

ANTHONY G. BROWN, in his
official capacity as Attorney General of
Maryland, DORCHESTER COUNTY,
Maryland, SUSAN E. WEBB, personally
and in her official capacity as Director of
Planning & Zoning for Dorchester County,
Maryland, and JAMES W. PHILLIPS, JR.,
personally and in his official capacity as
Sheriff of Dorchester County, Maryland,

        Defendants.

-------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.   Introduction ............................................................................................................... 1

II.  Factual & Legal Background ...................................................................................... 2

   A.   Red Flag Laws: Common Characteristics & Constitutional Problems............................ 2

   B.   The Maryland RFL ...................................................................................................... 3
      i.    Basic Structure & Usage ...................................................................................... 3
      ii.   ERPOs ................................................................................................................. 4
      iii.  Surrender of Firearms and Ammunition Pursuant to a non-Final ERPO................... 6
      iv.   Criminal Penalties ............................................................................................... 7

   C.   The Parties ................................................................................................................. 7

   D.   Dorchester County and Webb's Relentless Pursuit of Willey ........................................ 8

   E.   Webb's False RFL Petition & The Deleterious Consequences of Same ........................ 10

   F.   Further Unconstitutional Deprivation of Rights .......................................................... 13

III. Standard of Review .................................................................................................. 14

IV.  Argument .................................................................................................................. 15

   A.   Plaintiffs Are Likely To Succeed On Their Constitutional Claims ............................... 16
      i.    The Maryland RFL Violates the Fourth and Fourteenth Amendments ..................... 16
      ii.   The Maryland RFL Violates the Second and Fourteenth Amendments ..................... 21

   B.   Plaintiffs Will Suffer Irreparable Harm Absent Judicial Intervention............................ 26

   C.   The Remaining Factors Favor Preliminary Injunctive Relief........................................ 30

V.   Conclusion ............................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alabama v. White,*
  496 U.S. 325 (1990) ........................................................................................... 18

*Albright v. Oliver,*
  510 U.S. 266 (1994) ...................................................................................... 17, 27

*Avery v. McCall-Tanner,*
  2015 WL 13734646 (D.S.C. 2015) ..................................................................... 19

*Brower v. County of Inyo,*
  489 U.S. 593 (1989) ........................................................................................... 17

*Carpenter v. U.S.,*
  138 S. Ct. 2206 (2018) ....................................................................................... 27

*Di Biase v. SPX Corp.,*
  872 F.3d 224 (4th Cir. 2017) ............................................................................. 14

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .............................................................................. 21, 22, 27

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................................................................... 14

*Frein v. Pennsylvania State Police,*
  47 F.4th 247 (3d Cir. 2022) ............................................................................... 22

*Gamble v. U.S.,*
  139 S. Ct. 1960 (2019) ....................................................................................... 22

*Giovani Carandola, Ltd. v. Bason,*
  303 F.3d 507 (4th Cir. 2002) ........................................................................ 15, 30

*Grace v. District of Columbia,*
  187 F. Supp. 3d 124 (D.D.C. 2016) .................................................................... 28

*Griffin v. Wisconsin,*
  483 U.S. 868 (1987) ........................................................................................... 16

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
  174 F.3d 411 (4th Cir. 1999) ............................................................................. 30

*Illinois v. McArthur*,
    531 U.S. 326 (2001) ................................................................. 17

*In re Subp. Duces Tecum*,
    228 F.3d 341 (4th Cir. 2000) ................................................ 17, 27

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ...................................................... 26

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ........................................... 14, 27, 30

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ................................................ 15, 30

*Lyles v. State*,
    2020 WL 6158444 (Md. Ct. Spec. App. Oct. 21, 2020) ................. 18

*Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*,
    2023 WL 4373260 (D. Md. 2023) .............................................. 14

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................. 21

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ..................................................... 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .....................................................*passim*

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ................................................................. 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 14

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ..................................................... 30

*Range v. Att'y Gen. United States of Am.*,
    53 F.4th n.25 (3d Cir. 2023) ........................................... 21, 23, 25

*Rhode v. Becerra*,
    445 F. Supp. 3d 902 (S.D. Cal. 2020) ....................................... 28

*Rhode v. Bonta*,
    No. 20-55437, 2022 WL 17099119 (9th Cir. 2022) ..................... 28

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ................................................... 30

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ............................................................. 26

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) ...................................... 15, 26, 30

*St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*,
    566 F. Supp. 3d 327 (D. Md. 2021) ................................. 14, 30

*State v. Pearson*,
    356 N.C. 22 (2002) ........................................................ 18, 19

*State v. Watkins*,
    337 N.C. 437 (1994) ............................................................ 19

*Terry v. Ohio*,
    392 U.S. 1 (1968) ..................................................... 17, 18, 19

*U.S. v. Daniels*,
    2023 WL 5091317 (5th Cir. 2023) ................................... 23, 26

*U.S. v. Dziadus*,
    289 F. 837 (N.D. W. Va. 1923) ............................................ 20

*U.S. v. Harrison*,
    2023 WL 1771138 (W.D. Okla. 2023) ................................. 22

*U.S. v. Kincaid*,
    2021 WL 3260063 (W.D.N.C. 2021) ................................... 20

*U.S. v. Leon*,
    468 U.S. 897, 921 (1984) ................................................... 17

*U.S. v. Miller*,
    425 U.S. 435 (1976) ........................................................... 27

*U.S. v. Place*,
    462 U.S. 696 (1983) ........................................................... 17

*U.S. v. Rahimi*,
    61 F. 4th 443, 460 (5th Cir. 2023) ...................................... 23

iv

*U.S. v. Sokolow,*
   490 U.S. 1 (1989) .................................................................................................... 19

*U.S. v. Sowards,*
   690 F.3d 583 (4th Cir. 2012) ................................................................................. 20

*Utah v. Strieff,*
   579 U.S. 232 (2016) ............................................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................................. 14

*Yith v. Nielsen,*
   881 F.3d 1155 (9th Cir. 2018) ......................................................................... 17, 27

Statutes

1652 N.Y. Laws 138 .................................................................................................... 25

18 U.S.C. § 922(g)(3) .................................................................................................. 23

MD. CODE ANN., PUB. SAFETY §§ 5-601 *et seq* (West 2018)...............................*passim*

PUBLIC SAFETY—EXTREME RISK PROTECTIVE ORDERS, 2018 Maryland Laws Ch. 250
   (H.B. 1302) .......................................................................................................... *2*

U.S. CONST. amend. II ................................................................................................. 21

U.S. CONST. amend. IV................................................................................................ 2, 16

U.S. CONST. amend. XIV, § 1....................................................................................... 16

Rules

Fed. R. Civ. P. 65......................................................................................................... 1

Other Authorities

1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS
   259 (1805) (1790 Massachusetts)......................................................................... 25

11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022).............. 26

1768 N.C. Sess. Laws 168 ........................................................................................... 25

*A History of the King's American Regiment, Part 1,* THE ON-LINE INSTITUTE FOR ADVANCED
   LOYALIST STUDIES ............................................................................................... 25

ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW ENGLAND
2 (1759) ............................................................................................................... 25

ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY
344 (Samuel Allinson ed., 1776) (1771 New Jersey) ............................................. 25

Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearms Prohibitions*,
16 Drexel L. Rev. at 53 (2023) ............................................................................... 24

MARK M. BOATNER III, ENCYCLOPEDIA OF THE AMERICAN REVOLUTION
663 (3d ed. 1994) ................................................................................................... 24

THE STATE RECORDS OF NORTH CAROLINA
219 (Walter Clark ed., 1904) (1745 North Carolina) ............................................. 25

## I.    INTRODUCTION

Pursuant to FED. R. CIV. P. 65, Plaintiffs Donald S. Willey ("Willey") and The Second Amendment Foundation ("SAF" and, collectively with Willey, "Plaintiffs") respectfully request this Court issue a preliminary injunction prohibiting enforcement of Maryland's "red flag law" (the "Maryland RFL" or the "RFL"), which violates the Fourth, Second, and Fourteenth Amendments to the United States Constitution. The Maryland RFL authorizes state District Court commissioners and judges, upon *civil* commencement petition by a law enforcement officer or private citizen, to immediately issue an *ex parte* warrant ("RFL Warrant"), defined in the RFL as "extreme risk protective orders" ("ERPOs" or an "ERPO"),  (a) directing the respondent to immediately surrender to law enforcement *all* firearms and ammunition owned possessed by the respondent; (b) prohibiting the respondent from purchasing or possessing firearms or ammunition for the duration of the ERPO; and (c) directing law enforcement to serve and enforce the ERPO. MD. CODE ANN., PUB. SAFETY §§ 5-601 *et seq*. (West 2018). If the respondent does not comply with the ERPO, law enforcement will seize the respondent's firearms and ammunition, and the respondent will face arrest and criminal penalties including imprisonment, and fines. *Id*.

