IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONALD S. WILLEY, ET AL., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:23-cv-02299-ELH |
| ANTHONY G. BROWN, ET AL., | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

ANTHONY G. BROWN
Attorney General of Maryland

ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JOSHUA R. CHAZEN
Federal Bar No. 06837
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7055

October 13, 2023

Attorneys for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

STATUTORY BACKGROUND ......................................................................................... 2

PROCEDURAL BACKGROUND ...................................................................................... 4

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ...................................................................................................................... 5

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR FOURTH
      AMENDMENT CLAIMS. ........................................................................................... 6

II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND
      AMENDMENT CLAIMS. ......................................................................................... 10

      A.    The Supreme Court in Bruen Clarified the Standard Applied to
            Challenges under the Second Amendment................................................ 11

      B.    There is a Longstanding American Tradition of Regulating the
            Possession of Firearms by People Perceived to be Dangerous, Who
            Otherwise Threaten to Disrupt the Public Peace, and Who Are Not
            Law-Abiding, Responsible Citizens............................................................ 12

      C.    The Extreme Risk Protective Order Laws Passed by Maryland
            Constitute a Modern Trajectory Consistent with the Nation's History
            and Tradition of Firearm Regulations Prohibiting Irresponsible and
            Dangerous Citizens from Possessing Firearms. ........................................ 17

III.  PLAINTIFFS FAIL TO ESTABLISH THAT THEY WILL SUFFER IRREPARABLE
      HARM WITHOUT THE ENTRY OF A PRELIMINARY INJUNCTION. ............................ 20

IV.   THIS COURT SHOULD DENY PLAINTIFFS' MOTION FOR PRELIMINARY
      INJUNCTION BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE. ....... 21

CONCLUSION ................................................................................................................. 23

**INTRODUCTION**

In 2010, the Supreme Court in *McDonald v. City of Chicago* assured the States that, consistent with historical tradition, "experimentation with reasonable firearms regulations [may] continue under the Second Amendment." 561 U.S. 742, 785 (2010). Along with 20 other States and the District of Columbia, Maryland heeded that call in 2018 when it enacted House Bill 1302, which established a process by which a petitioner could seek an "extreme risk protective order" ("ERPO") preventing a respondent, for a limited time, from purchasing or possessing a firearm. *See* Md. Code Ann., Pub. Safety §§ 5-601 – 5-610 (LexisNexis 2022). True to the substantive limitations of the Second Amendment, the ERPO laws challenged here are designed to provide a mechanism to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022). And because this vital public safety measure fulfills that objective with appropriate procedural guardrails, and without imposing any constitutionally significant burdens on any law-abiding, responsible Maryland gun owner, it is constitutional. There is thus no validity to plaintiffs' assertions that they will likely prevail on their claims, that they will suffer irreparable harm in the absence of judicial intervention, that the balance of the equities favors them, or that the public interest favors leaving firearms in the possession of those found to be a danger to the public or themselves. Therefore, this Court should deny plaintiffs' motion for preliminary injunction.

## STATUTORY BACKGROUND

An ERPO is a civil protective order.  Pub. Safety § 5-601; *see also United States v. Somerlock*, 602 F. Supp. 3d 791, 804-06 (D. Md. 2022).  Modeled on domestic violence protective orders,[1] Maryland's statutory scheme allows a state judge or state district court commissioner to enter an ERPO "to prohibit the respondent from possessing a firearm," if the judge or commissioner "finds that there are reasonable grounds to believe that the respondent poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm."  Pub. Safety §§ 5-603, 5-604.

An ERPO petition must (1) set forth "specific facts" as to why the respondent poses a danger, (2) explain the basis for the petitioner's knowledge, and (3) describe any known firearms believed to be possessed by the respondent.  *Id*. § 5-602(a)(1)(iii) (v).  A petitioner files a petition for an ERPO under the penalty of perjury.  *Id*. § 5-602(a)(1)(i).

Not just anyone can file a petition for an ERPO.  The law requires instead that a petition may only be filed by a physician, psychologist, licensed clinical professional counselor, licensed clinical marriage or family therapist, law enforcement officer, cohabitant of the respondent, or a person related to the respondent by blood, marriage, or adoption.  *Id.* § 5-601(e)(2).

