**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

-------------------------------------------------------X

DONALD S. WILLEY and THE SECOND
AMENDMENT FOUNDATION,

        Plaintiffs,

    -against-

ANTHONY G. BROWN, in his
official capacity as Attorney General of
Maryland, DORCHESTER COUNTY,
Maryland, SUSAN E. WEBB, personally
and in her official capacity as Director of
Planning & Zoning for Dorchester County,
Maryland, and JAMES W. PHILLIPS, JR.,
personally and in his official capacity as
Sheriff of Dorchester County, Maryland,

        Defendants.

-------------------------------------------------------X

Case No. 1:23-cv-02299-ELH

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
MOTION TO DISMISS BY DEFENDANTS DORCHESTER COUNTY AND SUSAN E. WEBB**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND FACTUAL BACKGROUND......................................................... 1

        A.      Defendant Susan Webb's Tangled Web of Lies ........................................................ 1

        B.      The Motion to Dismiss............................................................................................ 3

II.     ARGUMENT.................................................................................................................... 4

        A.      The County Defendants' Motion Turns Primarily on Their Self-Serving Assertion
                that They "Committed No Unlawful Act," Which is Erroneous Under Maryland
                Law and Wholly Improper at the Rule 12(b)(6) Stage ............................................ 4

        B.      Webb's Perjury Was An Unlawful (And Criminal) Act Under Maryland Law ..... 4

        C.      The County Defendants' Factual Arguments are Wholly Improper at the Rule
                12(b)(6) Stage ........................................................................................................ 9

        D.      The County Defendants Have Failed to Assert Qualified Immunity Except as to
                Count Two (Second Amendment) ......................................................................... 12

        E.      Each Count in the Amended Complaint is Adequately Pleaded........................... 13
                i. Count One (Fourth Amendment).................................................................. 13
                ii. Count Two (Second Amendment)............................................................... 16
                iii. Count Three (First Amendment - Retaliation) ......................................... 18
                iv. Count Four (Fourteenth Amendment – Equal Protection Class of One).... 18
                v. Count Five (Fourteenth Amendment – "Stigma Plus") .............................. 20
                vi. Count Six (Malicious Use of Process under Maryland Law) ................... 20

        F.      The County is Not Immune from State Liability Under Count Six ...................... 22

        G.      The County is Liable under Counts One through Five under *Monell*................... 22

III.    Conclusion ..................................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

Cases

*Albright v. Oliver*,
    510 U.S. 266 (1994) ....................................................................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................. 9, 10

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
    520 U.S. 397 (1997) ....................................................................................... 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. 9, 10

*Blissett v. Coughlin*,
    66 F.3d 531 (1995) ......................................................................................... 13

*Buffington v. Baltimore County, Md.*,
    913 F.2d 113 (4th Cir. 1990) ......................................................................... 13

*City and Cnty. of San Francisco v. Sheehan*,
    575 U.S. 600 (2015) ....................................................................................... 12

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988) ....................................................................................... 24

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ......................................................................... 19

*DiMeglio v. Haines*,
    45 F.3d 790 (4th Cir. 1995) ..................................................................... 12, 15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................................................................... 17

*E. Eyring & Sons v. Baltimore*,
    253 Md. 380 (1969) ........................................................................................ 23

*Engquist v. Oregon Department of Agriculture*,
    555 U.S. 591 (2008) ....................................................................................... 21

*Franks v. Delaware*,
    438 U.S. 154 (1978) ....................................................................................... 14

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................................................................ 12

*Hourie v. State,*
    53 Md. App. 62 (1982) ............................................................................................... 5

*Humbert v. Mayor & City Council of Baltimore City,*
    866 F.3d 546 (4th Cir. 2017) .............................................................. 14, 15, 16, 17

*Jackson v. Carin,*
    646 F. Supp. 3d 656 (D. Md. 2022) ....................................................................... 14

*Jacques v. Baltimore City Police Dep't,*
    2023 WL 3198122 (D. Md. May 2, 2023) ............................................................... 4

*Jensen v. W. Carolina Univ.,*
    2012 WL 6728360 (W.D.N.C. Dec. 28, 2012) ..................................................... 21

*Kirby v. City of Elizabeth City,*
    338 F.3d 440  (4th Cir. 2004) ................................................................................. 19

*Martin v. Duffy,*
    858 F.3d 239 (4th Cir. 2017) ................................................................................. 19

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ......................................................................................... 17, 18

*Miller v. Prince George's County,*
    475 F.3d 621 (4th Cir. 2007) .............................................................. 14, 15, 16, 17

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) ......................................................................................... 23, 24

*Neitzke v. Williams,*
    490 U.S. 319 (1989) ............................................................................................... 10

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ........................................................................................... 18

*One Thousand Fleet Ltd. P'ship v. Guerriero,*
    346 Md. 29 (1997) ............................................................................................ 22, 23

*Paul v. Davis,*
    424 U.S. 693 (1975) ............................................................................................... 21

*Pembaur v. Cincinnati,*
    475 U.S. 469 (1986) ............................................................................................... 24

*Ridpath v. Board of Governors Marshall University*,
  447 F.3d 292 (4th Cir. 2006) ........................................................................... 21

*Saucier v. Katz*,
  533 U.S. 194 (2001) .............................................................................. 16, 18

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ...................................................................................... 10

*Sciolino v. City of Newport News, Va.*,
  480 F.3d 642 (4th Cir. 2007) ........................................................................... 21

*Smith v. Reddy*,
  101 F.3d 351 (4th Cir. 1996) ........................................................................... 13

*Smith v. State*,
  51 Md. App. 408 (1982) ................................................................................. 5

*State v. Devers*,
  260 Md. 360 (1971) ....................................................................................... 5

*United States v. Colkley*,
  899 F.2d 297 (4th Cir. 1990) ...................................................................... 14, 15

*United States v. Leon*,
  468 U.S. 897 (1984) ...................................................................................... 14

*Walsh v. Mellas*,
  837 F.2d 789 (7th Cir. 1988) ........................................................................... 13