The Maryland RFL violates: (a) the Fourth and Fourteenth Amendments because the RFL authorizes state District Court commissioners and judges to issue ERPOs on a standard **less than** **"probable cause"** called "**reasonable grounds**"; (b) the Fourth and Fourteenth Amendments for the separate reason that the RFL authorizes searches and seizures based upon a subjective and undefined forbidden *personal characteristic* of the targeted individual (being a "**danger**"), rather than upon the objective and defined metric of *an alleged underlying violation of one or more laws*; and (c) the Second and Fourteenth Amendments because the RFL has no historical analogue. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131-32 (2022).

## II.     FACTUAL & LEGAL BACKGROUND

### A.     Red Flag Laws: Common Characteristics & Constitutional Problems

In 1999, Connecticut enacted the nation's first red flag law, joined only by Indiana in 2005. (1st Am. Compl. (filed Aug. 28, 2023) [ECF 5] ("FAC") ¶ 3). This changed when nineteen other states and the District of Columbia enacted their own red flag laws between 2014 and 2023—all conceptually identical and structurally similar. *Id*. Maryland enacted the RFL in 2018. *See* 2018 MD. HB 1302, codified at PUB. SAFETY §§ 5-601 *et seq*. This burst of copycat activity was fueled by the unsupported belief of gun control proponents that red flag laws could identify and stop would-be mass shooters. (FAC ¶ 4).

Some red flag laws, including the Maryland RFL, have the unconstitutional characteristic that they authorize RFL Warrants (in Maryland, ERPOs) to issue upon less than "probable cause." PUB. SAFETY §§ 5-603. In Maryland, the unconstitutional standard is "reasonable grounds." *Id*. This falls well short of what the Fourth Amendment requires. U.S. CONST. amend. IV.

Additionally, *all* red flag laws share the same unconstitutional characteristic: they authorize seizure of firearms and ammunition, and punishment of respondents, for conduct that *has not* occurred, but that the government predicts *could* occur at an unknown future place and time, because the government asserts the respondent has the personal characteristic of being a "danger." (FAC ¶¶ 2, 4-7, 9, 10). During Senate debate on HB 1302, the Bill's sponsor, then-Delegate Geraldine Valentino-Smith, admitted: "[i]t's the respondents' *possible* actions that we are worried about."[1] (*Id.* ¶ 6 (emphasis added)). When questioned by a colleague expressing concern that RFL respondents would be forced to prove a negative (that they are not dangerous), Valentino-Smith asserted that RFL respondents accused of being a "danger" would bear the burden of proof: "Well, then they're

---

[1] https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* remarks at 2:51:54).

going to have to prove why they're not based on the evidence presented."[2] (*Id.* ¶ 7). This was no mistake: several minutes later, Valentino-Smith again asserted that "you have to convince a court that you're not [dangerous]."[3] (*Id.*).

Finally, *all* red flag laws lack historical analogue, rendering them unconstitutional. *Bruen*, 142 S. Ct. at 2131-32. Under *Bruen*, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Red flag laws effectuate a wholesale ban on possession, applicable to a respondent personally and to his firearms and ammunition; no law in the civilian, peacetime context permitted disarmament and seizure in this manner within the relevant historical tradition.

### B.    The Maryland RFL

#### i.  Basic Structure & Usage

On April 24, 2018, Maryland's Governor signed the RFL into law. The Maryland RFL defines an ERPO as "a civil interim, temporary, or final protective order issued in accordance with this subtitle." PUB. SAFETY § 5-601(c) (West 2018). It allows a wide range of individuals to petition for an ERPO, defining "petitioner" to encompass medical providers, law enforcement officers, spouses, family members, co-parents, dating or intimate partners, cohabitants, and guardians. *Id.* § 5-601(e)(2). An ERPO petition must "include information known to the petitioner that the respondent poses an immediate and present **danger** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm," together with supporting facts, the basis for such facts and supporting documents or information together with a description of "the number, types, and location of any known firearms believed to be possessed by the respondent." *Id.* § 5-602(a)(1) (emphasis added).

---

[2] https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* exchange beginning at 2:40:53).
[3] https://mgahouse.maryland.gov/mga/play/726b586c-881f-4cf9-b78a-5c1a52c41c24?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (*see* remarks at 2:51:23).

Maryland court officials created a form to be used by petitioners. Within the first ten months of the RFL effective date, 788 petitions were filed statewide, with over 400 granted. *See* Sheriff Darren M. Popkin, *Montgomery County Sheriff's Office – Estimates of Extreme Risk Protective Orders – Md. Code, Public Safety Article § 5-601-610* (Aug. 5, 2019).[4] According to *The Baltimore Sun*, as of October 2020, "[a]djusted per capita and per day in effect, Maryland courts [had] issued the second most [RFL Warrants] out of the wave of states that [had] implemented similar laws since 2016."[5] Furthermore:

> In the two years since the law took effect on Oct. 1, 2018, Maryland courts have granted 989 extreme risk protective orders, an average of about 8.2 orders per year 100,000 residents. Only Florida has used it more, about 9.4 orders per 100,000 residents. Maryland has used it twice as much as the next-highest state, New Jersey.[6]

Maryland Courts compiled detailed ERPO statistics by judicial district for every month in 2021[7] and 2022.[8] These statistics show that Maryland operates a veritable "red flag assembly line" on a scale second only to Florida, as ERPO petitions were filed at a rate of over two per day in both years with over 1,000 combined Interim and Temporary ERPOs issued each year (the "Red Flag Assembly Line"). In 2021, 754 ERPO petitions were filed, resulting in 540 Interim ERPOs and 554 Temporary ERPOs issued. In 2022, 741 ERPO petitions were filed, resulting in 508 Interim ERPOs and 548 Temporary ERPOs issued. Under the statute, *all* of the ERPOs issued on the Red Flag Assembly Line were issued upon less than "probable cause" and upon the personal characteristic of being a "danger."

### ii.  ERPOs

---

[4] https://opendata.maryland.gov/Demographic/Choose-Maryland-Compare-Counties-Demographics/pa7d-u6hs/data.
[5] https://www.baltimoresun.com/politics/bs-md-pol-red-flag-extreme-risk-erpo-maryland-20201022-piawdaqnbffv7etagy2lhqaopq-story.html.
[6] *Id.*
[7] https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2021.pdf.
[8] https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2022.pdf .

ERPOs are issued in three variations: Interim ERPOs, Temporary ERPOs, and Final ERPOs. Interim ERPOs are issued by district court commissioners after ordinary business hours, or during holidays or weekends, *without a hearing and without the respondent present*:

> if the commissioner finds that there are **<u>reasonable grounds</u>** to believe that the respondent poses an immediate and present **<u>danger</u>** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm.

PUB. SAFETY § 5-603(a)(1) (emphases added). An Interim ERPO shall:

> (i) order the respondent to surrender to law enforcement authorities any firearm and ammunition in the respondent's possession; and (ii) prohibit the respondent from purchasing or possessing any firearm or ammunition for the duration of the interim [ERPO].