---

[1] *See* Md. Code Ann., Family Law §§ 4-504 — 4-512.1 (LexisNexis 2019); *see also* Fiscal and Policy Note – Revised, House Bill 1302 (2018) ("The bill is modeled on statutory provisions that set forth a process by which an individual may seek relief from abuse by filing a petition for a domestic violence protective order.").

Generally, the petitioner files the petition with the state district court. *Id.* § 5-602(b)(1). However, if the state district court is closed, the petitioner files the petition with a state district court commissioner. *Id.* § 5-602(b)(2). In this instance, the commissioner may enter an interim ERPO, which lasts no more than two business days and is followed during that time by a hearing on a temporary ERPO. *Id.* § 5-603. Otherwise, a state district court judge may enter a temporary ERPO, which lasts no more than seven days and is followed during that time by a hearing on a final ERPO. *Id.* § 5-604. Following the entry of an interim or temporary ERPO, the respondent shall surrender to law enforcement authorities any firearm and ammunition in the respondent's possession and shall not purchase or possess any firearm or ammunition for the duration of the interim or temporary ERPO. *Id.* §§ 5-603(a)(3), 5-604(a)(3).

Although a district court judge can enter a temporary ERPO *ex parte*, a judge shall provide respondent with an opportunity to be heard on the issue of whether the court should enter a final ERPO. *Id.* § 5-605(a). At the hearing on the determination of entry of a final ERPO, the judge may enter a final ERPO "to prohibit the respondent from possessing a firearm if the judge finds by clear and convincing evidence that the respondent poses a danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* § 5-605(c)(1)(ii). In making this determination, the court can review all relevant open and shielded court records involving the petitioner and respondent. *Id.* § 5-605(d)(1). The duration of a final ERPO may not exceed one year. *Id*. § 5-605(f)(1).

## PROCEDURAL BACKGROUND

On August 28, 2023, plaintiffs filed their first amended complaint (the "amended complaint").  (ECF 5.)  Among other claims, plaintiffs assert a widespread challenge to Maryland's laws regarding ERPOs under the Second, Fourth, and Fourteenth Amendments.[2]  (ECF 5 at 24-40.)  However, plaintiffs only seek a preliminary injunction as to Counts One and Two of the amended complaint.  (ECF 15-1 at 15.)

In Count One, plaintiffs challenge the ERPO laws under the Fourth Amendment. They claim that, because an ERPO is equivalent to a warrant in that it permits the seizure of a respondent's firearms, such an order may issue only upon a finding of "probable cause."  (ECF 5 at 24 ¶ 90.)  Plaintiffs then point out that the ERPO laws allow the entry of an interim or temporary ERPO on a finding of "reasonable grounds," and in turn argue that this standard is constitutionally deficient because it "is lower than the constitutionally required 'probable cause' standard."  (ECF 5 at 27-28 ¶ 99.)  In addition, plaintiffs argue that the ERPO laws violate the Fourth Amendment because they "authorize searches and seizures based upon [a] finding of a subjective and undefined forbidden personal characteristic of the targeted individual (being a 'danger'), rather than upon an alleged objective and defined underlying violation of one or more laws."  (ECF 5 at 28 ¶ 100 (emphasis omitted).)

---

[2] Plaintiffs' other claims are not directed to the facial constitutionality of the ERPO law, but instead relate to particular factual allegations made against individual and county defendants.  Those claims are not at issue in plaintiffs' motion for preliminary injunction.

In Count Two, plaintiffs challenge Maryland's ERPO laws as violating the Second Amendment.  (ECF 5 at 30-36 ¶¶ 107-29.)  Relying on the principles set forth in *Bruen*, plaintiffs argue that the ERPO laws are unconstitutional because there was no distinctly similar historical analogue at the time of the Founding that authorized the disarming of dangerous individuals.  (ECF 5 at 35 ¶ 125.)