*Washington v. Hous. Auth. of the City of Columbia*,
  58 F.4th 170 (4th Cir. 2023) ............................................................................ 4

*Willis v. Town of Marshall, North Carolina*,
  275 F. App'x 227 (4th Cir. 2008) ..................................................................... 20

*Willowbrook v. Olech*,
  528 U.S. 562 (2000) ...................................................................................... 20

*Wilson v. Russo*,
  212 F.3d 781 (3d Cir. 2000) ............................................................................ 14

*Yith v. Nielsen*,
  881 F.3d 1155 (9th Cir. 2018) ......................................................................... 13

Statutes

42 U.S.C. § 1983 ............................................................................................................. 14, 18

Md. Code Ann., Crim. Law § 9-101(a) ............................................................................. 4, 5

Md. Code Ann., Pub. Safety § 5-601 ................................................................................... 1

Md. Code Ann., Pub. Safety § 5-603 ............................................................................. 13, 15

Md. Code Ann., Pub. Safety § 5-604 ............................................................................. 13, 15

U.S. CONST. amend. I ........................................................................................................ 19

U.S. CONST. amend. IV ..................................................................................................... 13

Rules

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 3, 4

Fed. R. Civ. P. 56(c)(2) ...................................................................................................... 11

## I.     INTRODUCTION AND FACTUAL BACKGROUND

### A.     Defendant Susan Webb's Tangled Web of Lies

Scottish author and poet Sir Walter Scott famously wrote in his 1808 historical romance *Marmion: A Tale of Flodden Field*: "Oh what a tangled web we weave/When first we practice to deceive." Defendant Susan Webb ("Webb") would have done well to heed Scott's wise words. Instead, Webb weaved a tangled web of lies designed to ensnare her unwitting victim—Plaintiff Donald Willey ("Willey")—in considerable legal peril. But Willey escaped Webb's web and commenced this action. Ironically, now caught in the web she weaved and unable to extricate herself, Webb asks this Court to cut her loose. For the reasons set forth below, the Court should decline Webb's invitation.

On June 15, 2023, Webb—who has served as the Director of Planning and Zoning for Defendant Dorchester County (the "County") since 2020—filed a bad faith, perjured petition for an extreme risk protective order ("ERPO") under Maryland's "red flag law" (the "Maryland RFL" or the "RFL"; MD. CODE ANN., PUB. SAFETY §§ 5-601 *et seq.*) against Willey, a decorated combat veteran who served our Country honorably in the United States Marine Corps for over 25 years. (First Amended Complaint filed 8/28/2023, ECF 5  [the "FAC"] at ¶¶ 13, 17, 63-72, Ex. I). The proceeding was captioned *Susan Webb v. Donald Willey*, Case No. D-021-FM-23-817452 in Dorchester County District Court, assigned to Judge Melvin James Jews ("Judge Jews"). (FAC ¶ 64).

Webb falsely alleged in her petition that Willey was "making threats of violence by firearms to myself and other departmental employees on numerous occasions" and even concocted three dates on which Willey supposedly threatened her. (*Id*. ¶¶ 64-70, Ex. I). In an *ex parte* hearing, Webb then testified before Judge Jews that Willey was "threatening to kill anybody that comes [to his property] from the county, that he is prepared" and "is waiting for us to come and he is waiting to kill me and anybody else from the department that comes." (*See* Transcript of Recorded Hearing, June 15, 2023

1

hearing, ECF 28-2 at 3:9-19). *All of Webb's brazen accusations written in her petition and uttered before Judge Jews were categorically and demonstrably false. Willey never—not once—caused nor did he threaten violence against Ms. Webb or her staff*. (FAC ¶¶ 58-70).

Nonetheless, Judge Jews issued an *ex parte* Temporary ERPO warrant directing Willey to immediately surrender to law enforcement all of his firearms and ammunition, prohibiting him from purchasing or possessing firearms or ammunition, and ordering Willey to undergo an involuntary mental health evaluation, all pursuant to the RFL. (FAC ¶ 72, Ex. B). Later that same day, several County Sheriff's deputies arrived at Willey's property to serve and enforce the ERPO, and were met by a bewildered but cooperative Willey. (*Id*. ¶¶ 73-74). The deputies seized eight firearms and various ammunition. (FAC ¶ 75, Ex. J). They then transported Willey to a local hospital, where he underwent a humiliating and involuntary battery of tests before being discharged several hours later. (FAC ¶¶ 76-79).

Webb's petition marked an extreme escalation in the County's longstanding campaign of harassment; Webb and her predecessors had long hounded Willey with actual and threatened nuisance and zoning violations relating to the condition of his yard. (FAC ¶¶ 48-57). The last interaction between Webb and Willey before she filed the ERPO petition occurred on June 2. Accompanied by County zoning inspector Tyler Bennett ("Bennett"), Webb berated Willey from her vehicle and demanded that he take his fence down while he stood within earshot at the edge of his property. (FAC ¶ 58). After Willey called an irate Webb "stupid" and told her "bye" several times, Bennett used a tool to affix summonses to Willey's fiberglass boat cover, causing nearly three thousand dollars of damage. (FAC ¶¶ 59-61, Ex. G, Ex. H).

On June 22, 2023, Judge Jews held a Final ERPO hearing with Webb (accompanied by County Manager Jeff Powell) and Willey (accompanied by his attorney Michael Dodd) present in court. (FAC ¶ 80; *see also* Transcript of Recorded Hearing, June 22, 2023 hearing, ECF 28-3). Both

Webb and Willey were sworn in, but before Webb could perjure herself again, she informed the Court that she was requesting dismissal. (FAC ¶ 81; ECF 28-3 at 3:9-20). Accordingly, Judge Jews dismissed the proceeding on the record in open court. (ECF 28-3 at 3:9-20). This was an unconditional dismissal and a termination of the proceeding in Willey's favor. (FAC Ex. L; ECF 28-3 at 3:9-20). Judge Jews then issued a written "Order of Denial/Dismissal of Petition for Extreme Risk Protection," which stated as follows: "After the appearance of the petitioner, respondent, respondent's counsel, the court makes the following determination: Petition is Dismissed. PETITIONER REQUESTED DISMISSAL." (FAC ¶ 81, Ex. L). The Sheriff did not return Willey's firearms until June 27, in all, a twelve-day deprivation of his right to keep and bear arms. (FAC ¶ 82).