*Id*. § 5-603(a)(3). When a commissioner issues an Interim ERPO:

> the commissioner shall: immediately forward a copy of the petition and [Interim ERPO] to the appropriate law enforcement agency for service on the respondent (*Id*. § 5-603(c)), [and] [a] law enforcement officer shall: immediately on receipt of an [Interim ERPO], serve it on the respondent . . . .

*Id*. § 5-603(d)(1).

Temporary ERPOs are issued by a district court judge during ordinary business hours and can also be issued *without the respondent present*, but unlike an Interim ERPO, are issued "[a]fter a hearing . . . whether ex parte or otherwise . . . ." *Id*. § 5-604(a)(1). To be clear: *all* Interim ERPOs and *many* Temporary ERPOs are issued with no opportunity for the respondent to be heard before the ERPO takes effect. The standard for issuance of a Temporary ERPO is the same as for issuance of an Interim ERPO; that is, if the judge:

> finds that there are **<u>reasonable grounds</u>** to believe that the respondent poses an immediate and present **<u>danger</u>** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm.

*Id*. § 5-604(a)(1)) (emphases added). A Temporary ERPO also requires surrender of all firearms and ammunition and prohibits any purchases or possession. *Id*. § 5-604(a)(3). The notice provisions of § 5-604 vary slightly from § 5-603, since the respondent is sometimes present during a Temporary ERPO hearing (in situations where the respondent has previously been served with an Interim

5

ERPO). After a judge issues a Temporary ERPO, law enforcement must "immediately serve the [Temporary ERPO] on the respondent." *Id*. § 5-604(b)(1)(i). If the respondent is present in court (having previously been served with an Interim ERPO), the respondent shall be served in open court, but if the respondent is not present, the respondent may be served by first-class mail. *Id*. § 5-604(b)(2).

While Interim ERPOs remain in effect until the second day on which a district court is available to hold a Temporary ERPO hearing, *Id*. § 5-603(b)(1)(ii), Temporary ERPOs "shall be effective for not more than 7 days after service of the order." *Id*. § 5-604(c)(1). But a Temporary ERPO may remain in effect for up to *six months* to effectuate service, for safety reasons, or for "good cause." *Id*. § 5-604(c)(2) (emphasis added). After a hearing, the court may enter a Final ERPO "to prohibit the respondent from possessing a firearm if the judge finds by clear and convincing that the respondent poses a danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm, *Id.* §§ 5-605(a), 5-605(c)(1)(ii)), not to exceed 1 year." *Id*. § 5-605(b)(2)(iii).

In summary, Temporary and Interim ERPOs, unlike Final ERPOs, are issued if the judge or commissioner "finds that there are **reasonable grounds** to believe that the respondent poses an immediate and present **danger** of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* §§ 5-603(a)(1), 604-(a)(1) (emphases added). And, both Interim and Temporary ERPOs "prohibit the respondent from possessing a firearm," and prohibit the respondent from purchasing firearms or ammunition. *Id*.

### iii. Surrender of Firearms and Ammunition Pursuant to a non-Final ERPO

Interim and Temporary ERPOs, including the one issued against Willey, are generally issued on a standard form. *See* Ex. 1[9] (FAC Ex. B; *see also* FAC ¶ 44). Under the heading "Process for Surrendering the Firearm(s) and Ammunition," the form states:

---

[9] All numbered exhibits are attached to the Willey Declaration or the Paltzik Declaration.

If a law enforcement officer is serving you personally with the [ERPO], you must immediately surrender all firearms and ammunition to the officer.

If you have received this [ERPO] by mail, you must contact the law enforcement agency designated in the order and arrange for the immediate surrender of all firearms and ammunition in your possession.

*Id*.

### iv. Criminal Penalties

A person who fails to comply with an ERPO is guilty of a misdemeanor and subject to a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both (first offense), and a fine not exceeding $2,500 or imprisonment not exceeding 1 year or both (subsequent offenses). *Id*. §§ 5-610(a)(1), (a)(2). These penalties are stated on the form under the heading "NOTICE TO RESPONDENT: PENALTIES." Ex. 1 (FAC ¶ 46; Ex. B at 1). This Notice informs respondents that "violation of an [ERPO] is a crime and law enforcement shall arrest the respondent . . . . [v]iolation of this [ERPO] may result in criminal prosecution, imprisonment or fine or both." *Id*.

### C.     The Parties

Plaintiff Willey is a sixty-four year-old, decorated combat veteran who earned an honorable discharge after serving in the United States Marine Corps for over twenty-five years. (Declaration of Donald S. Willey ("Willey Decl.") ¶ 3; FAC ¶ 13)). Through his Marine Corps training, he acquired substantial expertise in the safe handling and use of firearms. (Willey Decl. ¶ 4; FAC ¶ 13). He is a certified antique firearms collector and holds a lawfully issued Maryland wear and carry permit. (Willey Decl. ¶ 5; FAC ¶ 13). Willey is a lawful firearms owner and has never been adjudicated as a mental defective nor committed to a mental institution. (Willey Decl. ¶¶ 5-6; FAC ¶ 13). Other than harassment perpetrated by Dorchester County officials discussed below, Willey has no history of contact with the justice system. (Willey Decl. ¶ 7; *see also* FAC ¶ 13).

Plaintiff SAF is a 501(c)(3) nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. (Declaration of Adam

Kraut ("Kraut Decl.") ¶ 2; FAC ¶ 14). SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutional right to keep and bear arms, and the consequences of gun control. (Kraut Decl. ¶ 3; FAC ¶ 14). SAF has approximately 720,000 members nationwide, thousands of whom reside in Maryland, including Willey, who is a lifetime member of SAF. (Kraut Decl. ¶ 4; FAC ¶¶ 13-14).

Defendant Susan E. Webb ("Webb"), as Dorchester County's Director of Planning and Zoning, supervises the Office of Planning and Zoning, and is the County's highest-ranking official for enforcement of the County Code's nuisance and zoning provisions. (FAC ¶ 17). As discussed below, Webb—with the County's full knowledge and consent—conducted a relentless, multi-year harassment campaign against Willey, including filing a false RFL petition against Willey. (*Id*. ¶¶ 8-10, 48-83).

Defendant James W. Phillips, Jr. ("Phillips") is Sheriff of Dorchester County, and therefore the County's highest officer for enforcement of Maryland's criminal laws and certain civil laws. (FAC ¶ 18).

### D.     Dorchester County and Webb's Relentless Pursuit of Willey

For nearly two decades, Dorchester County officials relentlessly pursued Willey for minor nuisance and zoning infractions related to the condition of his property. (Willey Decl. ¶ 8; *see also* FAC ¶ 48.) Webb's predecessors even had Willey jailed for such infractions. (Willey Decl. ¶ 9; *see also* FAC ¶ 48).

On May 3, 2021, Webb launched a new harassment campaign when one of her inspectors wrote Willey advising that he was in violation due to "storage of Untagged/unregistered/expired vehicles and junk, rubble, and trash" in his yard. (Willey Decl. ¶ 10; *see also* FAC ¶ 49). Webb then issued three civil Citations to Willey: one relating to the condition of his yard, one for allegedly running an illegal business on his property, and one for purported "unpermitted disturbance to 100-foot tidewater buffer." (Willey Decl. ¶ 11; *see also* FAC ¶ 49). These required him to pay fines. (*Id*.)

Webb later withdrew the yard infraction Citation. (Willey Decl. ¶ 13 *see also* FAC ¶ 49). She then met with Willey, without his attorney, about the two remaining Citations and attempted to intimidate him by aggressively pushing copies of the Citations toward him and threatening to fine him $5,000 a day for the business infraction and $5,000 a day for the tidewater buffer infraction. (Willey Decl.¶ 14; *see also* FAC ¶ 49).