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  Preliminary injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Dewhurst v. Century Aluminum Co*., 649 F.3d 287, 290 (4th Cir. 2011) (citation omitted).  To obtain a preliminary injunction, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 196 (4th Cir. 2023) (citation omitted).

## ARGUMENT

Plaintiffs' motion for preliminary injunction should be denied because plaintiffs have failed to establish that they are likely to succeed on the merits of their claims that Maryland's ERPO laws violate constitutional principles.  Just as importantly, plaintiffs cannot demonstrate that they will suffer irreparable harm if this Court denies the plaintiffs' requested relief and permits Maryland's ERPO laws to remain in effect during the duration

of this litigation.  Further, the balance of the equities favors defendants because the State has the obligation to protect the public from dangerous people, and the ERPO laws further this important duty.  For these reasons, as further explained below, plaintiffs cannot satisfy their burden for entitlement to the "extraordinary remedy" of a preliminary injunction.

## I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR FOURTH AMENDMENT CLAIMS.

Plaintiffs argue that "a court may not issue a judicial warrant directing or authorizing seizure of personal property upon less than 'probable cause.'"  (ECF 15-1 at 24.)  They then assert that, because the ERPO laws authorize the seizure of firearms, the applicable standard must be "probable cause" rather than "reasonable grounds."  Plaintiffs' argument, however, is based on an erroneous premise.  Contrary to plaintiffs' arguments, the terms "reasonable grounds" and "probable cause" have the same meaning under Maryland law. Accordingly, notwithstanding the ERPO laws' use of the phrase "reasonable grounds," an ERPO may only be issued upon a finding that rises to the level of "probable cause."  The ERPO laws are thus consistent with constitutional standards.

Maryland case law has long recognized "probable cause" and "reasonable grounds" as synonymous standards.  *See In re O.P.*, 470 Md. 225, 265 (2020) (noting that "reasonable grounds" "has often been used essentially as a synonym for probable cause"); *Stevenson v. State*, 287 Md. 504, 516 (1980) ("While phrased in terms of 'reasonable grounds' for arrest, this common law criterion also happens to state the constitutional standard, since it and the 'probable cause' requirement of the federal constitution's fourth amendment 'are substantial equivalents.'"  (citing, *e.g.*, *Draper v. United States*, 358 U.S.

307, 310 n.3 (1959)); *Riley v. State*, 179 Md. 304, 311-12 (1941).  Other sources are in accord.  *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 3.1(a) ("As for arrest without a warrant, it is commonly said that such action is permissible upon 'reasonable grounds to believe.' This language, however, has been viewed as stating 'the constitutional standard' of probable cause."); Black's Law Dictionary, 1321 "*Probable Cause*" (9th ed. 2009) (defining "probable cause" as a "reasonable ground" to believe that a person has committed a crime).

Plaintiffs ignore entirely this case law.  Indeed, although plaintiffs assert that "[f]ederal and state courts . . . have consistently held that the 'reasonable grounds' standard is similar to the 'reasonable suspicion' standard" (ECF 15-1 at 18), plaintiffs fail to support this statement with any relevant authority.  Instead, plaintiffs cite to cases such as *Terry v. Ohio*, 392 U.S. 1 (1968) and *Alabama v. White*, 496 U.S. 325 (1990), which both stand for the uncontroversial notion that "reasonable suspicion" is a less demanding standard than "probable cause."  (ECF 15-1 at 18.)   To be clear, defendants are not claiming that an ERPO may issue upon a finding of "reasonable suspicion" or any standard less than probable cause.  Rather, as explained above, because "reasonable grounds" as used in the ERPO laws is the same standard as "probable cause," it follows that an ERPO may issue only upon a finding of "probable cause."  And because that standard is consistent with constitutional principles, plaintiffs cannot not succeed on their claim that the ERPO law allows the issuance of an order under a constitutionally-deficient standard.