### B.    The Motion to Dismiss

The County and Webb (together the "County Defendants") now move to dismiss[1] the FAC pursuant to FED. R. CIV. P. 12(b)(6) and submit a Memorandum in Support of the Motion (*See* ECF 28 - the "Motion"; ECF 28-1 - "Def. Mem."), together with the aforementioned Transcripts of Recorded Hearing for the June 15, 2023 and June 22, 2023 hearings (ECF Nos. 28-2, 28-3). Willey and co-Plaintiff The Second Amendment Foundation respectfully submit this Memorandum in Opposition the Motion, in which the County Defendants rely primarily on their attorney's absurd reimagination of what was actually said in court before Judge Jews. This frivolous Motion is a "Hail Mary" attempt to spare Webb from the perilous choice she will face during discovery: lie *again* under oath at her deposition, or invoke her Fifth Amendment right against compulsory self-incrimination. The Court should deny the Motion in its entirety.

---

[1] The other Defendants, Maryland Attorney General Anthony G. Brown and Dorchester County Sheriff James R. Phillips, Jr., have also filed a motion to dismiss. (ECF 25). Plaintiffs oppose that motion in a separate Memorandum.

## II.     ARGUMENT

### A.     The County Defendants' Motion Turns Primarily on Their Self-Serving Assertion that They "Committed No Unlawful Act," Which is Erroneous Under Maryland Law and Wholly Improper at the Rule 12(b)(6) Stage

The Motion turns primarily on the County Defendants' self-serving assertion that they "Committed No Unlawful Act." (Def. Mem. at 4). But this argument suffers from two fatal flaws. First, under Maryland law, the act in question—Webb's perjury, pleaded with great detail in the FAC, and evident in the Transcript of the June 15 hearing—is *most definitely* unlawful, and in fact, is *criminal*. Second, it is black letter law that on a Rule 12(b)(6) motion, Plaintiffs' well-pleaded allegations that Webb submitted a bad faith, perjured ERPO petition must be treated as true. *See Jacques v. Baltimore City Police Dep't*, No. CV 21-2682-BAH, 2023 WL 3198122, at *5 (D. Md. May 2, 2023) (Hurson, J.) ("In deciding a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff.") (quoting *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023)).  Therefore, the County Defendants' attempt to convince this Court that Webb really didn't perjure herself are wholly improper at this stage. The proper stage of this proceeding for her to further perjure herself is trial.

### B.     Webb's Perjury Was An Unlawful (And Criminal) Act Under Maryland Law

MD. Code ANN., CRIM. LAW § 9-101(a) provides:

> (a) A person may not willfully and falsely make an oath or affirmation as to a material fact:
>     (1) if the false swearing is perjury at common law;
>     (2) in an affidavit required by any state, federal, or local law;
>     (3) in an affidavit made to induce a court or officer to pass an account or claim;
>     (4) in an affidavit required by any state, federal, or local government or governmental official with legal authority to require the issuance of an affidavit; or
>     (5) in an affidavit or affirmation made under the Maryland Rules.

"A person who violates this section is guilty of the misdemeanor of perjury and on Conviction is subject to imprisonment not exceeding 10 years." *Id.* § 9-101(b).

At common law, "perjury was . . . the giving of a false oath in a judicial proceeding in regard to a material matter." *Hourie v. State*, 53 Md. App. 62, 63 (1982), *aff'd*, 298 Md. 50 (1982). Statutory perjury involves the following elements: (1) a lawful oath is administered; (2) in some judicial proceeding; (3) when a person swears willfully, absolutely and falsely; (4) to a matter material to the issue or point in question. *Smith v. State*, 51 Md. App. 408, 418 (1982). The third element, willful falsity, involves "swearing falsely and corruptly, without probable cause of belief." *State v. Devers*, 260 Md. 360, 372 (1971). "To be willful, the false oath must be deliberate and not the result of surprise, confusion, or bona fide mistake." *Id.* In addition, perjury may be established by the testimony of one witness and corroborative evidence. *Id.*

In addition, directly above the signature line on Maryland Form DC-ERPO-001 – PETITION FOR EXTREME RISK PROTECTIVE ORDER (Public Safety Title 5, Subtitle 6), appears the following language: "I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief." (FAC, Ex. I). Below the signature line, Form DC-ERPO-001 also warns RFL petitioners in pertinent part that "[y]ou have made the statements above under the penalties of perjury." *Id.*

Here, Webb's conduct as described in the FAC easily meets the elements of common law and statutory perjury. As to the first two statutory elements—(1) an oath, (2) in a judicial proceeding—on June 15, 2023, Webb submitted her ERPO petition on Form DC-ERPO-001 in order to commence the RFL proceeding against Willey in Dorchester County District Court, thereby taking an oath in a judicial proceeding. (FAC ¶¶ 64-65, Ex. I). She also appeared before Judge Jews for the *ex parte* hearing, whereupon the following exchange occurred:

> MALE SPEAKER 1: Do you swear or affirm under the penalties of perjury that the statements made and responses given will be the truth and nothing but the truth?

5

SUSAN WEBB: I do.

(ECF 28-2 at 2:5-9).

As to the third statutory element—willful falsity—there are numerous facts pleaded in the FAC to show that Webb deliberately made false accusations against Willey.

First, Webb had the motive, means, and opportunity to "get" Willey. She had an extremely strong dislike of him, frustration about his resistance to her long-running nuisance and zoning enforcement, and a history of angrily confronting him and harassing him with frivolous violations. (FAC ¶¶ 48-62).

Second, in May 2021, one of Webb's inspectors sent a letter to Willey warning that he was in violation of the County Code due to "storage of Untagged/registered/expired vehicles, and junk, rubble, and trash" in his yard. Webb then issued three violations to Willey requiring him to pay fines, one for the condition of his yard, one for allegedly operating an illegal business on his property, and one for "unpermitted disturbance to 100-foot tidewater buffer." (*Id*. ¶ 49, Ex. C).