After that meeting, Willey's attorney confronted Webb with the fact that Willey never operated a business on his property and that the tidewater buffer infraction was not applicable. (Willey Decl. ¶ 15; *see also* FAC ¶ 50). Webb withdrew those remaining Citations. (*Id.*).

Undeterred, on July 6, 2022, by Writ of Summons accompanied by a Complaint, Webb commenced a civil enforcement proceeding against Willey in Dorchester County Circuit Court relating to the alleged condition of his yard. (Willey Decl. ¶ 16; *see also* FAC ¶ 51). The parties resolved this proceeding by Consent Order dated November 3, 2022, whereby Willey agreed to remediate any alleged yard infractions by May 31, 2023 and that Webb's inspectors could enter to assess compliance, but only after notice to his attorney. (Willey Decl. ¶ 17; *see also* FAC ¶ 51).

On May 30, 2023, Webb and one of her inspectors, Tyler Bennett ("Bennett"), conducted an inspection. (Willey Decl. ¶ 20; *see also* FAC ¶ 52). Although Willey had achieved substantial compliance through substantial and costly efforts, Webb was not satisfied. (Willey Decl. ¶¶ 18, 20; *see also* FAC ¶ 52). She issued three Notices of Violation to Willey, two dated June 1, 2023, one dated June 6, 2023. (Willey Decl. ¶ 21; *see also* FAC ¶¶ 54-6). The first accused Willey of violating the County Code due to "tall grass/weeds/vegetation 12" or higher"; the second accused Willey of violating the Code due to "[s]torage of Untagged/unregistered/expired/vehicles, trailers, junk, rubble, and or trash"; and the third accused Willey of having "a fence of various heights from 4 feet to 10 feet." (Willey Decl. ¶ 22; *see also* FAC ¶¶ 54-6). All required compliance on pain of fines. (*Id.*).

Numerous properties in Dorchester County have fences of varying heights, vehicles, rubble, junk, and vegetation over 12", but are not the subject of harassing and relentless "enforcement" by Webb and her inspectors, including their fabricated allegations of running a business and a "tidewater buffer" violation. (Willey Decl. ¶¶ 19, 23; *see also* FAC ¶ 56). Willey, having undertaken substantial and costly compliance efforts, disputes the validity of all the allegations. (Willey Decl. ¶ 18; *see also* FAC ¶ 57).

### E. Webb's False RFL Petition & The Deleterious Consequences of Same

On June 2, 2023, Webb and Bennett drove to Willey's property to serve him with the Notices of Violation without notice to his attorney, as required under the Consent Order. (Willey Decl. ¶ 24; *see also* FAC ¶ 58). When Webb and Bennett arrived, Willey was outside in his yard. (*Id.*). Willey respectfully declined to accept in-hand service of the Notices and politely asked Webb to communicate with his attorney. (*Id.*). Instead, an irate Webb refused to leave, berated Willey, and yelled at him that his fence had to be taken down. (*Id.*). In response, Willey told Webb: "you're stupid." Webb, apparently not satisfied, lingered, and far angrier after being called "stupid," continued to loudly berate Willey even after he said "bye" several times. (Willey Decl. ¶ 25; *see also* FAC ¶ 58). Webb, now even angrier, approached Willey's boat, which he was storing in his yard, and caused the Notices of Violation to be violently affixed to the fiberglass covering of the boat, damaging the cover in the process, before storming off the property. (Willey Decl. ¶25; *see also* FAC ¶59).

At no time on June 2, nor during multiple prior interactions with Webb and her inspectors, did Willey ever (a) brandish or otherwise display a firearm or any other weapon, (b) have a firearm or any other weapon on his person or immediately accessible, or (c) make any verbal threats or even raise his voice. (Willey Decl. ¶ 26; *see also* FAC ¶ 62). Willey has never misused or threatened with a firearm. (*Id.*).

Webb, unable to inflict what she believed to be sufficient punishment upon Willey for his perceived insolence and alleged property infractions, chose a new approach to get her pound of flesh. On June 15, 2023, she filed her false RFL Petition (the "Webb Petition"). Ex. 2, (Pet., *Webb v. Willey*, Case No. D-021-FM-23-817452 (Md. Dist. Ct., Dorchester County); Willey Decl. ¶ 28; *see also* FAC ¶ 64). As set forth *infra*, the Webb Petition contained purely false allegations and therefore as entirely perjured.

Webb filed her false RFL Petition using the required form. *Id*. The Webb Petition stated:

I, Susan E. Webb, request that this court issue an Extreme Risk Protective Order against Donald S. Willey, as the respondent poses an immediate and present **danger** of causing personal injury to himself/herself, to me, or to another by possessing a firearm.

*Id*. at 1 (emphasis added). In describing the alleged behavior supporting Webb's request, she stated that Willey had been "making threats of violence by firearms to myself and other departmental employees on numerous occasions."(*Id*.). Although Section Two of the Petition specifically asks the petitioner to "[i]nclude a description of the behavior and/or statements made by the respondent, date(s) of occurrences, and any other information," Webb provided no such description. (*Id*.). In Section Three—a listing of firearms and number of firearms—Webb alleged that Willey possessed an unknown number of handguns, shotguns, rifles, and assault weapons, without providing any description. (*Id*.). These allegations were, at best, a guess—Webb had never spoken to Willey about his firearms and had no way of determining what firearms he possessed. (*Id*.). Under a subheading requiring a description of how "respondent has unlawfully, recklessly, or negligently used, displayed, stored, possessed, or brandished a firearm," Webb stated only: "June 8, 2023, June 9, 2023, June 12, 2023." (*Id*.). Although this subheading specifically asks the petitioner to "[i]nclude a description of the action(s) and date(s) of occurrence(s)," Webb only alleged dates with no description. (*Id*.). Critically, Willey did not interact with Webb or any of her inspectors on June 8, June 9, or June 12, 2023. (Willey Decl. ¶¶ 27-8). These encounters *never* occurred—their most

11

recent interaction was on June 2, 2023. (Willey Decl. ¶ 27). In Section Four, which asked whether "respondent has committed or threatened violence against himself/herself or others, whether or not the threat of violence involved a firearm," Webb falsely stated: "On three recent occasions myself and staff were warned of threats of violence from Mr. Willey." (Ex. 2; *see also* Willey Decl. ¶ 29). Webb signed the Petition under penalty of perjury. (Ex. 2).

The entire Webb Petition was perjured, and Webb knew her statements were categorically false when made. (FAC ¶ 70). Webb's false and malicious allegations, which lacked any consistency or detail, fell far short of "probable cause."(FAC ¶ 71). But because the applicable standard was "reasonable grounds" rather than "probable cause," Judge Melvin James Jews ("Judge Jews") issued a Temporary ERPO directing Willey to immediately surrender to law enforcement all of his firearms and ammunition, prohibiting him from purchasing or possessing firearms or ammunition. (Ex. 1; Willey Decl. ¶ 31; *see also* FAC Ex. B; FAC ¶ 72). Judge Jews also ordered Willey to undergo an involuntary mental health evaluation pursuant to the RFL. (Ex. 1; Willey Decl. ¶ 34; *see also* FAC Ex. B at 2; FAC ¶ 72).

On June 15, shortly after Judge Jews issued the ERPO, several Dorchester County Sheriff's deputies arrived at Willey's property to serve and enforce the ERPO. (Willey Decl. ¶ 34, FAC ¶¶ 73-4). Willey, bewildered by the sudden appearance of Phillips's deputies, read and respectfully objected to the ERPO, and attempted to understand what was happening. (Willey Decl. ¶ 35, FAC ¶ 74). Nonetheless, Willey cooperated fully and permitted the deputies to seize his firearms and ammunition—given that the alternatives were arrest and severe criminal penalties. (*Id.*). Although Willey cooperated fully with Phillips's deputies to avoid arrest, criminal charges, and the undignified spectacle that would have otherwise ensued (which would have included deputies forcibly grabbing firearms and ammunition out of his home and which could have resulted in his death), the nightmare

was just beginning. The deputies informed Willey he was being taken for an involuntary mental health evaluation. (Willey Decl. ¶¶ 31, 37; *see also* FAC ¶ 76).