Plaintiffs' subsidiary arguments can be rejected out of hand.  Plaintiffs first ascribe significance to the fact that an assistant Attorney General in an unrelated criminal appellate

brief "agree[d] . . . that 'reasonable grounds' is a lesser standard than probable cause." (ECF 15-1 at 18.)  Plaintiffs, however, have presented no case law establishing that a statement[3] by an assistant Attorney General is conclusively binding in subsequent cases, especially here where the context is vastly different.  Rather, the opposite principle applies. *See, e.g.*, *Maryland Transp. Auth. Police Lodge 34 of Fraternal Order of Police, Inc. v. Maryland Transp. Auth.*, 195 Md. App. 124, 219 (2010), *rev'd on other grounds*, 420 Md. 141 (2011) (concluding that a plaintiff will not be able to "prevent the State from applying an otherwise valid law or regulation because of the prior statements or conduct of public employees, upon which the claimant detrimentally relied, which led the claimant to assume that the applicable law was otherwise.")

Next, plaintiffs point to the fact that, although the ERPO laws use the "reasonable grounds" standard with regard to an order authorizing the seizure of firearms, the statutes have a provision allowing the judge or commissioner to sua sponte order an emergency psychiatric evaluation if there is "probable cause" to believe that a respondent is dangerous due to a mental illness.  (ECF 15-1 at 19.)  Plaintiffs read too much into this.  The fact that the ERPO laws use different nomenclature for the same substantive standard appears to be a function of how the legislation came together.  As noted above, the general infrastructure

---

[3] A review of the brief in question shows that the assistant Attorney General's statement was entirely unnecessary, and in any event was inconsequential to the resolution of the case.  Indeed, the court accepted the State's argument in that case that, although a judge had signed a warrant that in its heading referenced "reasonable grounds," its inclusion was a typographical error and that, in any event, the facts within the warrant application were sufficient to satisfy a probable cause standard.

of the ERPO laws was borrowed from the domestic violence protective order statutes, which use the "reasonable grounds" standard.  *See, e.g.*, Md. Code Ann., Family Law §§ 4-504.1(b) (LexisNexis 2019).  The provision allowing a judicial officer to order an emergency evaluation, however, was added to the ERPO laws late in the legislative session to assuage concerns that simply taking a dangerous person's firearms might be ineffective or at times counterproductive.  *See* House Bill 1302, Amendment  258778 (adopted by the Senate April 5, 2018).  And in doing so, the Legislature imported the language from the stand-alone emergency evaluation statute, which uses the "probable cause" standard.  Md. Code Ann., Health-Gen. § 10-623 (LexisNexis 2019).  Accordingly, the ERPO laws' use of different terminology for the same standard appears to be more a function of last-minute legislative patchwork than a deliberate attempt to require the use of different standards.

Finally, plaintiffs also argue that the ERPO law is "constitutionally defective because it authorizes Interim and Temporary ERPOs to issue based upon the subjective and undefined personal characteristic of a respondent (being a 'danger') rather than upon an alleged violation of one or more laws." (ECF 15-1 at 19.)  Plaintiffs' argument is easily dismissed.  Although plaintiffs invoke science fiction, they ignore the fact that predictive decisions, like those encompassed in the ERPO laws, are commonplace in the law.  For example, domestic violence protective orders may be issued to protect an abused person from the harm that an abuser may thereafter inflict.  *See, e.g.*, Family Law §§ 4-504 — 4-512.1.  Maryland law allows medication to be administered to an individual who refuses the medication in an emergency upon "the order of a physician where the individual presents a danger to the life or safety of the individual or others."  Md. Code Ann., Health-

Gen. § 10-708 (LexisNexis 2019).  And Maryland law allows the labor commissioner to "enjoin a condition or practice at a railroad company if the condition or practice creates an imminent danger that reasonably could be expected to cause death or serious physical harm to an individual or serious physical damage to property."  Md. Code Ann., Lab. & Empl. § 5.5-120 (LexisNexis 2016).  Moreover, in a perhaps more relevant example, the Supreme Court in *Bruen* expressly approved of public carry permitting schemes that denied the right to carry to "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon."  142 S. Ct. at 2123 n.1.  Nothing about the predictive nature of these statutes violates the Fourth Amendment.