Third, on another occasion shortly after the inspector's letter, an incensed Webb met with Willey and attempted to intimidate him by aggressively pushing copies of violation citations toward Willey on a table while threatening to fine him $5,000 a day for the "illegal business" infraction and $5,000 a day for a "tidewater buffer" infraction. (*Id*. ¶¶ 49-50).

Fourth, not long after she issued these three violations, Webb reluctantly withdrew all three violations when she realized that Willey had *never* operated a business on his property and that the other two violations were legally improper. (*Id*.).

Fifth, undeterred, Webb continued her pursuit of Willey and sued him in Dorchester County Circuit Court over the condition of his yard. The parties resolved this proceeding by a November 2022 Consent Order, whereby Willey agreed to remediate any alleged yard infractions by May 31,

6

2023 and that Webb's inspectors could enter to assess compliance, but only after notice to his attorney. (*Id*. ¶ 51, Ex. D).

Sixth, on May 30, 2023, Webb and Bennett inspected Willey's Property; even though Willey had made substantial and costly efforts to improve the condition of his property, Webb was not satisfied, and, two days later, prepared three new violations for "tall grass/weeds/vegetation 12" or higher," "junk, rubble, and or trash," and "a fence of various heights from 4 to 10 feet. (*Id*. ¶¶ 52-55, Ex. F).

Seventh, on June 2, 2023, without notifying Willey's attorney as required by the Consent Order, Webb and Bennett drove to Willey's Property in order to serve him with the new violations. When they arrived in a marked County vehicle, Willey was outside in his yard. Willey respectfully declined to accept-in-hand service of the violations and asked Webb to communicate with his attorney. Instead, an irate Webb refused to leave, berated Willey, and yelled at him that his fence had to be taken down. In response, Willey told Webb: "you're stupid." Webb, apparently not satisfied, lingered, and far angrier after being called "stupid," continued to loudly berate Willey even after he said "bye" several times. Webb, now even angrier, went to Willey's boat on a different part of the Property, where she or Bennett violently affixed the violations to the fiberglass covering of Willey's boat using some sort of tool, thereby causing $3,000 of damage. (*Id*. ¶¶ 58-60).

Moreover, Webb's sworn accusations against Willey on June 15, both in her ERPO petition and verbally before Judge Jews were riddled with outright lies, inconsistencies, and lack of detail that defied common sense and logic, including at least the following.

First, although section two of Form DC-ERPO-001 specifically ask the petitioner to "[i]nclude a description of the behavior and/or statements made by the respondent, date(s) of occurrences, and any other information," Webb wrote only that Willey had been "making threats of

violence by firearms to myself and other departmental employees on numerous occasions" without describing what threats were allegedly made or when, where and to whom. (*Id.* ¶¶ 66, 71, Ex. I).

Second, under a subheading of DC-ERPO-001 section three, asking the petitioner for a listing of firearms and number of firearms, Webb was unable to state how many firearms Willey possessed or describe any of his firearms. (Id. ¶¶ 67, 71, Ex. I).

Third, under another subheading of DC-ERPO-001 section three, asking the petitioner to describe how "respondent has unlawfully, recklessly, or negligently used, displayed, stored, possessed, or brandished a firearm," Webb oddly stated three dates "June 8, 2023, June 9, 2023, June 12, 2023" in lieu of actually describing any threats or misconduct with firearms. (*Id.* ¶¶ 68, 71, Ex. I).

Fourth, under DC-ERPO-001 section four, asking the petitioner whether "respondent has committed or threatened violence against himself/herself or others, whether or not the threat of violence involved a firearm," Webb stated only: "On three recent occasions myself and staff were warned of threats of violence from Mr. Willey." (*Id.* ¶¶ 69, 71, Ex. I). Willey *never* threatened Webb or her inspectors in any way, never brandished or displayed a firearm or any other weapon to them, and never even raised his voice to them; indeed, he never even interacted with them after June 2, contrary to Webb's false claims that threats occurred on "June 8, 2023, June 9, 2023, June 12, 2023." (*Id.* ¶¶ 62, 66-69).

Fifth, Webb's petition contains no indication that she ever contacted the police before she filed the petition, belying her false claims that she was afraid of supposedly imminent danger from Willey. In fact, *thirteen days* elapsed between the interaction at Willey's property and her filing of the petition on June 15. (*Id.* ¶¶ 58, 63, Ex. I).

Sixth, Webb's false claims of imminent danger supposedly presented by Willey are also belied by the fact that she so quickly dropped the case on June 22 after only one week, even though

this meant that Willey would get his firearms back. By requesting dismissal, she avoided having to testify about her bogus story under oath in an adversarial hearing with Willey and his attorney. (*Id.* ¶¶ 80-82, Ex. L, Ex. M). Indeed, during the June 22 court appearance, the following exchange occurred:

> JUDGE JEWS: And Ms. Webb . . . you're requesting a dismissal. Is that correct?
> WEBB: Correct. We have made an agreement as far as any communication going forward being handled.
>
> (ECF 28-3 at 3:11-15).

Webb's willingness to dismiss her petition without a hearing on the merits is strong evidence that her testimony at the June 15 *ex parte* hearing was false. Just one week prior, she stood in the very same courtroom and claimed that she was under imminent threat of being *shot and killed* by Willey and that he was lying in wait for her and other County inspectors. The notion that all of a sudden, she was no longer in fear for her life and was fine with Willey having his firearms returned because a "communication agreement" had been negotiated strains credulity.

Finally, as to the fourth statutory element of perjury—materiality—it is beyond cavil that Webb's perjured statements were material, as her sworn petition and testimony were the but-for cause of Judge Jews issuing the ERPO warrant compelling Willey to surrender all of his firearms and ammunition.

### C. The County Defendants' Factual Arguments are Wholly Improper at the Rule 12(b)(6) Stage

The County Defendants' argument that they "Committed No Unlawful Act" is not only erroneous under Maryland perjury law and jurisprudence; this argument also demonstrates a gross misapprehension of the applicable standards on a Rule 12(b)(6) motion, as set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Indeed, the crux of Defendants' argument seems to be that this Court should resolve the numerous genuine disputes of

material fact *right now*, without any discovery. This flies in the face of the Supreme Court's well-settled Rule 12(b)(6) jurisprudence.