Phillips's deputies then transported Willey to Shore Medical Center in the front seat of a marked Sheriff's vehicle. (Willey Decl. ¶ 38, *see also* FAC ¶ 77). Meanwhile, Willey struggled to comprehend the surreal turn of events set in motion by Webb. (Willey Decl. ¶ 37). Once at Shore Medical Center, Willey was admitted and evaluated without his consent, and forced to remove his clothes and don a hospital gown. (Willey Decl. ¶ 38, *see also* FAC ¶ 78). He was discharged the same day, after it was determined he was not suffering from mental illness. (Willey Decl. ¶ 39).

On June 22, 2023, Willey appeared for his Final ERPO hearing. (Willey Decl. ¶ 40; *see also* FAC ¶ 80). Webb appeared with Interim County Manager Jeff Powell. (FAC ¶ 80). Willey and Webb were sworn in. (FAC ¶ 81). But before Webb could perjure herself again, Powell and Webb informed the Court that the County would not be pursuing the case. (Willey Decl. ¶ 40; *see also* FAC ¶ 81). The proceeding was terminated in Willey's favor on the record but without any opportunity to offer substantive testimony or make arguments. (*Id.*). Judge Jews issued an Order, which stated: "After the appearance of the petitioner, respondent, respondent's counsel, the court makes the following determination: Petition is Dismissed. PETITIONER REQUESTED DISMISSAL." Ex. 3 (FAC Ex. L).

### F.   Further Unconstitutional Deprivation of Rights

Absent judicial intervention, Willey remains at imminent risk of further unconstitutional harassment and selective enforcement by Webb, Phillips, their subordinates, and other County officials, in various forms, including but not limited to additional malicious abuse of the Maryland RFL. (FAC ¶ 83). As a direct result of Webb's systematic and unfounded harassment of Willey, his constitutional rights are in jeopardy. Moreover, Willey, SAF and its other members, and all other individuals who possess firearms in Maryland, face the *certainty* that the unconstitutional issuance of Interim and Temporary ERPOs upon less than "probable cause" and upon the characteristic of

being a "danger" will be repeated, since Maryland's formidable and prolific Red Flag Assembly Line operates at a pace of over two ERPO petitions per day, and over 1000 combined Interim and Temporary ERPOs issued per year, with *all* of these ERPOs issued upon **less than "probable cause"** and based on the subjective and undefined characteristic of being a "**danger**." (*Id.*).

## III.    STANDARD OF REVIEW

A preliminary injunction is warranted where the moving party can show (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the party seeking the injunctive relief, and; (4) that the injunctive relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While preliminary injunctive relief "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit[,]" such relief may also act to "restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017) (internal citations omitted).

The first two elements—likelihood of success on the merits and likelihood of suffering irreparable harm in the absence of preliminary relief—are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "Although that standard does not require 'a certainty of success,' the plaintiff 'must make a clear showing that he is likely to succeed at trial.'" *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd*, No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd*, No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Di Biase*, 872 F.3d at 231).

The deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't,* 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the

14

irreparable harm factor is satisfied."); *Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, No. CV TDC-21-1736, — F. Supp. 3d. —, 2023 WL 4373260, at *16 (D. Md. July 6, 2023) ("[A]s a legal matter, the denial of a constitutional right, if established, would qualify as irreparable harm."); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("Moreover, the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."). Therefore, the irreparable harm prong is satisfied upon establishing the denial of a constitutional right—here, the denial of Fourth, Second, and Fourteenth Amendment rights by ongoing, daily issuance of ERPOs on less than "probable cause" and based on the "danger" characteristic without any alleged underlying violation of one or more laws, and without historical analogue.

As a matter of law, the public interest is served by enjoining the unconstitutional actions of the government. *See, e.g., Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("upholding constitutional rights is in the public interest"); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("upholding constitutional rights surely serves the public interest"). While a plaintiff must show the balance of equities tips in its favor, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Id*. at 521. As such, upon establishing the likelihood that the Maryland RFL is unconstitutional, the public interest prong favors granting injunctive relief.

## IV.    ARGUMENT

Plaintiffs' present motion is limited to Counts I and II of the FAC, as those Counts address Defendants'[10] ongoing denial, deprivation, and infringement of constitutional rights that will be repeated with certainty and impunity, absent immediate judicial intervention. As detailed below, Plaintiffs have a substantial likelihood of success on the merits on their Fourth, Second, and

---

[10] "Defendants" refers collectively to Anthony G. Brown, in his official capacity as Attorney General ("AG") of Maryland ("Brown"), Dorchester County, Maryland, Webb, and Phillips.

Fourteenth Amendment claims. A preliminary injunction is necessary to restore the status quo during the pendency of this action. Plaintiffs, and Maryland residents as a whole, face losing their Fourth, Second, and Fourteenth Amendment rights due to unconstitutionally issued ERPOs. Unless enforcement of the Maryland RFL is enjoined, they will be continually subject to the threat of having RFL Warrants (ERPOs) issued against them on a standard less than "probable cause" and without any alleged violation of the law in violation of the Fourth and Fourteenth Amendments, resulting in having their Second and Fourteenth Amendment rights abridged on those same unconstitutional standards. There is no public interest in allowing Defendants' continuing violation of Plaintiffs' constitutional rights.

### A.     Plaintiffs Are Likely To Succeed On Their Constitutional Claims

The Maryland RFL, §§ 5-603(a)(1) and 5-604(a)(1), authorize the issuance of warrants (ERPOs) for the seizure of property based on a standard less than "probable cause", and without any allegation of an underlying violation of any law, contrary to the Fourth Amendment. Further, the Maryland RFL has no historical analogue, and is therefore inconsistent with the Second Amendment right to keep and bear arms. As set forth below, Plaintiffs have a high likelihood of succeeding on the merits of their claims.

### i.  The Maryland RFL Violates the Fourth and Fourteenth Amendments

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, . . . and effects, against unreasonable searches and seizures, shall not be violated, and **no Warrants shall issue, but upon probable cause**, supported by Oath or affirmation . . . .

U.S. CONST. amend. IV (emphasis added). The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

> nor shall any State deprive any person of life, liberty, or property, without due process of Law [the Due Process Clause of the Fourteenth Amendment].

U.S. CONST. amend. XIV, § 1.

The Fourth Amendment, as incorporated through the Fourteenth Amendment, requires "that where the matter is of such a nature as to require a judicial warrant, it is also of such a nature as to require **probable cause**." *Griffin v. Wisconsin*, 483 U.S. 868, 877 (1987) (emphasis added). "[I]n the 'ordinary case,' seizures of personal property are 'unreasonable within the meaning of the Fourth Amendment,' without more, 'unless . . . accomplished pursuant to a judicial warrant,' issued by a neutral magistrate after a finding of **probable cause**." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (quoting *U.S. v. Place*, 462 U.S. 696, 701 (1983) (emphasis added)). In other words, a court may not issue a judicial warrant directing or authorizing seizure of personal property upon less than "probable cause".