## II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CLAIMS.

Plaintiffs are also unlikely to succeed on their claim that Maryland's ERPO laws violate the Second Amendment and, by association, the Fourteenth Amendment. Maryland's ERPO laws are consistent with this Nation's historical tradition of preventing persons who are not law-abiding, responsible citizens from possessing firearms.  As detailed below, this tradition dates to the colonial era and continues to the present day.  It falls in line with decisions by legislatures to disarm loyalists and rebels in the 18th century. It falls in line with decisions by legislatures to disarm underage individuals and persons of unsound mind in the 19th century.  And it falls in line with decisions by legislatures to disarm felons, drug addicts, and domestic abusers in the 20th century.  It thus does not offend the Second Amendment for Maryland to implement ERPO laws and disarm individuals whose irresponsibility makes them a danger to the public and/or themselves.

10

A.    **The Supreme Court in *Bruen* Clarified the Standard Applied to Challenges under the Second Amendment.**

In 2022, the United States Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), which struck down the "proper cause" aspect of New York's public carry permit scheme.  In doing so, the *Bruen* majority rejected the two-step interest-balancing framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges.  Instead, the Supreme Court clarified that if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id*. at 2126; *see also id*. at 2129.

*Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower courts.  For example, as it did in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment."  *Id*. at 2134 (quotation and ellipses omitted).  And although *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," it similarly declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id*. at 2132-33.  As the Court recognized, in some cases historical analogies will be "relatively simple to draw," while

"other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id*. at 2132.

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern regulations.  *Id*. at 2133.  The Supreme Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id*. at 2132.  Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

     **B.**     **There is a Longstanding American Tradition of Regulating the Possession of Firearms by People Perceived to be Dangerous, Who Otherwise Threaten to Disrupt the Public Peace, and Who Are Not Law-Abiding, Responsible Citizens.**

"The history and tradition of restricting the use of dangerous weapons to prevent terror and protect civil order is grounded in centuries of English statutory and common law."  Declaration of Saul Cornell, attached hereto as Exhibit 1 ("Cornell Decl.")  at ¶ 13.  This foundational history is most notably embodied in the 1328 Statute of Northampton, which provided that "no man . . . [shall] come before the King's Justices . . . with force and arms, nor bring no force in affray of the peace . . . ."  (Cornell Decl., at ¶ 13.)

The drafters of the Second Amendment had a background in English common law ideas.  (Cornell Decl. ¶ 14.)  And no concept was more important to English common law than the concept of the peace and preventing fear of injury.  (Cornell Decl. at ¶ 14.)  "In the post-Revolutionary period, states began writing common law practices into statutory law, including the adoption of surety laws, which required individuals deemed to be dangerous to post a surety or face imprisonment (and thereby disarmament as well)."  (Cornell Decl. at ¶ 16.)  *See also Bruen*, 142 S. Ct. at 2148.  These surety laws preemptively forbade offensive, non-peaceable conduct.  (Cornell Decl.  at ¶ 18.)  *See also Bruen*, 142 S. Ct. at 2148 n.23.  And they represented "an ongoing and consistent trend to condition or limit the right to keep and bear arms based on the extent to which an individual was perceived to be dangerous to others or to a peaceful society."  (Cornell Decl. at ¶ 18.)

When the Revolution began, most States enacted laws disarming loyalists and others who refused to swear allegiance to the new Republic.  *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of May 1777, ch. 3, 9 *The Statutes at Large:  Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).  "The decision of the Continental Congress to disarm loyalists illustrates the broad commitment to disarm those who did pose potential threat to the peace and public safety."  (Cornell Decl. at ¶ 22.)  This decision and other statements and provisions limited the right to keep and bear arms for self-defense and subjected individuals to potential disarmament based on

dangerousness to others, "even in the absence of any direct unlawful act by a gun owner." (Cornell Decl. at ¶ 25.)  This included the ability of justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.  *See* James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) [North Carolina]; William Waller Hening, *The New Virginia Justice* 18 (1795) [Virginia]; Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

At the time of the Founding, many states and localities prohibited possession of firearms by intoxicated people, drug addicts, and minors.  (Cornell Decl. at ¶ 36.)  *See also* Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656.  States and localities also restricted possession of firearms from those suffering from mental illness and vagrants.  (Cornell Decl. at ¶ 37.)  *See also* Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297.  "As had been true under common law and in the early republic, individuals who were perceived to pose a danger, were not law abiding, or lacked the requisite capacity to use arms responsibly could be disarmed by the state."  (Cornell Decl. at ¶ 37.)