"[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). So long as a complaint contains allegations that are "enough to raise a right of relief above the speculative level, *Twombly*, 550 U.S. at 556 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d. ed 2004)), a plaintiff will enjoy "the assumption that *all allegations in the complaint* are *true* . . . ." *Twombly*, 550 U.S. at 556 (emphasis added); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570) (emphasis added). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." " *Iqbal*, 556 U.S. at 678. Ultimately, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). But the "plausibility standard is not akin to a 'probability requirement . . . .'" *Id.*

In the case at bar, the well-pleaded factual allegations contained in the FAC are assumed to be true, as they must be on a Rule 12(b)(6) motion. Moreover, Plaintiffs have gone above and beyond the minimum requirement of "plausibility." The *40-page*, *13-exhibit* FAC presents a painstakingly detailed and chronologically ordered narrative  starting with the events leading up to Webb's ERPO petition, the ERPO petition itself, and the dismissal of the petition. This narrative includes a violation-by-violation account of Webb's contentious and relentless pursuit of Willey, Webb's

increasing frustration with Willey and that frustration boiling over at various times, Webb's ERPO petition, detailed factual material about how and why Webb's accusations were false, and the harm sustained by Willey. Assuming the mountain of factual material contained within the *40 pages* and *13 exhibits* of the FAC to be true, the Court can easily draw the reasonable inference that Webb is liable for misconduct arising out of her lies, to wit: perjury undertaken with the goal of harming Willey.

In addition to the ample factual material contained in the FAC, the County Defendants have only added more fuel to the fire with the June 15 and June 22 Transcripts. As detailed and analyzed *supra*, Webb's perjured June 15 testimony actually worsens Defendants' position, and substantially at that. And, the June 22 testimony confirms what the FAC already alleges—that Webb requested an unconditional dismissal of her own petition rather than face an adversarial hearing and lose.

FED. R. CIV. P. 56(c)(2) provides that "the judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to judgment as a matter of law." Here, the County Defendants dispute the truth of Plaintiffs' allegations and therefore the Motion sounds in summary judgment rather than Rule 12(b)(6). But this type of argument is inappropriate where, as here, all of Plaintiffs' allegations are presumed true, and before any discovery has been taken. Moreover, there is a long list of discovery that Plaintiffs are entitled to and would need the opportunity to collect before any summary judgment motion practice should occur, including (1) deposition of Webb; (2) deposition of Bennett; (3) deposition of Defendant Sheriff Phillips; (4) deposition of other County officials who acted in concert with Defendants or have knowledge of any material facts; (5) deposition of Willey's neighbors who may be witnesses to relevant conduct; (6) deposition of anonymous individuals who Webb claims communicated threats to her; (7) exchange of electronically stored information (ESI), including the County Defendants' emails and texts

relating to Willey; (8) information regarding Webb's and Bennett's whereabouts on relevant dates; and (9) information regarding Webb's treatment of other individuals in the County with alleged nuisance and zoning violations similar to Willey's.

In summary, the Motion in its entirety is premised on misapprehension of Maryland perjury law and federal jurisprudence on the subject of Rule 12(b)(6), is wholly improper at this early pre-discovery stage, and should be denied.

> **D.     The County Defendants Have Failed to Assert Qualified Immunity Except as to Count Two (Second Amendment)**

As a threshold matter, it should be noted that as to five of Plaintiffs' six counts, the County Defendants have not asserted a qualified immunity defense. "Qualified immunity shields government officials for liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). Defendants assert qualified immunity *only* as to Plaintiffs' Second Amendment claim (Count Two). (Def. Mem. at p. 7). Indeed, the phrase "qualified immunity" appears just once in Defendants' Memorandum, in a paragraph explicitly delineated as addressing Count Two only. *Id.*

A qualified immunity inquiry is distinct from the Court's inquiry into whether the required factual elements of a constitutional violation are adequately pleaded. *DiMeglio v. Haines*, 45 F.3d 790, 798 (4th Cir. 1995). Moreover, qualified immunity is "an affirmative defense on which [the Defendants] carry the burden of proof." *Harlow*, 457 U.S. at 815. Accordingly, given Defendants' failure or deliberate choice not to assert qualified immunity except on Count Two, this Memorandum addresses qualified immunity only as to that one Count and elsewhere focuses on the adequacy of the constitutional violations pleaded in the FAC. Additionally, because Defendants had every opportunity to assert qualified immunity in this Motion but failed to do so, the Court should treat

qualified immunity as waived on Counts One, Three, Four, Five, and Six for the remainder of this action. *See, e.g., Buffington v. Baltimore County, Md.*, 913 F.2d 113, 120-122 (4th Cir. 1990); *Blissett v. Coughlin*, 66 F.3d 531, 538-540 (1995); *Walsh v. Mellas*, 837 F.2d 789, 799-800 (7th Cir. 1988).

### E.   Each Count in the Amended Complaint is Adequately Pleaded

#### i.  Count One (Fourth Amendment)

Plaintiffs allege in Count One that Webb's perjured ERPO petition against Willey "violated his constitutional right not to be arrested or searched without probable cause." *Smith v. Reddy*, 101 F.3d 351, 355 (4th Cir. 1996); *see also* (FAC ¶¶ 63-79, 102-103). The County Defendants devote only three lines and no case law to their argument for dismissal. (Def. Mem. at 7). Defendants' only Fourth Amendment argument is that "the Court [Judge Jews] believed there was probable cause." *Id.* This argument is without merit.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. CONST. amend. IV.