A "warrant" is a "writ directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest, a search, or a seizure . . . ." *Yith v. Nielsen*, 881 F.3d 1155, 1166 (9th Cir. 2018) (quoting *Black's Law Dictionary* (10th ed. 2014)); *see also In re Subp. Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000) ("A warrant is a judicial authorization to a law enforcement officer to search or seize persons or things."); *U.S. v. Leon*, 468 U.S. 897, 921 (1984) ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest"); *Utah v. Strieff*, 579 U.S. 232, 240 (2016) (same). Interim and Temporary ERPOs are plainly "warrants" within the meaning of the Fourth Amendment; both are writs issued by a judge or commissioner that direct and authorize law enforcement to serve an ERPO on a respondent, and to enforce the ERPO by arrest of the respondent and seizure of the respondent's property if the respondent does not immediately surrender said property. This authorization stems from a judicial directive issued on "**reasonable grounds**," which is without question **less than "probable cause"**. Even where respondents surrender their property rather than face arrest and severe criminal penalties (as Willey chose to do), the result is still a seizure of property within the meaning of the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("[S]urrender to the State's show of authority constituted a seizure for the purposes of the

17

Fourth Amendment.") (citing *Terry v. Ohio*, 392 U.S. 1, 18 (1968); *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)).

The Maryland AG's Office has conceded that the "reasonable grounds" standard is lower than the "probable cause" standard. *See Lyles v. State*, No. 1536, 2020 WL 6158444 (Md. Ct. Spec. App. Oct. 21, 2020), *cert. denied Lyles v. State*, 474 Md. 190, 253 A.3d 621 (Md. Mar 1, 2021). On appeal to the Maryland Court of Special Appeals, the defendant argued that the warrant in his case was issued on less than "probable cause" due to a clerical error causing "reasonable grounds" to appear next to "probable cause." And, the AG's Office, in its appellate brief, conceded that "reasonable grounds" is an insufficient standard under the Fourth Amendment: "The State agrees with Lyles that a warrant may issue only upon 'probable cause,' **and that 'reasonable grounds' is a lesser standard than probable cause**.'" (Ex. 4 (Brief of Appellee, FAC Ex. N[11] at 2 (emphasis added))).

Federal and state courts agree and have consistently held that the "reasonable grounds" standard is similar to the "reasonable suspicion" standard, *see Terry*, 392 U.S. at 1, and not similar to the higher "probable cause" standard. The Supreme Court has described the difference between "reasonable suspicion" and "probable cause":

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is **less reliable than that required to show probable cause**.

*Alabama v. White*, 496 U.S. 325, 333 (1990) (emphasis added). Similarly, the Supreme Court of North Carolina, for example, in analyzing the standard for issuance of a non-testimonial identification order, explained that the "reasonable grounds standard is similar to the reasonable suspicion standard applied to brief detentions." *State v. Pearson*, 356 N.C. 22, 28 (2002) (citing

---

[11] Also available at *Lyles*, 2020 Md. Sp. App. Ct. Briefs LEXIS 1753, at *3 (Md. Sp. App. Ct. June 19, 2020).

*Terry*, 392 U.S. at 1 (1968)). The only requirement under the lower standard of "reasonable suspicion" is a minimal amount of objective justification, something more than an "unparticularized suspicion or 'hunch.'" *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *accord State v. Watkins*, 337 N.C. 437 442 (1994). Therefore, the "reasonable grounds standard . . . is significantly lower than a probable cause standard." *Pearson*, 356 N.C. at 28.

Moreover, the drafters of the Maryland RFL use the term "probable cause" **six** times: the standard required to compel a mental health evaluation after an Interim or Temporary ERPO is served (thrice), the standard required with or without a warrant to arrest a respondent for violating an ERPO (twice), and the standard required to obtain a warrant for seizure of a firearm where a respondent failed to initially surrender a firearm (once). PUB. SAFETY §§ 5-603(a)(4)&(b)(2)(vi), 5-604(a)(4), 5-605(c)(4), 5-607, 5-610(b). Clearly, the RFL's drafters did not intend for "reasonable grounds" and "probable cause" to be interchangeable or synonymous but rather intended for the terms to have different meanings—otherwise they would not have used the "probable cause" standard in certain instances, while using the "reasonable grounds" standard for issuance of Interim and Temporary ERPOs.

The Maryland RFL is also constitutionally defective because it authorizes Interim and Temporary ERPOs to issue based upon the subjective and undefined personal characteristic of a respondent (being a "danger") rather than upon an alleged violation of one or more laws. *Id.* Indeed, the "probable cause" standard of the Fourth Amendment requires an actual alleged violation of the law. "Ordinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon 'probable cause' to believe that a violation of the law has occurred." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985); *see also, e.g., Avery v. McCall-Tanner*, No. 9:14-0037-DCN-BM, 2015 WL 13734646, at *10 (D.S.C. Oct. 22, 2015), *report and recommendation adopted*, No. CV 9:14-037-MBS, 2016 WL 1253186 (D.S.C. Mar. 31, 2016), *aff'd sub nom. Avery v. Wilson*, 671

Fed. Appx. 138 (4th Cir. 2016) (unpublished) ("Probable cause exists if, given the totality of the circumstances, the officer 'had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner **had committed or was committing an offense**'") (emphasis added) (citing *U.S. v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012)); *U.S. v. Kincaid*, 196CR00016MRWCM1, 2021 WL 3260063, at *2 (W.D.N.C. July 29, 2021) ("the narrow question before this court at this time is whether there is probable cause to believe that Defendant has committed the alleged **new law violations**") (emphasis added); *U.S. v. Dziadus*, 289 F. 837, 840 (N.D. W. Va. 1923) ("The provisions of the statute are plain. No warrant shall issue to search any private dwelling unless facts are adduced before the commissioner tending to establish that it is being used for the unlawful sale of intoxicating liquor . . . .").

Here, however, Maryland RFL authorize ERPOs—which are warrants—to be issued on less than "probable cause" and without any showing of suspected, current or past underlying violations of any law. PUB. SAFETY §§ 5-603(a)(1) and 5-604(a)(1). Instead, ERPOs issue based on "reasonable grounds" that the respondent is a "danger." The "reasonable grounds" standard is lower than required by the Fourth Amendment, and the "danger" standard, in addition to being a personal characteristic rather than alleged underlying violation of one or more laws as required by the Fourth Amendment, is all the more suspect since the RFL directs service of some Temporary ERPOs to occur by *mailing*, thus leaving a time during which individuals who supposedly present immediate "danger" remain armed. PUB. SAFETY §§ 5-601(b)(2)(i)(2).   In any event, disarming individuals because they supposedly have the characteristic of being a "danger" is akin to seizing the bank accounts of individuals who are suspected of being "dishonest" to prevent them from committing tax evasion even though they have not yet violated any tax laws.

Therefore, based on the foregoing, Maryland RFL §§ 5-603(a)(1) and 5-604(a)(1) unquestionably violate the Fourth and Fourteenth Amendments. In addition, the entire Maryland

RFL violates the Fourth and Fourteenth Amendments, since the judicial process that occurs after issuance of an Interim or Temporary ERPO is hopelessly tainted from the beginning by the lack of "probable cause" and lack of an actual underlying violation of law.

Plaintiffs therefore have a high likelihood of succeeding on their claim for violation of the Fourth and Fourteenth Amendments.

### ii.   The Maryland RFL Violates the Second and Fourteenth Amendments

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Incorporated against the states through the Due Process Clause of the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Second Amendment guarantees "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *Id.*, which is and has always been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

### 1.   *Defendants must identify a historical analogue to the RFL*

"*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2118 (citing *Heller*, 554 U.S. 570). Consistent with this demand, and because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). Thus, "[t]o be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a

21

historical analogue." *Range v. Att'y Gen. United States of Am*., 69 F. 4th 96, 103 (3d Cir. 2023) (en banc).

The government bears the burden of proof to show the "well-established and representative historical analogue" required by *Bruen*. 142 S. Ct at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). Public safety concerns are not part of the analysis and cannot be used to justify restrictions on Second Amendment rights. *Bruen* made clear that the government "may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the **regulation is consistent with this Nation's historical tradition of firearm regulation**." *Id.* at 2126 (emphasis added). Thus, a court must "closely scrutinize all gun restrictions for a historically grounded justification." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022).