Courts that have considered this issue have affirmed the proposition that the right embodied in the Second Amendment does not extend beyond "law-abiding, responsible citizens."  For example, in *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012), the Fourth Circuit engaged in an "historical analysis" that demonstrated that this limitation had roots in classical republican political philosophy:  "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous

14

citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id*. at 979 (citation omitted).  The Fourth Circuit explained how these theoretical underpinnings had been implemented in the pre-constitutional Founding era, citing colonial laws "bar[ring] 'potential subversives' from owning firearms," laws disarming citizens who refused to swear allegiance to the government, and the disarmament of those who participated in Shays' Rebellion. *Id.*  The Fourth Circuit then moved on to the development of, and debates surrounding the adoption of, the Second Amendment, noting that various states' iterations of the underlying right limited the right to "peaceable citizens" or those who "are or have been in actual rebellion. *Id.*  Finally, the Court noted that these limitations were consistent with the pre-Founding English right to bear arms (as expressed in the English Bill of Rights), which "allowed the government to disarm those it considered disloyal or dangerous."[4] *Id*.

Although the republican virtue theory has been questioned by some jurists, there is firm agreement that the "law-abiding, responsible citizens" entitled to the protections of the Second Amendment do not include those who are "dangerous."  *See Harley v. Wilkinson*, 988 F.3d 766, 780 n.7 (4th Cir. 2021) (Richardson, J., dissenting) ("There is ongoing debate on whether felons have historically been disarmed because of the danger they pose to the public or because of their lack of virtue."); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (rejecting the "virtuous citizen" theory and

---

[4] The Fourth Circuit reaffirmed its "endorse[ment]" of the "'virtuous citizen' justification" in *Hamilton v. Pallozzi*, 848 F.3d 614, 625 & n.9 (4th Cir. 2017).

concluding that "[t]he historical evidence . . . support[s] a different proposition:  that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety").

Indeed, whether based on history or common sense (or both), this and other courts have recognized the proposition, grounded in Founding-era history, that governments may prohibit the possession of firearms by individuals who are dangerous or whose possession would otherwise be contrary to the public safety.  *See United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) ("The Government offers substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'"); *Carpio-Leon*, 701 F.3d at 979 ("The Court was careful to note that its opinion should not be read to limit the government's ability to disarm individuals who cannot be trusted with firearms."; *see also New York State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting) ("[*Heller*] recognized that history supported the constitutionality of . . . laws . . . prohibiting possession [of firearms] by felons *and other dangerous individuals*." (emphasis added)); *Doe I v. Governor of Pa.*, 977 F.3d 270, 273 (3d Cir. 2020) (concluding that "the historically-barred class of mentally ill individuals who were excluded from Second Amendment protection" "consists of 'individuals who were considered dangerous to the public or to themselves'"); *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016) (noting that the Supreme Court "understood that Congress's power to enact categorical disqualifications was 'part of the original meaning' of the Second

Amendment" and that legislatures have the "power to categorically prohibit certain presumptively dangerous people from gun ownership").

Later history bears out these principles.  By the mid to late nineteenth century, states and localities denied the right to carry arms in public to those deemed dangerous.  (Cornell Decl. at ¶ 39.)  For example, both the Texas and Tennessee constitutions, adopted in the 1870s, allowed the state legislatures to regulate the wearing of arms to prevent crime. (Cornell Decl. at ¶ 40.)  "As the foregoing demonstrates, regulation of firearms took various forms in the early republic.  But as each type of statute makes plain, the legislatures have consistently exercised the authority to disarm individuals perceived to be dangerous." (Cornell Decl. at ¶ 41.)