A warrant is a "writ directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest, a search, or a seizure . . . ." *Yith v. Nielsen*, 881 F.3d 1155, 1166 (9th Cir. 2018) (quoting *Black's Law Dictionary* (10th ed. 2014)). As set forth in the FAC and as the County Defendants do not dispute, Interim and Temporary ERPOs issued under the RFL (*see* MD. CODE ANN., PUB. SAFETY §§ 5-603, 5-604) are plainly "warrants" within the meaning of the Fourth Amendment, as they are judicially issued writs that direct and authorize law enforcement to serve and enforce an ERPO on a RFL respondent, then arrest the respondent and seize the respondent's firearms and ammunition if the respondent does not immediately surrender the firearms and

ammunition to law enforcement. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("[S]urrender to the State's show of authority constituted a seizure for the purposes of the Fourth Amendment.").

"[A]n officer who intentionally or recklessly puts lies before a [judicial officer], or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017) (citing *Miller v. Prince George's County*, 475 F.3d 621, 630-631 (4th Cir. 2007)). In the criminal context, this means that a "search warrant must be voided" where the defendant establishes by a preponderance of the evidence that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and the false material was necessary to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978); *see also United States v. Leon*, 468 U.S. 897, 923 (1984). In other words, the test under *Franks* is one of materiality: "the false information must be essential to the probable cause determination." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). In order to determine materiality, courts will "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Miller*, 475 F.3d at 628 (quoting *Wilson v. Russo*, 212 F.3d 781, 7891 (3d Cir. 2000).

The *Franks/Colkley* test is equally applicable in civil actions brought under 42 U.S.C. § 1983. *Humbert*, 866 F.3d 546.

> To recover under § 1983, a plaintiff must demonstrate that the challenged warrant application was authored with deliberate or reckless disregard for the truth, and that "the false statement or omission is material, that is, necessary to the neutral and disinterested [judicial officer's] finding of probable cause."

*Jackson v. Carin*, 646 F. Supp. 3d 656, 668 (D. Md. Dec. 19, 2022) (quoting *Humbert*, 866 F.3d at 556). For example, in *Humbert*, plaintiff "languished in pretrial solitary confinement, charged with committing a heinous act of sexual assault" due to various acts of investigatory misconduct by the Baltimore City Police Department, most significantly an arrest warrant affidavit

which falsely stated that "the victim positively identified [plaintiff] as her attacker." *Id.* at 550, 556. After a jury awarded plaintiff $2.3 million in damages, the district court struck the damages award, but the Fourth Circuit reversed and remanded with instructions to reinstate the jury verdict. *Id.* at 550-51. The Court found that "probable cause . . . was based primarily, if not entirely, on the false assertion that the victim positively identified [plaintiff]." *Id.* at 558.

In the case at bar, since the County Defendants have not asserted qualified immunity, the only issue is whether the required factual elements of a Fourth Amendment violation are adequately pleaded in the FAC. *DiMeglio*, 45 F.3d at 798. Ordinarily, the *Franks/Colkley* materiality tests asks whether the false information was "essential to the *probable cause* determination." *Colkley*, 899 F.2d at 300 (emphasis added). Here, though, the analysis is slightly altered, since Interim and Temporary ERPOs under the Maryland RFL are issued pursuant to a reduced, unconstitutional[2] "*reasonable grounds*" standard and not "probable cause." MD. CODE ANN., PUB. SAFETY §§ 5-603(a)(1), 5-604(a)(1).

Either way, under the materiality test, it is clear that Webb's false statements were essential to Judge Jews's reasonable grounds determination. In fact, her statements were the *only* evidence that Judge Jews had before him. Therefore, if Webb's statements were "excise[d]" from the determination, no RFL warrant would have issued against Willey, he would not have been forced to surrender his firearms and ammunition, and he would not have been seized to undergo an involuntary mental health evaluation. *See Miller*, 475 F.3d at 628. Simply put, Webb used her position as a law enforcement officer (*See* FAC Ex. I, Section 1: Webb is a self-described "code enforcement officer") to deliberately utter false accusations under oath to a judge, which was the actual and proximate cause of the unreasonable search and seizure of Willey's firearms and ammunition *and* his person.

---

[2] This reduced, unconstitutional "reasonable grounds" standard is the primary matter at issue on Plaintiffs' Motion for a Preliminary Injunction (ECF 15) and is also a major issue in connection with the separate Motion to Dismiss by Attorney General Brown and County Sheriff James R. Phillips, Jr. (ECF 25).

And, at the time Webb swore these false accusations, she well knew that the result would be an unreasonable search and seizure of Willey's personal effects (firearms and ammunition) and Willey himself. And, indeed, this is ultimately what Webb caused to happen.

Accordingly, the Motion should be denied as to Count One.

### ii. Count Two (Second Amendment)

As to Count Two, the County Defendants assert qualified immunity:

> Ms. Webb had no reason to believe the statute under which she was advised to proceed was unconstitutional. For the reasons stated in the State's briefing, it is not. But even if it were to be held unconstitutional, it was certainly not clearly established and Ms. Webb would be entitled to qualified immunity.

(ECF 28-1 at 7 (internal citation omitted)).

Defendants demonstrate a profound misunderstanding of qualified immunity; the question of whether qualified immunity applies does not turn on the constitutionality of a particular statute; rather, what matters is whether an officer took one or more actions that violated one or more of the plaintiff's clearly established constitutional rights. To that end, Courts first inquire whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the Fourth Amendment context, for example, courts look at "whether the facts illustrate that the officer violated the plaintiff's constitutional right to be free from unreasonable seizures." *Humbert*, 866 F.3d at 555 (quoting *Miller*, 475 F.3d at 627). Indeed, in *Humbert*, the issue was *not* the constitutionality of the underlying Maryland laws of criminal procedure pertaining to arrest warrants; instead, the issue was whether the police officers who procured the plaintiff's arrest warrant through the artifice of false statements misused the law to violate his constitutional rights. 866 F.3d at 561-62. By the same token, Webb can be liable to Willey even if, *arguendo*, the RFL *is* constitutional (which it is not). The fact that Webb selected the Maryland RFL as her *vehicle of choice* to violate Willey's rights is what matters—the RFL's constitutionality or lack thereof is an utterly irrelevant red herring brought

forth by Defendants. In the Second Amendment context, then, the question on the first prong of the qualified immunity inquiry will be whether Webb violated the plaintiff's constitutional right to keep and bear arms.