The Founding Era is the proper historical period for the "distinctly similar" and "relevantly similar" analyses. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142. S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35). The Second Amendment was adopted in 1791. The Supreme Court has explained that 1791 is the controlling time for interpreting the Second Amendment. *See*, *e.g.*, *Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Gamble v. United States*, 139 S. Ct. 1960, 1975-76 (2019) (explaining *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (Second Amendment's "meaning is fixed according to the understandings of those who ratified it").

Here, as in *Bruen* and *Heller*, the restrictions imposed by the Maryland RFL are not prompted by some "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. Indeed, with respect to the Maryland RFL, this "distinctly similar" standard should apply, because the RFL seeks to address a general societal problem that has persisted since the eighteenth

century: the possession of firearms by allegedly dangerous individuals. *See*, *e.g.*, *U.S. v. Harrison*, No. CR-22-00328-PRW, — F.3d —, 2023 WL 1771138, at *2 (W.D. Okla. Feb. 3, 2023) ("[W]here the societal problem addressed by [18 U.S.C.] § 922(g)(3)—users of illicit substances possessing guns—is nothing new, the government must identify 'distinctly similar' laws in our Nation's history and tradition."). Alternatively, although the "distinctly similar" standard clearly should apply here, this Court may also consider whether there are any historical analogues that are at least "relevantly similar" to the Maryland RFL. *U.S. v. Rahimi*, 61 F. 4th 443, 460 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023), quoting *Bruen*, 142 S. Ct. at 2132); *see also Range*, 69 F. 4th at 105.

### 2. The Maryland RFL has no historical analogue to justify its infringement on Plaintiffs' Second Amendment Rights

Despite the possession of firearms by purportedly dangerous individuals having been a societal issue for centuries, the Maryland RFL—which seeks to restrict gun possession to purportedly prevent crimes committed with a firearm—has no historical analogue to justify its restrictions. Indeed, the Maryland RFL authorizes disarmament of purportedly "dangerous" individuals in a manner without any "distinctly similar" connection to *any* Founding Era law; nor are there any such "relevantly similar" Founding Era analogues. "What matters is whether a conceptual fit exists between the old law and the new." *U.S. v. Daniels*, No. 22-60596, 77 F.4th 337, 2023 WL 5091317, at *3 (5th Cir. 2023). In the case at bar, there is no conceptual fit between the Maryland RFL and any old laws. As such, Defendants cannot meet their burden of proving the RFL is part of the historical tradition of the People's right to keep and bear arms. As discussed below, wholesale disarmament of individuals did not occur outside of the military and wartime context during the relevant period. Indeed, laws relating to emergency disarmament of British loyalists or dissidents occurred entirely outside of a peacetime, civilian context.

Throughout the Revolutionary War, "we may safely say that 50,000 soldiers, either regular or militia, were drawn into the service of Great Britain from her American sympathizers." MARK M.

BOATNER III, ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 663 (3d ed. 1994). Indeed, "over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES.[12] "Loyalists were thus commonly treated as enemy combatants." Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearms Prohibitions*, 16 DREXEL L. REV. at 53 (2023) (forthcoming).[13] As a result of the danger presented by loyalists in the military context of the Revolutionary War, disarmament orders were regularly issued to prevent military danger. *Id*. at 54. One of numerous examples of this disarmament of loyalist enemy combatants occurred on May 8, 1776, nineteen days after the Battles of Lexington and Concord, when Massachusetts's Provincial Congress disarmed loyalists so they could not "join with the open and avowed enemies of America" and inflict "ruin and destruction . . . against these Colonies." 2 AMERICAN ARCHIVES, 4th Ser. at 793. In another such example, New York's Provincial Congress, citing "the immutable laws of self-defense," first disarmed loyalists on September 1, 1775:

> Resolved, That if any person shall be found guilty, before the Committee of any City or County in this Colony, of having furnished the Ministerial Army or Navy (after the date of this Resolution) with Provisions or other necessaries, contrary to any Resolution of the Continental or of this Congress, such person or persons, so found guilty thereof, upon due proof thereof, shall be disarmed . . . .

3 AMERICAN ARCHIVES, 4th Ser. at 573. These resolutions of Massachusetts's and New York's Provincial Congresses, and similar resolutions to disarm loyalists, were not analogous to red flag laws, as disarmament of loyalists occurred in a military and wartime context. These Revolutionary War resolutions targeted enemy combatants to accomplish military and wartime objectives:

> Disarmament during the war served the express purpose of neutralizing potential enemy combatants. It also served the express purpose of supplying arms to unarmed patriot troops.

---

[12] https://www.royalprovincial.com/miliatry/rhist/kar/kar1hist.htm.
[13] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000.

Greenlee, *Disarming the Dangerous*, at 65. This contrasts starkly with the objective of red flag laws, which is seizure of firearms and ammunition possessed by allegedly dangerous individuals in a civilian and peacetime context.

Outside of the military and wartime context (other than discriminatory laws targeting purported "dissidents" such as Catholics, discussed below) even where Founding Era (or earlier) laws permitted disarmament in some form, they bore no resemblance to red flag laws; indeed, "no law forbade the disarmed individual from *immediately acquiring new arms*," *id*. at 71-72 (emphasis added), and no civil law permitted authorities to effectuate wholesale seizure of all firearms possessed by an individual, or a wholesale disarmament of that individual. For example, several laws during the Founding Era prohibited hunting at particular times or in particular places. Penalties for illegal hunting included, in some instances, forfeiture of the *individual* firearm used in the hunt, but no more. *See, e.g.*, 1652 N.Y. Laws 138; 1768 N.C. Sess. Laws 168; 23 THE STATE RECORDS OF NORTH CAROLINA 219 (Walter Clark ed., 1904) (1745 North Carolina); ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY 344 (Samuel Allinson ed., 1776) (1771 New Jersey) (only nonresidents had to forfeit the arms used to hunt illegally); 1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS 259 (1805) (1790 Massachusetts). "[T]hese laws involved the isolated disarmament of the firearm involved in the offense, not a ban on possession." *Range v. Att'y Gen. United States of Am*., 53 F.4th at 281 n.25 (3d Cir. 2023), *overruled by Range*, 69 F. 4th 96. In contrast, red flag laws *effectuate a wholesale ban on possession*, applicable to respondent personally *and* respondent's firearms and ammunition. Another kind of "disarmament" laws before, during, and after the Founding Era were the "surety" laws, whereby those who committed firearms offenses were not disarmed but, instead, had to pay a surety to ensure good behavior. For example, in 1759, New Hampshire persons "who shall go armed offensively" were not released "until he or she finds such surities [sic] of the peace and good behavior." ACTS AND

25

LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW ENGLAND 2 (1759). Even felons were not automatically stripped of their right to possess firearms. *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barret, K., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons.").

The bottom line is that, for the most part, examples of disarmament in the Founding Era or earlier "fall into two general buckets," *Daniels*, No 22-60596 at *21, with a few other types of disarmament occasionally appearing in the historical record (such as the aforementioned hunting laws). As to those "buckets":

> *First*, states barred political dissidents from owning guns during period of conflict. Many American states, for instance, disarmed those who failed to take an oath of allegiance during the Revolutionary War. *Second*, both British and American governments disarmed religious minorities—especially Catholics.

*Id*. (internal citations omitted). Indeed, "[a]lmost all the laws disarming dissidents were passed during wartime or periods of unprecedented turmoil." *Id*. at *22. As the Fifth Circuit further observed in *Daniels*:

> Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both [dissidents and Loyalists] were viewed as potential threats to the integrity of the state. The same was true of religious minorities—the perceived threat was as much political as it was religious.

*Id*. (internal citations omitted). Based on the foregoing, and considering Defendants' inability to satisfy *Bruen's* "distinctly similar" test, Plaintiffs have a high likelihood of succeeding on their claim for violation of the Second Amendment.

### B.   Plaintiffs Will Suffer Irreparable Harm Absent Judicial Intervention

"[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross*, 818 F.2d at 1135; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Thus, when alleged deprivation of a constitutional right is involved, "most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022).