By the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses from being armed.  *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220.  And in the 1990s, Congress passed a series of statutes that reflected its longstanding judgment that "firearms must be kept away from persons . . . who might be expected to misuse them."  *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983), *superseded by statute on other grounds*, *Logan v. United States*, 552 U.S. 23 (2007).

### C.     The Extreme Risk Protective Order Laws Passed by Maryland Constitute a Modern Trajectory Consistent with the Nation's History and Tradition of Firearm Regulations Prohibiting Irresponsible and Dangerous Citizens from Possessing Firearms.

The State may show that a regulation is consistent with the Nation's history and tradition of firearm regulations by identifying analogous historical regulations throughout

the Nation's history.  *Bruen*, 142 S. Ct. at 2132-33.  Although these historical regulations may range from the pre-Founding era to the Reconstruction era, ultimately the analogous regulation inquiry is meant to reveal whether the original public understanding of the Second Amendment right at the time of ratification or incorporation would permit the modern regulation.  *See id.* at 2136-38.  And because of our English common law tradition, it would be error to draw dispositive significance from the absence of enacted statutes that expressly set forth these principles.

A law is "relevantly similar" if it uses similar means to achieve similar purposes. *Bruen*, 142 S. Ct. at 2133.  Here, Maryland's laws governing ERPOs use the tradition of keeping firearms out of the hands of individuals deemed to be a danger to the public as their foundational analog.  "Temporary disarmament of individuals who, after receiving due process, a higher level of due process than anything available in earlier periods of American history, imposes a far lower burden on Second Amendment rights than the preemptive and permanent disarmament of entire categories of people thought to be dangerous (without being given any due process) that is amply supported by the American historical tradition."  (Cornell Decl. at ¶ 46.)

Further, plaintiffs appear to be challenging Maryland's *substantive* authority under the Second Amendment to place firearms restrictions on those individuals who "pose[] a danger of causing personal injury" to themselves or others through the possession of a firearm.  Yet, as set forth above, courts have consistently held that American history and tradition allows for the disarmament of persons who pose a danger to themselves or others. *See, e.g.*, *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("[T]he Anglo-

18

American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."). Accordingly, as a substantive matter, Maryland's ERPO laws—which are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"—are constitutional on their face. *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

Plaintiffs' claim that Maryland's ERPO laws have "no historical analogue" (ECF 15-1 at 30), is thus disingenuous. And while an absence of a history of identical regulations may be relevant to the Second Amendment inquiry, *Bruen*, 142 S. Ct. at 2131, the Supreme Court does not treat such absence as dispositive. Legal, social, and technological factors readily explain the absence of historical laws targeting individuals subject to ERPOs. (*See* Cornell Decl. at ¶¶ 42-45 (describing colonial approaches to domestic violence, and underscoring that, with only a small fraction of spousal homicides being committed with a firearm, the Founding generation had no reason to pass laws specifically targeting an abuser's right to possess firearms).) Plaintiffs' requested relief does not account for these changes to society nor does it coexist with this Nation's history of firearm restrictions.

Individuals subject to interim or temporary ERPOs pose a grave danger to others. Most obviously, their possession of firearms imperils the petitioner and others in the community. Lessons from domestic violence orders teach that the entry of a protective order does not guarantee that abuse will cease. *See* Kellie R. Lynch et al., *Firearm-Related Abuse and Protective Order Requests Among Intimate Partner Violence Victims*, 37 J. Interp. Violence 12,974, 12,983 (2021) (finding that victims who sought protective orders

were significantly more likely to report that their abusers threatened to shoot others in public places, such as strangers).

In sum, the pre-existing right embodied in the Second Amendment encompassed a limitation that allowed governments to restrict firearm possession by those individuals who are properly deemed to be dangerous.  Because Maryland's ERPO laws, by their nature, provide a considered mechanism for disarming those individuals deemed by a judicial officer to "pose an immediate and present danger of causing personal injury" to themselves or others, those laws are consistent with the historical tradition of firearm regulation in the United States.

## III.   PLAINTIFFS FAIL TO ESTABLISH THAT THEY WILL SUFFER IRREPARABLE HARM WITHOUT THE ENTRY OF A PRELIMINARY INJUNCTION.