As to the second prong of the qualified immunity, the relevant question is whether the right was "clearly established" at the time of the alleged event such that "a reasonable officer would have understood that [her] conduct violated the asserted right." *Humbert*, 866 F.3d at 555 (quoting *Miller*, 475 F.3d at 627). The Second Amendment guarantees the right to keep and bear arms inside *and* outside one's home. Indeed, in three landmark decisions since 2008, the Supreme Court has emphatically recognized this right as clearly established on the same level as the other sacrosanct liberties contained in the Bill of Rights. First, in *District of Columbia v. Heller*, the Court observed "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). Thus, the Court "held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense . . . " *McDonald v. City of Chicago*, 561 U.S. 742, 749 (2010). Then, in *McDonald*, the Court held "that the Second Amendment right is fully applicable to the States." *Id*. The Court left no doubt that this right is not only clearly established, but *fundamental*:

> [W]e must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition. Our decision in *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is "the *central component*" of the Second Amendment right . . . . *Heller* makes it clear that this right is "deeply rooted in this Nation's history and tradition."

*McDonald*, 561 U.S. at 767-68 (internal citations omitted) (italics in original). The Court also added that the "right to keep and bear arms was considered no less fundamental by those who drafted the Bill of Rights." *Id*. at 768. Finally, in 2022, the Court explicitly confirmed that "consistent with *Heller* and *McDonald* . . . the Second and Fourteenth Amendments protect an individual's right to

carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). "The constitutional right to bear arms in public for self-defense is not a 'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780). Here, the County Defendants fail on both prongs of the qualified immunity inquiry.

As to the first prong, the Court must view Plaintiffs' Second Amendment allegations in "*the light most favorable to* [Plaintiffs]," *Saucier*, 533 U.S. at 194 (emphasis added), with respect to whether "the facts alleged show the officer's conduct violated a constitutional right." *Id*. Webb's conduct—perjury—actually and proximately caused the seizure of Willey's firearms and ammunition for twelve days and undergo an involuntary mental health evaluation for good measure. But for Webb's perjured ERPO petition, Willey would not have lost his Second Amendment rights for *any* period of time. As to the second prong, the Supreme Court has left no doubt that Willey's Second Amendment right to keep and bear arms was clearly established.

Finally, the same facts that defeat Defendants' qualified immunity argument also demonstrate that Plaintiffs have adequately pleaded the elements of a Second Amendment Claim under 42 U.S.C. § 1983.

Accordingly, the Motion should be denied as to Count Two.

### iii.      Count Three (First Amendment - Retaliation)

### iv.      Count Four (Fourteenth Amendment – Equal Protection Class of One)

The County Defendants offer somewhat more detail relating to Count Four. First, Defendants argue that "others were treated similarly and also challenged citations, except that they did not experience an ERPO filing." (Def. Mem. at 7). This argument is nonsensical and completely *confirms* Willey's claim—the fact that others "did not experience an ERPO filing" is *exactly* the

point. Willey is the *only* person in the County who experienced an ERPO filing in retaliation for his resistance to Webb's zoning and planning enforcement. In fact, the FAC alleges as much:

> Here, Willey was treated differently from others similarly situated without rational basis for this disparate treatment. Willey, like some other citizens of Dorchester County or Fishing Creek, received, and later contested, citations or notices of infractions under the County Code. However, Willey was the only citizen of the County or Fishing Creek intentionally targeted by Webb, acting under color of state law, with a red flag proceeding . . . ." (FAC ¶ 134).

This allegation, assumed to be true at this stage, is the epitome of a "class-of-one" equal protection claim, "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 563 (2000). Generally, whether a plaintiff bringing such a claim "is similarly situated to those who have been treated differently is a factual issue *for a jury*." *Willis v. Town of Marshall, North Carolina*, 275 F. App'x 227, 233 (4th Cir. 2008) (citation omitted). Defendants attempt to navigate around the law by arguing that Willey failed "to comply with the Consent Order" and mentioning "communications regarding threats that form the context of the ERPO." (Def. Mem. at 8). But this is misdirection—the FAC alleges that Willey *did* comply with the Consent Order (*see* FAC ¶¶ 51, 52, 57, Ex. E); in fact, it was Webb who failed to comply with the Consent Order by showing up at Willey's Property without notifying his attorney. (FAC ¶ 58). And, as to the "threats" argument, this was covered at length *supra*—Willey never made any threats.

Next, Defendants argue that an equal protection "class of one" claim is arguably no longer valid under *Engquist v. Oregon Department of Agriculture*, 555 U.S. 591 (2008).[3] (Def. Mem. at p. 8). But that is not what the Court held in *Engquist*. The narrow holding in *Engquist* was that a class of one equal protection claim not be brought "in the public employment context." *Id*. at 594. Since the case at bar has nothing to do with public employment, *Engquist* is inapposite.

Accordingly, the Motion should be denied as to Count Four.

---

[3] Incorrectly cited by Defendants as 555 U.S. 591.

### v.      Count Five (Fourteenth Amendment – "Stigma Plus")

The County Defendants offer yet another skeletal argument lacking legal citation, contending that "Webb only repeated the information regarding threats that were credibly reported to her from multiple varied sources." (Def. Mem. at p. 9).

In a "stigma plus" claim, a plaintiff has been deprived of his procedural due process rights under the Due Process Clause of the Fourteenth Amendment where: (1) there has been a "stigmatizing governmental disclosure," *Paul v. Davis*, 424 U.S. 693, 706 (1975), that was false, *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007); (2) The disclosure was "voluntarily published by the defendants," *id.*; (3) There is resulting harm beyond reputational harm (the "stigma plus"), *Paul*, 424 U.S. at 706; *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 309 (4th Cir. 2006); and (4) a deprivation of due process "in that no proper opportunity to be heard and defend was afforded," *Jensen v. W. Carolina Univ.*, No. 2:11-cv-33, 2012 WL 6728360, at *36-37 (W.D.N.C. Dec. 28, 2012).