"The 'basic purpose of [the Fourth Amendment] . . . 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Leaders*, 2 F.4th at 339 (citing *Carpenter v. U.S.*, 138 S. Ct. 2206, 2213 (2018)). Seizures conducted pursuant to a warrant "demand the safeguard of demonstrating probable cause to a neutral judicial officer before the warrant issues." *In re Subp.*, 228 F.3d at 348 (citing *U.S. v. Miller*, 425 U.S. 435, 446 (1976)). Here, as discussed *supra*, Interim and Temporary ERPOs are warrants within the meaning of the Fourth Amendment, as they are writs issued by a judge or commissioner that direct and authorize law enforcement to serve an ERPO on a respondent, and then seize the respondent's property and arrest the respondent, if he or she does not immediately surrender the property to law enforcement. *See Yith*, 881 F.3d at 1166; *In re Subp.*, 228 F.3d at 348. Indeed, this constitutes a seizure even when the respondent surrenders his or her property voluntarily as he or she is surrendering to the State's authority. *Albright*, 510 U.S. at 271. Yet both Interim and Temporary ERPOs are issued on a standard less than "probable cause", as the AG has conceded. (Ex. 4; FAC ¶ 97; *see also* FAC Ex. N) ("The State agrees with Lyles that a warrant may issue only upon 'probable cause,' and that 'reasonable grounds' is a lesser standard than probable cause.'"). And, both types of ERPO issue based, impermissibly, on the respondent's alleged personal characteristic of being a "danger," which does not comport with the "probable cause" requirement. Thus, the issuance of Interim and Temporary ERPOs without "probable cause" is a violation of the Fourth Amendment rights of Plaintiffs and all residents of Maryland, and therefore constitutes irreparable harm. Moreover, as demonstrated above, the Maryland ERPO statistics, which show the existence of a Red Flag Assembly Line, prove that this harm will be repeated daily absent judicial intervention.

The Second Amendment protects the right to be "armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 584 (2008)). Because this is a right "for self defense," it is "a right that can be infringed upon whether or not

plaintiffs are ever actually called upon to use their weapons to defend themselves." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016), *granting permanent injunctive relief, sub. nom. Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). "When one needs to defend herself, family, or property right now, but is defenseless," that "is the heaviest kind of irreparable harm." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 954 (S.D. Cal. 2020), *vacated and remanded; Rhode v. Bonta*, No. 20-55437, 2022 WL 17099119 (9th Cir. 2022). The rights recognized in *Bruen, Heller, McDonald,* and *Grace* are precisely the rights of which Willey was unconstitutionally deprived when Defendants undertook the actions described herein, and the rights of which SAF, its members, and all other residents of Maryland have been deprived and will be deprived, absent judicial intervention.

This irreparable harm to Plaintiffs *will* be repeated. On a personal level regarding Willey, over the past three years, Webb has proven her intent to harass and harm Willey by any means, including weaponizing the law. Further, the Webb Petition shows Webb has no issue perjuring herself to further her vendetta against Willey. Nothing in the Maryland RFL prevents Webb or other Dorchester County officials from repeating this exact conduct—falsely claiming that Willey made threats of violence and using the RFL to further harass and harm Willey by having a warrant issued against him without "probable cause" and seizing his lawfully owned property. And like this instance, Willey would have no say in the matter and would once again see his constitutional rights infringed. In the absence of injunctive relief, Willey faces a repeat of this entire ordeal. Further, Willey has had to refrain from actively combatting Webb and Dorchester County's onslaught of nuisance and zoning infractions to the extent he otherwise would have, such as publicly speaking out against Webb's campaign of harassment against him or taking further legal action against her and Dorchester County, out of fear of having further baseless ERPOs issued against him. (Willey Decl. ¶ 30).

On a broader level, SAF and its members who reside in Maryland face a likelihood of irreparable harm absent an injunction prohibiting enforcement of the Maryland RFL. SAF is composed of approximately 720,000 members, thousands of whom reside in Maryland. (Kraut Decl. ¶ 4). Many of SAF's members residing in Maryland are lawful owners of firearms and ammunition. (*Id.* ¶ 5). SAF's members therefore face the same prospects as Willey; namely, the risk of having an ERPO issued against them depriving them of their constitutional rights, potentially based on false petitions like Webb's, but even when not based on a false petition, on less than "probable cause" and based on a personal characteristic of being a "danger," and based on a law that exists without any historical analogue. In fact, the repetition of this unconstitutional conduct statewide throughout Maryland is not a question of "if," but "when," since it is a *certainty* that ERPOs will be issued daily on the Red Flag Assembly Line in a manner that does not comport with the Fourth or Second Amendments.

The likelihood of this irreparable harm being repeated is evidenced by the data collected by Maryland courts, which compiled detailed ERPO statistics categorized by judicial district for every month in 2021[14] and 2022.[15] These statistics display a troubling picture of the Red Flag Assembly Line, in which Maryland courts churn out ERPOs on a scale second only to Florida. Absent judicial intervention, over two ERPO petitions will continue to be filed daily, which will result in over 1,000 combined Interim and Temporary ERPOs issuing annually, just like in 2021 and 2022, all on less than "probable cause" and upon the characteristic of being a "danger", and all without any historical analogue, as required by *Bruen*. Therefore, the irreparable harm of having constitutional rights infringed upon by government officials acting under the Maryland RFL is not only likely, it is *certain*.

---

[14] https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2021.pdf.
[15] https://www.courts.state.md.us/sites/default/files/import/district/statistics/ERPO_2022.pdf.

As discussed *supra*, Plaintiffs have shown a high likelihood of success on the merits of their claims for violation of the Fourth, Second, and Fourteenth Amendments. Defendants' denial of those constitutional rights constitutes irreparable harm. *Ross*, 818 F.2d at 1135. Therefore, Plaintiffs risk facing irreparable harm in the absence of the requested injunctive relief.

### C.      The Remaining Factors Favor Preliminary Injunctive Relief

When the party opposing a preliminary injunctive relief is the government, the last two factors—the balance of equities and the public interest—merge. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020), *as amended* (Jan. 14, 2020). The public interest is served by enjoining unconstitutional actions. *See*, *e.g.*, *Legend*, 637 F.3d at 303 ("upholding constitutional rights is in the public interest"); *Giovani*, 303 F.3d at 521 ("upholding constitutional rights surely serves the public interest"). Further, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Id*. at 521; *see also Leaders*, 2 F.4th at 346 (same); *St. Michael's*, 566 F. Supp. at 351 ("When a state is precluded from enforcing restrictions that are likely to be deemed unconstitutional, then the balance of the equities favors preliminary relief.") (internal quotation omitted).[16] The balance of equities tips in Plaintiffs' favor and granting injunctive relief is in the public interest.

### V.      CONCLUSION

For the foregoing reasons, the Court should grant the requested preliminary injunction enjoining Defendants from enforcing the Maryland RFL.

Date: September 8, 2023                          Respectfully submitted,
                                                 /s/ Edward Andrew Paltzik
                                                 Serge Krimnus, Esq. (Bar No. 22072)
                                                 Edward Andrew Paltzik, Esq. (Bar No. 30785)

---

[16] Under Rule 65(c), this Court has discretion to waive the security requirement. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Enjoining an unconstitutional law will impose the State no financial harm and any harm in not enforcing an unconstitutional law is "remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The Court should therefore waive the security requirement in the instant case.

Bochner PLLC
1040 Avenue of the Americas, 15th Floor
New York, New York 10018
(516) 526-0341
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Edward Andrew Paltzik, hereby certify that I caused a true and correct copy of this motion and supporting documents to be served, via mail, under FED. R. CIV. P. 5(a), on all Defendants.

<u>/s/ Edward Andrew Paltzik</u>
Edward Andrew Paltzik, Esq.