As shown above, plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims, which itself is fatal to their motion for preliminary relief.  *See DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  Plaintiffs' motion for preliminary injunctive relief also fails because they have not shown they will suffer irreparable harm if an injunction is not entered.

To satisfy the irreparable harm requirement, plaintiffs "must make a clear showing of irreparable harm[,] . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent."  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).  In other words, the harm must be likely, not just possible.  *Winter* 555 U.S. at 22.  Here, although Mr. Willey alleged facts establishing that his firearms had been taken pursuant to an ERPO, he admits that he is no longer subject to that ERPO, and the

proceedings were concluded in his favor.  As a result, with regard to irreparable harm, Mr.

Willey (and all members of SAF) now stands in the same shoes as any member of the

public.    Although Mr. Willey may subjectively believe that he will be targeted by

defendant Webb for another ERPO, he has presented nothing to support that belief other

than speculation.[5]   Nor does the fact that the ERPO laws are used regularly by Maryland

courts to seize firearms from dangerous individuals establish the requisite irreparable harm.

In other words, the mere fact that a law exists, and that the law might possibly be applied

to a plaintiff in this case, fails to establish judicially-cognizable harm for purposes of the

extraordinary relief of a preliminary injunction.

## IV.   THIS COURT SHOULD DENY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE.

Plaintiffs also have failed to establish, as they must to prevail, that "'the balance of

equities tips in [their] favor, and that an injunction is in the public interest.'"  *Id*. (quoting

*Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008)).

The State's authority to enforce duly enacted laws "clearly inflicts irreparable harm

on the State."  *Abbot v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Cameron v.

EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1011 (2022).  That harm is especially clear

where, as here, there is an "ongoing and concrete harm" to the State's "law enforcement

---

[5] To the extent that this Court would be inclined to issue injunctive relief, such relief should be limited only to enjoining defendant Webb from filing a petition for ERPO against Mr. Willey.

and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Here, plaintiffs seek to enjoin laws designed to prevent gun violence.  The risks of allowing citizens that are irresponsible and dangerous to possess firearms are obvious. According to the Centers for Disease Control, in 2020, 45,222 people died from gun-related injuries in the United States, the most in any year recorded.  *See* Centers for Disease Control and Prevention, *Fast Facts: Firearm Violence Prevention*, https://www.cdc.gov/violenceprevention/firearms/fastfact.html.  Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents.  J. Goldstick, R. Cunningham, & P. Carter, *Current Causes of Death in Children and Adolescents in the United States*, 386 New England J. Med. 1955 (May 19, 2022).

Moreover, using data related to longstanding ERPO laws in Connecticut and Indiana, ERPO laws have been shown to be effective in preventing suicides.  In Connecticut, researchers concluded that every "ten to twenty gun seizures" averts approximately one suicide.  Jeffrey W. Swanson, et al., *Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does it Prevent Suicides?*, 80 L. & Contemp. Probs. 179, 206 (2017).  Similarly, research on Indiana's ERPO laws found that that one suicide was prevented for every ten ERPO orders issued.  Jeffrey W. Swanson, et al., Criminal Justice and Suicide Outcomes with Indiana's Risk-Based Gun Seizure Law, 47 J. Am. Acad. of Psychiatry & L. 188, 188 (2019).  Yet another study concluded that Connecticut's and Indiana's laws reduced suicides by 13.7 and 7.5 percent, respectively.

Aaron J. Kivisto et al., *Effects of Risk-Based Firearm Seizure Laws in Connecticut and Indiana on Suicide Rates, 1981-2015*, 69 Psychiatric Servs. 855, 855 (2018).

Courts historically recognize that public safety is an important governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984). Staying enforcement of Maryland's ERPO laws would undermine the strong interest that the public has in preventing gun violence and suicide. Both the balance of equities and the public interest mandate denial of plaintiffs' request for extraordinary relief.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Robert A. Scott
_____
ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JOSHUA R. CHAZEN
Federal Bar No. 06837
Assistant Attorneys General
200 Saint Paul Place
20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
410-576-7055

October 13, 2023

Attorneys for Defendants Brown and Phillips