Here, Webb, acting intentionally and under color of state law, voluntary published a false disclosure about Willey (the ERPO petition), which stigmatized him as "dangerous" and as a "threat," and subjected him to the "plus" of unreasonable search and seizure of his person, and of his firearms and ammunition, in violation of his fundamental and clearly established constitutional rights.

Accordingly, the Motion should be denied as to Count Five.

### vi.      Count Six (Malicious Use of Process under Maryland Law)

The County Defendants argue that this claim should be dismissed because "there was probable cause" and—bizarrely—that "the matter was not terminated in Mr. Willey's favor, but was dismissed at the request of Ms. Webb based on agreement of the parties that future contacts regarding Mr. Willey's compliance issues would occur through his counsel." (Def. Mem. at p. 10). As to the first point, the complete lack of "probable cause" or even "reasonable grounds" is covered at length,

*supra*. Second, Defendants' assertion that the RFL proceeding was not terminated in Mr. Willey's favor is so absurd as to call into question the credibility of their entire Motion. The Transcript of the June 22 court appearance, coupled with the "Order of Denial/Dismissal of Petition for Extreme Risk Protection," make clear that Defendants are grasping at straws—the proceeding was dismissed with no conditions. (ECF 28-3 at 3:11-15; FAC Ex. L). What counsel appears to be referring to is  the fact that Webb stated right before dismissal there was "an agreement as far as any communication going forward being handled." (ECF 28-3 at 3:11-15). But the dismissal was in no way contingent upon such an agreement. The fact of the matter is that whatever her reasons—and the FAC lays out in detail that the real reason Webb requested dismissal was that accusations were false and she knew they were false—Webb chose not to proceed with an adversarial hearing on June 22 and as a result, Willey *was* the prevailing party. Importantly, as the Maryland Court of Appeals explained, this element "may be . . . upon demurrer or its equivalent." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 42 (1997) (quoting RESTATEMENT (SECOND) OF TORTS 675 cmt. j)). There is no doubt that a dismissal in favor of Willey is a "demurrer or its equivalent." *Id.*

Simply put, under Maryland law, malicious use of process has five elements:

(1) a civil proceeding instituted against the plaintiff; (2) without probable cause; (3) with malice; (4) that terminated in favor of the plaintiff; and (5) that inflicted a special injury upon the plaintiff which would not necessarily result in all such suits.

*Id.* at 37.

Here, Webb instituted an RFL proceeding against Willey without probable cause and with malice; that terminated in his favor; and he suffered special injury, to wit: involuntary confinement at a hospital, severe and ongoing emotional distress, and substantial reputational harm, all on top of the forced surrender of his firearms and ammunition. (FAC ¶ 138).

Accordingly, the Motion should be denied as to Count Six.

### F.    The County is Not Immune from State Liability Under Count Six

As a matter of Maryland law, the County Defendants urge the Court to dismiss Count Six as to the County purportedly because "seeking an ERPO was a governmental act . . . ." (Def. Mem. at 10). Defendants argue that "[c]ode enforcement by its terms involves the enforcement of law and this case allegedly stems from issuance of citations and other activity related to the enforcement of law. Code enforcement is a governmental function." (*Id*. at p. 11). However, filing a perjured ERPO petition is not a proper governmental function under Maryland law. For example, *E. Eyring & Sons v. Baltimore*, 253 Md. 380 (1969), cited by Defendants, recognized that "[t]he enactment and enforcement of building codes and ordinances constitutes a governmental function." (Def. Mem. At 11). But the situation here is easily distinguishable because even though Webb's perjured RFL petition was made in retaliation for Willey's resistance to her zoning and planning enforcement, Webb used her office and position to perform a vicious act of perjury that was outside the ordinary bounds of her job functions. Accordingly, the County should remain as a Defendant on Count Six.

### G.    The County is Liable under Counts One through Five under *Monell*

Lastly, the County Defendants contend that Plaintiffs have failed to state any cognizable federal claims against the County, arguing that recovery against the County is precluded under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But Defendants misapprehend *Monell*.

The Supreme Court has long held that there is no vicarious municipal liability in § 1983 cases. Rather, "[a] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694); *Pembaur v. Cincinnati*, 475 U.S. 469, 480-481 (1986)). However, the Court has also long held that "an unconstitutional policy c[an] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). As the Court held in *Pembaur*:

[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because *even a single decision* by such a body unquestionably constitutes an act of official government policy.

475 U.S. at 480.

Moreover:

"[T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level . . . . *Monell's* language makes it clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,' and whose decisions therefore may give rise to municipal liability under § 1983.

*Id*. (quoting *Monell*, 436 U.S. at 694).

And, an "official policy" need not be in writing. *Pembaur*, 475 U.S. at 480.

In the case at bar, Webb is the suitable final municipal policymaker. The Amended Complaint alleges that Webb was the relevant policymaker where zoning and planning is concerned, as she was (and still is) the Director of the County's Office of Planning and Zoning, and is therefore "the County's final policymaker with respect to enforcement of the nuisance and zoning provisions of the County Code." (FAC ¶¶ 17, 85). Webb's policy decision to target Willey with a perjured ERPO petition in furtherance of the County's selective nuisance enforcement, and to retaliate against Willey, is sufficient to establish municipal liability at this stage. A *single decision* can bind the County to *Monell* liability. Defendants' argument that there was no "express written policy" is similarly unavailing as the case law does not contain any such requirement and explicitly states that no writing is required. Indeed, it would be highly improbable that a policy of targeting a citizen with a perjured ERPO petition would be put in writing.

## III.   CONCLUSION

For the foregoing reasons, the County Defendants' Motion should be denied in its entirety.

Date: December 8, 2023                    Respectfully submitted,

                                          /s/ Edward Andrew Paltzik
                                          Edward Andrew Paltzik, Esq. (Bar No. 30785)
                                          Serge Krimnus, Esq. (Bar No. 22072)
                                          Bochner PLLC
                                          1040 Avenue of the Americas, 15th Floor
                                          New York, New York 10018
                                          (516) 526-0341
                                          edward@bochner.law
                                          serge@bochner.law

                                          *Attorneys for Plaintiffs*