## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DONALD S. WILLEY ET AL.,       *

     Plaintiffs,       *

      *

v.       *

      *       Civil No. 23-2299-BAH

ANTHONY G. BROWN ET AL.,       *

     Defendants.       *

*    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM OPINION

Pending before the Court is one motion for a preliminary injunction, ECF 15, and two motions to dismiss, ECFs 25, 28. Donald S. Willey ("Willey") and The Second Amendment Foundation ("SAF" and, collectively with Willey, "Plaintiffs"), filed the present motion pursuant to Federal Rule of Civil Procedure 65 seeking a preliminary injunction prohibiting enforcement of portions of Maryland's "Red Flag Law" (the "Maryland RFL" or the "RFL"). ECF 15. The Defendants include Anthony G. Brown in his official capacity as Attorney General of Maryland ("Brown"), Dorchester County, Maryland ("Dorchester County" or "the County"), Susan E. Webb, personally and in her official capacity as Director of Planning & Zoning for Dorchester County, Maryland ("Webb"), and James W. Phillips, Jr., in his official capacity as Sheriff of Dorchester County, Maryland ("Phillips" and collectively "Defendants"). ECF 5 (Amended Complaint), at 1.

Pursuant to the Court's Memorandum Opinion and Order Certifying Questions of Law to the Supreme Court of Maryland, also filed today, the Court will deny Webb's and Brown's motions to dismiss without prejudice to refile after a response from the Supreme Court of Maryland. Below, the Court addresses Plaintiffs' motion for preliminary injunction. ECF 15. The Court has

reviewed all relevant filings, including Brown's and Phillips' Response in opposition to Plaintiffs' motion for preliminary injunction, ECF 24, Webb's and Dorchester County's Response in opposition to the same, ECF 29, and Plaintiffs' Reply, ECF 38. The Court finds that no hearing is necessary. Loc. R. 105.6 (D. Md. 2023). For the reasons indicated below, the Court will **DENY** Plaintiffs' motion for preliminary injunction.

## I.   BACKGROUND

Twenty-one states and the District of Columbia currently have RFLs.[1] These laws permit a judicial officer to issue a protective order that temporarily prohibits an individual from possessing a firearm if that judicial officer makes a particularized determination that the individual poses a substantial risk of committing violence to himself or others. *See* Everytown for Gun Safety Support Fund & Johns Hopkins Ctr. for Gun Violence Solutions, Promising Approaches for Implementing Extreme Risk Laws: A Guide for Practitioners and Policymakers 8 (May 2023) (hereinafter "Promising Approaches for Implementing Extreme Risk Laws") ("ERPO laws provide a mechanism to act when warning signs are present that an individual may be at risk rather than waiting for a tragedy to occur.").

---

[1] These states include California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. *See* Everytown for Gun Safety Support Fund & Johns Hopkins Ctr. for Gun Violence Solutions, Promising Approaches for Implementing Extreme Risk Laws: A Guide for Practitioners and Policymakers 46–48 (May 2023) (state survey).

Such laws are not uniform as they differ in name,[2] delineate differing categories of individuals that may petition the court for the issuance of these orders,[3] require different legal standards for issuance of an order,[4] and vary in the lengths of time an order issued under such laws may remain in effect.[5] However, all RFLs share a common trait: the recognition that in a manner

---

[2] For instance, Illinois' law permits issuance of a "firearms restraining order," Virginia courts may issue "substantial risk order[s]," and Delaware courts may issue "lethal violence protective order[s]." *Id.*; *see also* 430 Ill. Comp. Stat., § 67/5 ("'*Firearms restraining order*' means an order issued by the court, prohibiting and enjoining a named person from having in his or her custody or control, purchasing, possessing, or receiving any firearms or ammunition, or removing firearm parts that could be assembled to make an operable firearm." (emphasis added)); Va. Code Ann. § 19.2-152.13A. ("[U]pon a finding that there is probable cause to believe that a person poses a substantial risk of personal injury to himself or others in the near future by such person's possession or acquisition of a firearm, shall issue an ex parte *emergency substantial risk order*." (emphasis added)); Del. Code. Ann. tit. 10, § 7701(3) ("'*Lethal violence protective order*' means an order issued by the Justice of the Peace Court or Superior Court prohibiting and enjoining a person from controlling, owning, purchasing, possessing, having access to, or receiving a firearm." (emphasis added)).

[3] For instance, "law enforcement officers (in all states), family members and domestic partners (in most states), and clinicians and other parties (in a few states) can petition a court to temporarily prevent a person from purchasing and possessing firearms if that person is at risk of harming themselves or others." Promising Approaches for Implementing Extreme Risk Laws, *supra* at 8.

[4] *Compare* Colo. Rev. State § 13-14.5-103(c)(3) (requiring a court to find by a "preponderance of the evidence" that the individual "poses a significant risk of causing personal injury" to oneself or others prior to issuing a temporary extreme risk protective order), *with* PS § 5-603(a)(1) (permitting a commissioner to issue an interim extreme risk protective order if there are "reasonable grounds" the individual poses an "immediate and present danger" to oneself or others), *and* Conn. Gen. Stat. Ann. § 29-38c(b)–(c) (requiring a "good faith belief" to initiate a law enforcement investigation, but requiring "probable cause" prior to the issuance of an extreme risk protective order).

[5] For instance, state laws differ in the level of discretion judicial officers are afforded in the duration of a final order. *Compare* Colo. Rev. State § 13-14.5-105(2) ("[I]f the court finds by clear and convincing evidence . . . that the respondent poses a significant risk of causing personal injury to self or others by having in the respondent's custody or control a firearm or by purchasing, possessing, or receiving a firearm, *the court shall issue* an extreme risk protection order *for a period of three hundred sixty-four days*." (emphasis added)) *with* PS § 5-605(f)(1) (providing that "all relief granted in a final extreme risk protective order shall be effective for the period stated in the order, *not to exceed 1 year*." (emphasis added)).

consistent with due process and the Second Amendment, a state legislature can temporarily disarm an individual that poses a substantial risk of committing violence to himself or others.

### A.    Maryland's Red Flag Law: An Extreme Risk Protective Order

The present dispute concerns Maryland's RFL, which went into effect on October 1, 2018, and is codified in Title Five of the Public Safety Article of the Maryland Annotated Code. Md. Code Ann., Pub. Saf. ("PS") § 5-601 et seq. (2018).[6]

The law authorizes state district court commissioners and state district court judges, upon civil commencement by a particular list of individuals, to issue an "extreme risk protective order" requiring the subject of the order to surrender all firearms and ammunition, upon a showing that there exist "reasonable grounds" that the respondent poses a danger to himself or others.  PS § 5-603(a)(1).  The law is preventative in that it permits judicial intervention *before* an individual commits an act of violence.  PS § 5-601 et seq. (creating a civil legal process to temporarily prohibit a person from purchasing and possessing a firearm based upon a court's particularized finding that the individual is at risk of harming themselves or others); *see also* Promising Approaches for Implementing Extreme Risk Laws, *supra*, at 8 ("Extreme risk laws . . . or red flag laws, have become a vital tool in efforts to proactively intervene to prevent gun violence.").  However, before issuing an extreme risk protective order a judicial officer is required to find that the individual "poses an immediate and present danger of causing personal injury" to himself or others by possessing a firearm.  PS § 5-603(a)(1).

---

[6] The Maryland General Assembly recently enacted legislation aiming to protect ERPO records. 2024 Md. Laws Ch. 929 (S.B. 905).  The new legislation establishes that the Maryland Judiciary must require institutions of higher education that are studying ERPOs to enter into an agreement about the storage of such records.  *Id.*  This amendment does not alter the Court's analysis of the constitutionality of PS § 5-601 et seq.

To obtain an extreme risk protective order, a petitioner must: (1) fit into one of the classes of permissible petitioners that includes law enforcement agents and certain classes of private citizens such as the spouse, cohabitant, or legal guardian of the respondent, *see id.* § 5-601(e)(2) (full list); (2) swear under penalty of perjury specific facts known to the petitioner that the respondent "poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm," *id.* § 5-602(a)(1)(i)–(ii); and (3) file the petition with the District Court or, if the Office of the District Court Clerk is closed, a District Court commissioner. *Id.* § 5-602(b). There are three types of ERPOs that may issue: an interim, temporary, and final order. Each is described below.

      1.  <u>An Interim ERPO may issue upon "reasonable grounds."</u>

If the petition is filed with the District Court commissioner[7] under PS § 5-602(b)(2) because the District Clerk of Court is closed, the commissioner may enter an interim order prohibiting the respondent from possession of a firearm only if the commissioner finds that there are "*reasonable grounds* to believe the respondent poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* § 5-603(a)(1) (emphasis added); *see also id.* § 5-603(a)(2) (requiring consideration of all relevant evidence presented by petitioner and the amount of time that has elapsed since any of the events described in the petition).

---

[7] A district court commissioner is a judicial officer. *See Who Does What in District Court?*, Md. Cts., https://mdcourts.gov/district/selfhelp/whodoeswhat (last visited Jan. 30, 2024) ("For many people, commissioners are the first point of contact with the District Court of Maryland. Commissioners are judicial officers, appointed by the Chief Judge of the District Court of Maryland. There are more than 279 District Court commissioners around the state, available 24 hours a day, 365 days a year."). Identifying whether probable cause exists supporting criminal charges is one of the Commissioners' primary responsibilities. *Id.* (noting the first of three major responsibilities is "Reviewing Applications for Statement of Charges to determine whether probable cause exists to issue charging documents").

When issued, the interim extreme risk protective order requires the respondent to "surrender to law enforcement authorities any firearm and ammunition in the respondent's possession" and prohibits the respondent "from purchasing or possessing any firearm or ammunition for the duration of the interim extreme risk protective order." *Id.* § 5-603(a)(3); *see also id.* § 5-603(a)(4) (requiring commissioner to refer respondent to law enforcement officer for an emergency mental health evaluation if the commissioner finds probable cause to believe the respondent meets the requirements for emergency evaluation under Md. Code Ann., Health-General ("HG") § 10-620); *see also* HG § 10-622 (outlining petitions for emergency evaluations for situations in which the respondent both "[h]as a mental disorder" and "[p]resents a danger to the life or safety of the individual or of others"); *see generally* HG §§ 10-620–10-630 (outlining process for and requirements of emergency mental health evaluations).

A respondent that receives an interim ERPO will also receive notice of the "date, time, and location for a temporary risk protective order hearing and a tentative date, time, and location for a final extreme risk protective order hearing." PS § 5-603(b)(1)(i).   An interim extreme risk protective order is effective until the temporary extreme risk protective order hearing or the end of the second business day the Office of the District Court Clerk is open following the issuance of the interim order, whichever is earlier. *Id.* § 5-603(e).

2.  A Temporary ERPO may issue upon "reasonable grounds."

When the Clerk of Court is open, petitioners file the petition with the District Court, which triggers the scheduling of a temporary ERPO hearing. PS § 5-604(a)(1).  The hearing may be conducted on an *ex parte* basis. *See id.* ("After a hearing on a petition, whether ex parte or otherwise, a judge may enter a temporary extreme risk protective order . . . .").  The judge may issue a temporary ERPO to prohibit the respondent from possessing or purchasing a firearm if the judge finds that there are "*reasonable grounds* to believe that the respondent poses an *immediate*

*and present danger* of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* § 5-604(a)(1) (emphasis added).

Generally, "the temporary extreme risk protective order shall be effective for not more than 7 days after service of the order." *Id.* § 5-604(c)(1). However, the judge may extend the temporary ERPO "as needed, but not to exceed 6 months, to effectuate service of the order where necessary to provide protection or for other good cause." *Id.* § 5-604(c)(2). Additionally, "[t]he judge may proceed with a final extreme risk protective order hearing instead of a temporary extreme risk protective order hearing if . . . the respondent appears at the hearing; the respondent has been served with an interim extreme risk protective order; or the court otherwise has personal jurisdiction over the respondent; and the petitioner and the respondent expressly consent to waive the temporary extreme risk protective order hearing." *Id.* § 5-604(d).

3. <u>A Final ERPO may issue upon "clear and convincing evidence."</u>

A final ERPO hearing must be held prior to the issuance of a final ERPO and the respondent shall have the opportunity to be heard. PS § 5-605(a). The respondent is entitled to notice of the final hearing in the temporary ERPO. *Id.* § 5-605(b)(2)(i) ("temporary extreme risk protective order shall include notice . . . that if the respondent fails to appear at the final extreme risk protective order hearing, a final extreme risk protective order may be entered in the respondent's absence. . . ."). The judge may only enter a final ERPO if "the judge finds by *clear and convincing* evidence that the respondent poses a danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* § 5-605(c)(1)(ii) (emphasis added). The final order may be effective up to one year, *id.* § 5-605(f)(1), unless extended pursuant to the procedures outlined in PS § 5-606(a)(2).

A final ERPO may be extended "for good cause shown" only after giving notice to the respondent and affected persons and conducting a hearing on the matter. *Id.* § 5-606(a)(2). A

7

district judge's decision to extend a final ERPO is appealable to the circuit court in which the district court is located. *Id.* § 5-606(b).

4. Noncompliance with an ERPO can result in a misdemeanor conviction, arrest, and a search for removal of a respondent's firearms.

Noncompliance with an interim, temporary, or final ERPO is a misdemeanor, and on conviction is subject to either a fine of up to $1,000 and/or imprisonment of up to 90 days for a first-time offense, or for a second time offense, a fine up to $2,500 and/or imprisonment not exceeding 1 year. PS § 5-610(a).

Additionally, a law enforcement officer may arrest an individual if the officer has probable cause to believe the respondent is in violation of an effective ERPO. *Id.* § 5-610(b). This arrest may be effectuated with or without a warrant. *Id.* Furthermore, on application by a State's Attorney or law enforcement officer with probable cause to believe the respondent possesses a firearm and failed to surrender the firearm in accord with the order, law enforcement may, upon issuance of a search warrant, search and remove the firearm from any location identified in the application for the warrant. PS § 5-607.

5. Law enforcement officers must return firearms upon expiration or termination of an ERPO with specific deadlines.

Law enforcement officers taking possession of firearms or ammunition have duties to preserve a respondent's property, such as by transporting the firearms in a manner intended to prevent damage to the firearm. PS § 5-608(a)(2). Further, upon expiration of an ERPO, law enforcement must notify respondent, and upon request of respondent, return all firearms and ammunition of the respondent no later than fourteen (14) days after the expiration of an interim or temporary ERPO, fourteen (14) days after a court terminates a final ERPO, or forty-eight (48) hours after the expiration of a final ERPO. *Id.* § 5-608(b).

8

**B.     Application of Maryland's RFL to Willey**

Willey resides in Dorchester County, Maryland. ECF 5, at 6 ¶ 13. He lawfully owns numerous firearms. *Id.* Willey accuses Webb and Dorchester County of malicious use of process against him, claiming they have engaged in a two-decades-long practice of targeting and penalizing Willey for "de minimus nuisance and zoning infractions." *Id.* at 14 ¶ 48. This background contextualizes Webb's filing of an ERPO petition on July 15, 2023. *See* ECF 5-9 (ERPO Petition), at 2.

1.   Willey and Webb's contentious history over zoning infractions.

The dispute as relevant to this proceeding began on May 3, 2021. ECF 5, at 15–16 ¶ 49. Willey alleges that Webb's zoning inspector sent him a letter indicating he was in violation of the County Code for "storage of [u]ntagged/unregistered/expired vehicles and junk, rubble, and trash" in his yard. *Id.* Willey received three citations requiring payment of fines, one relating to the condition of his yard, another for running an illegal business on his property, and a third for an "unpermitted disturbance to 100-foot tidewater buffer." *Id.*; *see also* ECF 5-3 (citations and May 3rd letter).

A meeting took place between Willey, Willey's attorney, and Webb in which Willey alleges Webb acted aggressively and threatened to fine him $5,000 a day for the business infraction and $5,000 a day for the "tidewater buffer" infraction. ECF 5, at 15 ¶ 49. Ultimately all three citations were withdrawn. *Id.* ¶ 50.

On July 6, 2022, Willey received a "Writ of Summons" and "Complaint to Abate Violations of Title 121 of the Dorchester County Code" based upon the conditions of his yard. *Id.* ¶ 51. The parties resolved the complaint by a Consent Order dated November 3, 2022, where Willey agreed to remediate yard infractions by May 31, 2023, and agreed that Webb's inspectors could enter the property to assess compliance after notice to his attorney. *Id.* ¶ 51.

9

On May 30, 2023, Webb and one of her inspectors, Tyler Bennett ("Bennett") conducted an inspection. *Id.* at 16 ¶ 52. On June 1, 2023, Willey received two Notices of Violations that indicated "tall grass/weeds/vegetation 12 [inches] or higher," which needed to be corrected by June 7, 2023, and "untagged/unregistered/expired/vehicles, trailers, junk, rubble, and or trash," which needed to be corrected by June 15, 2023. *Id.* ¶¶ 53–54. On June 6, 2023, Willey received a third violation notice for "a fence of various heights from 4 feet to 10 feet," which needed to be corrected by July 6, 2023. *Id.* ¶ 55.

The dispute regarding the condition of Willey's yard morphed into the present ERPO dispute on June 2, 2023. *Id.* at 17 ¶ 58. Webb and Bennett allegedly drove to Willey's property without notice to Willey or his attorney to serve "one or more Notices of Violation." *Id.* Willey contends that he informed Webb and Bennett that he wished for Webb to "communicate with [Willey's] attorney" and alleges that he "respectfully declined to accept in-hand service of the Notices." *Id.* Willey contends that Webb was "irate," "refused to leave," and "berated" Willey. *Id.* Willey claims he was generally polite, though he admits he called Webb (or her behavior) "stupid." *Id.* Willey claims Webb became "even angrier" and "violently affixed" a Notice of Violation to the "fiberglass covering of [a boat Willey was storing in his yard] using a staple gun or other tool, damaging the cover in the process." *Id.* ¶ 59. Willey filed a complaint with the Sheriff's Office but alleges that Phillips failed to act upon it. *Id.* ¶ 60; *see also* ECF 5-7 (Incident Report), at 4–5.

### 2. Webb filed an ERPO Petition against Willey on June 15, 2023.

On June 15, 2023, Webb filed a petition for an ERPO against Willey in the District Court of Maryland for Dorchester County. ECF 5, at 18 ¶ 64. Webb, when identifying herself as a proper petitioner, checked the box for "law enforcement officer" and crossed out the word "law,"

10

writing in the word "code." ECF 5-9, at 2 (indicating she was a "code enforcement officer" from "County Planning & Zoning").

In Webb's petition she alleged Willey had been "making threats of violence by firearms to myself and other departmental employees on numerous occasions." ECF 5, at 18 ¶ 66; ECF 5-9, at 2. In a section seeming to call for a description of how Willey "has unlawfully, recklessly, or negligently used, displayed, stored, possessed, or brandished a firearm," Webb wrote only three dates. ECF 5, at 19 ¶ 68; ECF 5-9, at 2 (writing only "June 8th, 2023, June 9th, 2023, June 12, 2023"). Webb also checked box four on the ERPO petition indicating that Willey "has committed or threatened violence against himself/herself or others" and Webb wrote "on three recent occasions myself and staff were warned of threats of violence from Mr. Willey." ECF 5-9, at 3. Webb also indicated in box three that Willey possessed an "unknown" number of firearms including a handgun, a shotgun, a rifle, and an assault weapon. *Id.* at 2.

### 3. Willey Received Notice of his Temporary ERPO on June 15, 2023.

On June 15, 2023, the District Court for Dorchester County conducted an *ex parte* temporary ERPO hearing. ECF 28-2 (transcript of hearing). Webb provided brief testimony at the hearing reflecting that Willey became "violent" during Webb's "last visit" to Willey's property. *Id.* at 2. Webb also claimed that "several . . . neighbors" told a county contractor that Willey "is threatening to kill anybody that comes [to Willey's property] from the county, that he is prepared." *Id.* Webb stated that she received several phone calls related to Willey that left Webb feeling concerned for her safety:

> The next day I got a call from a counsel person that he was told personally by Mr. Willey that he was planning on shooting me at the property that he was already waiting and then I got a call Monday from his neighbor and she said that she felt she needed to warn me about what he is saying throughout the community that he is waiting. He is waiting for us to come and he is waiting to kill me and anybody else from the department that comes. So, I am concerned about the safety of my staff. I am concerned about the safety of him coming into the office for myself.

*Id.* Immediately after hearing this statement, the District Court for Dorchester County granted Webb's petition. *Id.*

That same day, Dorchester County Sheriffs served the Temporary ERPO on Willey, removed firearms from his home, and ultimately transported Willey for an Emergency Medical Evaluation. ECF 5, at 20–21 ¶¶ 73–79; *see also* ECF 5-10 (Receipt of Seized Firearms/Ammunition). The Temporary ERPO included the following information: (1) it indicated Petitioner was a law enforcement officer, ECF 5-2, at 2; (2) ordered Willey to surrender all firearms and ammunition to law enforcement and prohibited him from purchasing or possessing any firearm or ammunition for the duration of the order, *id.*; (3) scheduled a Final ERPO hearing for June 22, 2023, at 9:00 a.m., *id.*; and (4) ordered Mr. Willey to immediately surrender all firearms and ammunition to the officer," *id.* at 5.

Additionally, the Temporary ERPO included a summary of factual findings, likely from the temporary ERPO hearing on June 15, 2023, including that the petitioner is "a law enforcement officer"[8] and finding "reasonable grounds to believe" that Willey "poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id.* at 3. Willey was also served with an order for an emergency mental health evaluation based on the contents of the ERPO. *Id.* at 7. Specifically, the District Court Judge issuing the Order checked a box indicating that the court:

> finds probable cause to believe that the named individual (evaluee) has shown the symptoms of a mental disorder and presents a danger to the life of safety of the evaluee or others and, therefore, ORDERS that any peace officer take into custody and transport the evaluee to the nearest emergency facility, for examination by a physician within six hours after arrival at the facility and, if in

---

[8] On the same page, the Notice clarified in a "Comments" section on the Temporary ERPO that "PETITIONER IS A CODE ENFORCEMENT OFFICER." ECF 5-2, at 3 (all caps in original).

the physician's opinion necessary, for emergency care and treatment; provided
that the facility may not keep the evaluee for more than 30 hours under this order
but is not precluded from voluntary or involuntary admission in accordance with
Maryland Code, Health-General Article.

*Id.*

Consistent with the Notice, Willey was required to surrender his firearms and ammunition
immediately to Dorchester County Sheriff's deputies. ECF 5-2, at 5; ECF 5-10. Willey complied
and the officer seized three rifles, three handguns, two shotguns, and various ammunition from the
residence. ECF 5, at 20 ¶¶ 74–75; ECF 5-10. Willey was then transported in the front seat of a
marked Sheriff's Office vehicle to the University of Maryland Shore Medical Center at Cambridge
for an involuntary mental health evaluation. *Id.* ¶¶ 76–77. According to Willey, the evaluation
included "multiple non-consensual tests, including but not limited to a blood-alcohol test,
comprehensive metabolic panel, and a urinalysis drug screen." *Id.* ¶ 78. Willey was discharged
with a diagnosis of "acute stress reaction." *Id.* ¶ 79.

### 4. On June 22, 2023, the Final ERPO hearing resulted in a voluntary dismissal of the petition.

Willey and Webb appeared at the Final ERPO hearing on June 22, 2023. *Id.* at 22 ¶¶ 80–
81. Additionally, Interim County Manager, Jeff Powell was present. *Id.* "Powell and Webb
informed the Court that the County and Webb would not be pursuing the case" and the proceeding
was terminated. *Id.* ¶ 81. Since the matter ended in his favor, Willey did not have the opportunity
to present legal arguments or testimony. *Id.* On June 27, 2023, Willey's firearms and ammunition
were returned to him. *Id.* ¶ 82. In total, Willey was deprived of his personal property for twelve
days. *Id.*

### C. Procedural History

On August 22, 2023, Plaintiffs filed their original complaint. ECF 1; *see also* ECF 2
(Supplement to the Complaint). On August 28, 2023, Plaintiffs filed an Amended Complaint. *See*

13

ECF 5 (and attachments). Count One alleges a violation of Plaintiffs Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983. ECF 5, at 24–30. This count includes an allegation that the ERPO process is unlawful on its face and as applied to Willey. *Id.* at 24. Count Two alleges a violation of the Second and Fourteenth Amendments, as applied to Willey and on its face. *Id.* at 30–36. Count Three alleges "retaliation" under 42 U.S.C. § 1983 against Willey by Defendants Webb and Dorchester County in violation of the First and Fourteenth Amendments. *Id.* at 36–37. Count Four alleges an "equal protection class of one" on behalf of Willey and alleges disparate treatment of Willey by Defendants Webb, Phillips, and Dorchester County. *Id.* at 38. Count Five alleges a violation of the Fourteenth Amendment under a "stigma plus" theory.[9] *Id.* at 39. Count Six alleges malicious use of process under Maryland law against Defendants Webb and Dorchester County. *Id.* at 39.

Subsequently on September 8, 2023, Plaintiffs filed a motion for a preliminary injunction as to Counts I and II. ECF 15. On October 13, 2023, Defendants Brown and Phillips filed a joint motion to dismiss counts against them. ECF 25. On October 27, 2023, Dorchester County and Webb filed a joint motion to dismiss counts against them. ECF 28. On October 31, 2023, this matter was re-assigned to the undersigned.

## II.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–

---

[9] It is well settled that a plaintiff must allege more than "stigma" or harm to "reputation alone" to show a cognizable constitutional injury. *Elhady v. Kable*, 993 F.3d 208, 226 (4th Cir. 2021) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). As such, a cognizable "stigma-plus" claim requires a plaintiff to prove an additional harm than the mere damage to his reputation. *Id.* (quoting *Davis*, 424 U.S. at 706, 711). Here, Willey alleges that Webb's petition for an ERPO constitutes "a false disclosure" that damaged Willey's reputation. ECF 5, at 39 ¶ 136. The "plus" Willey alleges is the alleged "unreasonable seizure of his person, and of his firearms and ammunition." *Id.*

14

90 (2008)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To succeed on a motion for a preliminary injunction, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (alteration in original) (citing *Winter*, 555 U.S. at 20). "To secure a preliminary injunction, a plaintiff must 'make a "clear showing" that [he is] likely to succeed at trial, [but he] need not show a certainty of success.'" *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

Given the extraordinary nature of the relief, the court has "broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction, including hearsay." *Fitzhugh v. Wells Fargo Bank, N.A. as Tr. for IMPAC CMB Tr. Series 2005-3*, 594 F. Supp. 3d 265, 268 (D. Mass. 2022); *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 465–66 (D.S.C. 2020). The Court exercises its discretion to consider the transcript of Webbs' temporary ERPO hearing, ECF 28-2, and Plaintiffs' exhibits attached to the Motion for Preliminary Injunction. ECFs 15-2–15-9.

## III.   DISCUSSION

Plaintiffs move for a preliminary injunction only as to Counts I and II, which allege an ongoing constitutional violation of the rights of all Maryland residents' Fourth and Fourteenth (Count I) and Second and Fourteenth (Count II), Amendment rights. ECF 5, at 24, 30.

### A.   Count I: Fourth and Fourteenth Amendment

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, . . . and effects, against unreasonable searches and seizures, shall not

be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation
.... U.S. Const. amend. IV. The Fourteenth Amendment to the United States Constitution
provides, in pertinent part: "nor shall any State deprive any person of life, liberty, or property,
without due process of Law [the Due Process Clause of the Fourteenth Amendment]." U.S. Const.
amend. XIV, § 1.

1. Likelihood of Success

Plaintiffs argue they have met their burden to demonstrate a likelihood of success on their
Fourth and Fourteenth Amendment claims because the law's "reasonable grounds" standard, as
applicable to the issuance of interim and temporary ERPOs, authorizes the State to effectuate a
warrant based upon less than probable cause. ECF 15-1, at 24–27. Additionally, Plaintiffs argue
the law is unconstitutional as it authorizes a warrant based on the undefined concept of
"dangerousness," as opposed to specific suspicions that the respondent has violated a law. *Id.* at
26–27.

It is well established that "a seizure of personal property [is] per se unreasonable within
the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant
issued upon probable cause ...." *United States v. Place*, 462 U.S. 696, 701 (1983). "[A]
warrantless seizure ... can still be valid 'if the exigencies of the circumstances demand it or some
other recognized exception to the warrant requirement is present.'" *Allen v. County of Lake*, 71 F.
Supp. 3d 1044, 1050–51 (N.D. Cal. 2014) (quoting *Place*, 462 U.S. at 701). Defendants have not
argued for the applicability of any recognized exception to the warrant requirement, nor do they
contest that the ERPO is effectively a warrant.[10] *See* ECFs 24, at 8–9; 28-1. Rather, Defendants'

---

[10] Justice Alito noted that Fourth Amendment challenges to red flag laws were likely to come
before the Supreme Court. *See Caniglia v. Strom*, 593 U.S. 194, 202 (2021) (Alito, J., concurring)
("Provisions of red flag laws may be challenged under the Fourth Amendment, and those cases
may come before us."). Thus, it is unsurprising that Defendants concede the applicability of the

position is that the RFL does not offend the Fourth Amendment because the term "reasonable

grounds" in PS § 5-603 (interim orders) and PS § 5-604 (temporary orders) is equivalent to the

Fourth Amendment's demand for a warrant based upon "probable cause."[11] ECF 24, at 8.

Ordinarily when interpreting a state statute, such as PS § 5-601 et seq., a federal court

"defer[s] to statutory interpretation conducted by the 'state's highest court.'" *Castillo v. Holder*,

776 F.3d 262, 268 n.3 (4th Cir. 2015) (quoting *United States v. Aparicio-Soria*, 740 F.3d 152, 154

(4th Cir. 2014)). If there is no interpretation from the state's highest court, an interpretation from

an intermediate appellate court often provides "the next best indicia of what state law is." *United*

*States v. O'Brien*, 356 F. Supp. 3d 518, 525 (D. Md. 2018) (citing *Castillo*, 776 F.3d at 268 n.3).

In this case, no interpretation from Maryland's highest court nor its intermediate appellate court

exists on the statute at issue here, nor does such caselaw exist on the definition of "reasonable

grounds" as used in PS § 5-604(a)(1). For the reasons indicated by separate order issued this same

day, the Court has certified two questions to the Supreme Court of Maryland, so that the Court

may benefit from Maryland's interpretation of its own law prior to ruling on the pending motions

to dismiss.

Nevertheless, in resolving Plaintiffs' motion for preliminary injunction, the Court's task is

slightly different. Because of this procedural posture, the Court need not definitively resolve

---

Fourth Amendment to the ERPO process. *See also Yith v. Nielsen*, 881 F.3d 1155, 1166 (9th Cir.
2018) (noting a warrant is a "writ directing or authorizing someone to do an act, esp. one directing
a law enforcer to make an arrest, a search, or a seizure" (quoting Black's Law Dictionary (10th ed.
2014))); *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000) ("A warrant is a judicial
authorization to a law enforcement officer to search or seize persons or things."); *United States v.
Leon*, 468 U.S. 897, 920 n.21 (1984) ("A warrant is a judicial mandate to an officer to conduct a
search or make an arrest . . . ."); *Utah v. Strieff*, 579 U.S. 232, 240 (2016) (citing *Leon*, 468 U.S.
at 920 n.21).

[11] To be clear, Plaintiffs do not contest the RFL's Final Order section, as the statute requires "clear
and convincing evidence" prior to issuance of a Final ERPO. *See supra* Section I.A.3.

whether Maryland's RFL definitively offends the Fourth and Fourteenth Amendments; rather, the Court is merely considering whether Plaintiffs' have met their burden to establish that they are likely to success on the merits of counts one and two. This is a high bar, though not an insurmountable one. *See, e.g., MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (noting a preliminary injunction is a remedy that should "be granted only sparingly and in limited circumstances" (citation omitted)).

Plaintiffs argue that there is essentially no ambiguity as to the meaning of "reasonable grounds" because "[f]ederal and state courts agree and have consistently held that the "reasonable grounds" standard is similar to the "reasonable suspicion" standard, and not similar to the higher "probable cause" standard. ECF 15-1, at 25 (citation omitted). Plaintiffs cite to *Terry v. Ohio*, 392 U.S. 1 (1968), and one case from the Supreme Court of North Carolina interpreting a North Carolina statute related to nontestimonial identification orders.[12] ECF 15-1, at 25. Neither of these cases establish that the term "reasonable grounds" is so uniform and consistent as to eliminate any and all ambiguity regarding the meaning of the term.

Maryland caselaw reveals that the definition of "reasonable grounds" is not monolithic, and Maryland's highest court has held that the term means different things in different statutes.

---

[12] *Terry v. Ohio*, the seminal case setting out the reasonable suspicion standard for so-called "stop-and-frisk" police encounters, does not tell the Court anything about what "reasonable grounds" means in a state civil statute. 392 U.S. at 18. The additional case Plaintiffs cite to, *State v. Pearson*, also fails to provide the guidance Plaintiffs claim it does. 566 S.E.2d 50 (N.C. 2002). In *State v. Pearson*, the Supreme Court of North Carolina considered the statutory meaning of a state law permitting "nontestimonial identification orders" ("NIO") to issue upon reasonable grounds to believe the suspect committed a felony. *Id.* at 54 (citing N.C. Gen. Stat. Ann. § 15A-273). The *Pearson* Court acknowledged that "[t]he reasonable grounds standard required for an NIO is significantly lower than a probable cause standard." *Id.* (citation omitted). However, this case is neither binding nor particularly persuasive as the Supreme Court of North Carolina's interpretation of what the phrases in an unrelated North Carolina statute mean do not dictate what the same words may mean when employed in a fundamentally different law in a different state.

*Compare Motor Vehicle Admin. v. Shepard*, 923 A.2d 100, 107 (Md. 2007) ("We . . . hold that the term 'reasonable grounds' as used in [Section] 16–205.1 [of the Transportation Article] means 'reasonable articulable suspicion' and not preponderance of the evidence or probable cause."), *with Volodarsky v. Tarachanskaya*, 916 A.2d 991, 1001 (Md. 2007) (holding preponderance-of-the-evidence standard governed determination of whether there were "reasonable grounds to believe" that a child has been abused or neglected by a party to a custody or visitation proceeding under Md. Code Ann., Family Law § 9-101 et seq.), *and Stevenson v. State*, 413 A.2d 1340, 1347 (Md. 1980) ("While phrased in terms of 'reasonable grounds' for arrest, this common law criterion also happens to state the constitutional standard, since it and the 'probable cause' requirement of the federal constitution's fourth amendment 'are substantial equivalents.'" (citing *Henry v. United States*, 361 U.S. 98, 100 (1959))).

This caselaw alone supports that the term is ambiguous. *Deville v. State*, 858 A.2d 484, 487 (Md. 2004) ("A statute is ambiguous when there are two or more reasonable alternative interpretations of the statute."). Maryland courts do not view an ambiguous term in a vacuum and construe the terms in light of the "particular and broad objectives of the legislation, in addition to the overall purpose of the statutory scheme." *Id.*; *see also Maryland v. Bey*, 156 A.3d 873, 879 (Md. 2017) ("[A] court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.").

Further, one canon of statutory interpretation Maryland courts frequently rely upon is the canon of consistent usage. *See Toler v. Motor Vehicle Admin.*, 817 A.2d 229, 235 (Md. 2003) ("It

is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things."). Plaintiffs argue that the fact that the term "probable cause" is used in some sections of the RFL, *see* PS §§ 5-603(a)(4), 5-604(a)(4), 5-605(c)(4), 5-607, 5-610(b), while the term "reasonable grounds" is used in other sections, *see id.* §§ 5-603(a)(1), 5-604(a)(1), demonstrates a clear intent by the Maryland legislature to give different meanings to these different phrases. ECF 15-1, at 26; ECF 38, at 7.

Defendants acknowledge the inconsistent usage but argue that the legislative history of the ERPO law reflects that the term "reasonable grounds" was meant to be identical to "probable cause." ECF 24, at 10–11. "[T]he modern tendency of [the Supreme Court of Maryland] is to continue the analysis of the statute beyond the plain meaning to examine 'extrinsic sources of legislative intent' in order to check [] [the] reading of a statute's plain language' through examining 'the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.'" *In re S.K.*, 215 A.3d 300, 311 (Md. 2019) (quoting *Brown v. State*, 165 A.3d 398, 401 (Md. 2017)). Defendants argue that "the general infrastructure of the ERPO laws was borrowed from the domestic violence protective order statutes, which use the reasonable grounds standard." ECF 24, at 10–11 (citing Md. Code Ann., Family Law § 4-504.1(b) (2019)) (providing that "[i]f a petition is filed with a commissioner and the commissioner finds that there are reasonable grounds to believe that the respondent has abused a person eligible for relief, the commissioner may issue an interim protective order to protect a person eligible for relief"). By contrast, the provisions that use "probable cause"—such as those permitting a court to order an emergency medical evaluation, PS § 5-605(c)(4)—were "added to the ERPO laws late in the legislative session[,]" *see* ECF 24, at 11 (citing House Bill 1302, Amendment 258778, adopted by

20

the Senate April 5, 2018). Defendants argue that the legislature simply "imported the language from the stand-alone emergency evaluation statute, which uses the "probable cause" standard." *Id.* (citing Md. Code Ann., Health-Gen. § 10-623(b) (2019), which states that "[a]fter review of [a lay person's petition], the court shall endorse the petition if the court finds probable cause to believe that the emergency evaluee has shown the symptoms of a mental disorder and that the individual presents a danger to the life or safety of the individual or of others").

Plaintiffs do not meaningfully engage in the discussion of legislative history. ECF 38, at 8–9, 15. Instead Plaintiffs unhelpfully criticize a sponsor of the legislation at issue for purportedly "cutting corners" and allege that the use of "reasonable grounds" instead of "probable cause" was not an "innocent drafting mistake," but rather the result of the "casual, deliberate, and flagrant disregard for constitutional rights and standards." *Id.* at 9.

Nevertheless, both parties offer rationales that could support different readings of the key terms in the statute. But close calls typically do not compel a preliminary injunction. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (noting that a "preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought"). To warrant a preliminary injunction, Plaintiffs could have met their burden in a variety of ways, including by pointing to similarly challenged precedent that relates to the challenged law. *See, e.g., Garcia v. City of Los Angeles*, 11 F.4th 1113, 1119 (9th Cir. 2021) (finding likelihood of success on a Fourth Amendment claim where a challenged statute authorizing the destruction of property belonging to people experiencing homeless was very similar to a previously enjoined statute). Plaintiffs do not do so here and undertake little more than a plain meaning analysis for an ambiguous term. *See* ECFs 15-1, 38. While Plaintiffs' plain meaning analysis may carry the day with the Supreme

21

Court of Maryland, it certainly does not establish that Plaintiffs have "clearly established" entitlement to the extraordinary remedy of a preliminary injunction. *Di Biase*, 872 F.3d at 230.

Alternatively, Plaintiffs argue the "Maryland RFL also offends the Fourth and Fourteenth Amendments because it authorizes Interim and Temporary ERPOs to issue based upon the subjective and undefined personal characteristic of a respondent (being a "danger") rather than upon an alleged violation of one or more laws." ECF 15-1, at 26. However, Plaintiffs' arguments on this point are unclear. Plaintiffs note that dangerousness is a "personal characteristic" and not a criminal violation, *id.*, though the relevance of this point to a civil statute is not immediately apparent. Plaintiffs also argue that "disarming individuals because they supposedly have the characteristic of being a 'danger' is akin to seizing the bank accounts of individuals who are suspected of being 'dishonest' to prevent them from committing tax evasion." *Id.* at 27. Plaintiffs appear to suggest that preventative government measures are unlawful in any context, but they provide no real support as to why such a civil scheme would constitute a *per se* violation of the Fourth Amendment.[13]

Ultimately, Plaintiffs do not expend much energy on this argument, *see* ECF 15-1, at 26, and neither will the Court. Based upon Plaintiffs' lack of citation to relevant caselaw and their failure to reckon with the challenged law's legislative history, the Court cannot conclude that Plaintiffs have met their burden to secure a preliminary injunction. The Court has assessed the various arguments, and without expressing an opinion on the definitive meaning of "reasonable grounds," considers Plaintiffs' likelihood of success on the merits to be, at best, uncertain. Plaintiffs have not demonstrated a likelihood for success on the merits for Count I.

---

[13] Furthermore, Defendants counter that "predictive decisions" are "commonplace in the law." ECF 24, at 11–12 (listing various examples such as domestic violence protective orders, emergency medication administration, among others).

2. Remaining Prongs

Additionally, the Court cannot conclude Plaintiffs met their burden of establishing irreparable harm. As noted, the party moving for a preliminary injunction must show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The moving party must "make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). In addition, Plaintiffs are not entitled to a preliminary injunction unless the harm they allege "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Plaintiffs' arguments on this prong center solely on the principle that the "denial of a constitutional right, if denial is established, constitutes irreparable harm." ECF 15-1, at 33 (quoting *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)). This statement is correct as it relates to prospective and continuing violations of constitutional rights. *See, e.g., Jensen v. Md. Cannabis Admin.*, Civ. No. 24-0273-BAH, 2024 WL 811479, at *6 (D. Md. Feb. 27, 2024) (agreeing that the denial of participation in a lottery for the issuance of licenses to dispense marijuana constituted "irreparable harm"); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (finding that a constitutional violation constituted "irreparable harm" when Defendants continued to have access to data collected by the challenged practice (an aerial surveillance program)); *Mills v. District of Columbia*, 571 F.3d 1304, 1306 (D.C. Cir. 2009) (finding "irreparable injury" where a challenged police checkpoint program was not utilized but where the program had been used "more than once, and [where] the police chief [] expressed her intent to continue to use the program until a judge stop[ped] her."). However, courts have often noted that

in the context of preliminary injunctions seeking an end to the alleged violations of the First Amendment that "a plaintiff's claimed irreparable harm is 'inseparably linked'" to the likelihood of success on the merits. *See, e.g., WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 254–55 (4th Cir. 2003). Other courts have extended this logic to all claims of a constitutional nature. *See, e.g., Dean v. Leake*, 550 F. Supp. 2d 594, 602 (E.D.N.C. 2008) ("Although the balance of harms inquiry ordinarily precedes an analysis of a plaintiff's likelihood of success on the merits, when the harm alleged by the plaintiff is the deprivation of a constitutional right, the likelihood of success on the merits is so 'inseparably linked' to the proving of an actual harm that the court may proceed directly to consider the merits of the plaintiff's action." (citation omitted)); *Stewart v. Justice*, 502 F. Supp. 3d 1057, 1070 (S.D.W. Va. 2020) (extending the principal announced in *Musgrave* to "all of the Plaintiffs' constitutional claims," even those involving Fourth Amendment claims).

It also bears noting that the risk of future harm to Plaintiffs here is somewhat speculative. "An injunction 'will not be granted against something merely feared as liable to occur at some indefinite time in the future.'" *Norfolk & W. Ry. Co. v. Brotherhood of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) (quoting *Bloodgood v. Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986)). It is uncontested that Willey is no longer under an ERPO. ECF 5, at 4 ¶ 9 (noting that the ERPO petition "was ultimately dismissed"); *id.* at 22 ¶ 81 (noting that the ERPO was not pursued). Further, the twelve-day deprivation of his personal property ended on June 27, 2023. *Id.* ¶ 82; *see also* ECF 5-13 (Property Inventory Form), at 2 (reflecting the return of Willey's property). It is purely speculative to suggest Willey will be an ERPO respondent in a future petition filed by Webb or anybody else, particularly when no petitions have been sought in over a year. It is similarly

24

speculative to suggest that any of Plaintiff SAF's members will be subject to an ERPO when the law at issue only applies when specific individuals file a petition and after a judicial officer makes a particularized finding specific to the respondent. Noting that the Court has already found that Plaintiffs have failed to establish a likelihood of success on the merits and recognizing the speculative nature of Plaintiffs' arguments related to future harm, it is, at best, a close question as to whether Plaintiffs have established the requisite "irreparable harm" sufficient to secure a preliminary injunction.

Nor have Plaintiffs established that the balance of equities and public interest inquiries tip in their favor. "When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) and *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020)). This is so because "the government's interest *is* the public interest" in such a case. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (emphasis in original) (quoting *Pursuing Am. Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Plaintiffs argue that "public interest is served by enjoining unconstitutional actions." ECF 15-1, at 37 (citing *Legend Night Club*, 637 F.3d 291, 303 (4th Cir. 2011)). Furthermore, Plaintiffs claim that the "state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). This is, no doubt, true. However, the Court has not found that Maryland's RFL is likely to offend the Fourth Amendment. As such, Plaintiffs' public interest argument—which necessarily requires such a finding—fails.

As to the public interest inquiry, Defendants provide a compelling and well-supported argument that the public interest is best served by permitting ERPOs to be issued during the pendency of this suit because such laws prevent gun violence and can reduce suicides. ECF 24, at 24–25 (citing Jeffrey W. Swanson, et al., *Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does it Prevent Suicides?*, 80 L. & Contemp. Probs. 179, 206 (2017), where researchers in one study concluded that every "ten to twenty gun seizures" in Connecticut averted approximately one suicide," and Jeffrey W. Swanson, et al., *Criminal Justice and Suicide Outcomes with Indiana's Risk-Based Gun Seizure Law*, 47 J. Am. Acad. Of Psychiatry & L. 188, 188 (2019), where researchers concluded that one suicide was prevented in Indiana for every ten ERPO orders issued, as well as Aaron J. Kivisto et al., *Effects of Risk-Based Firearm Seizure Laws in Connecticut and Indiana on Suicide Rates*, 1981-2015, 69 Psychiatric Servs. 855, 855 (2018), which found Connecticut's and Indiana's ERPO laws reduced suicides by 13.7 and 7.5 percent, respectively); *see also* Promising Approaches for Implementing ERPO Laws, *supra*, at 6 ("While ERPO laws are relatively new, a growing body of research demonstrates the potential for these laws to prevent firearm violence, particularly firearm suicide, and multiple victim/mass shootings."). Public safety is an important governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 748 (1987) ("[T]he Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). The Court agrees with Defendants that staying enforcement of Maryland's ERPO laws would undermine the strong governmental interest of stemming gun violence, preventing suicide, and promoting the public peace. ECF 24, at 25. Plaintiffs' preliminary injunction on Count I is **DENIED**.

### B.   Count II: Second and Fourteenth Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

Const. amend. II. Incorporated against the states through the Due Process Clause of the Fourteenth

Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 749 (2010), the Second Amendment

guarantees "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S.

570, 592, 595 (2008). The right to keep and bear arms is a "fundamental" constitutional guarantee.

*Heller*, 554 U.S. at 594.

Plaintiffs' Second Amendment arguments rest primarily on three cases: *Heller, McDonald,*

and *New York Rifle Association v. Bruen*, 597 U.S. 1 (2022). ECF 15-1, 28–30.[14] Plaintiffs argue

that consistent with *Bruen*, the government must "demonstrate that the regulation is consistent

with this Nation's historical tradition of firearm regulation." *Id.* at 29 (quoting *Bruen*, 597 U.S. at

17). Since Defendants cannot identify any comparable historical analogues to Maryland's ERPO

law, Plaintiffs argue that their preliminary injunction motion should be granted. ECF 15-1, at 30.

Defendants argue they have met this burden and claim that "there is a longstanding American

tradition of regulating the possession of firearms by people perceived to be dangerous, who

---

[14] While this case was pending, the Supreme Court issued a fourth: *United States v. Rahimi*, 144
S. Ct. 1889 (2024). In *United States v. Rahimi*, the Supreme Court upheld the constitutionality of
a federal statue prohibiting an individual subject to a domestic violence restraining order from
possessing a firearm when the order includes a finding that the subject "represents a credible threat
to the physical safety of [an] intimate partner." 144 S. Ct. at 1901 (quoting 18 U.S.C. §
922(g)(8)(C)(1)). In that case, a Texas state court found that Mr. Rahimi had committed "family
violence" against his girlfriend and that such violence was "likely to occur" again" and posed a
"credible threat" to his girlfriend's "physical safety." *Id.* at 1895. The order prohibited Mr. Rahimi
from threatening his girlfriend for two years and as is relevant here, suspended Mr. Rahimi's gun
license for two years. *Id.* at 1895. Later, Mr. Rahimi was indicted under 42 U.S.C. § 922(g)(8),
a crime that at the time was punishable by up to ten years imprisonment. *Id.* The Supreme Court
undertook a thorough analysis of the historical evidence, much of which Defendants rely upon in
the present case, and concluded that "[s]ince the founding, our Nation's firearm laws have included
provisions preventing individuals who threaten physical harm to others from misusing firearms."
*Id.* at 1896. As Mr. Rahimi had only mounted a facial challenge to § 922(g)(8) and the Supreme
Court concluded that § 922(g)(8) "fits comfortably" within this Nation's tradition. *Id.* at 1896–97.

27

otherwise threaten to disrupt the public peace, and who are not law-abiding, responsible citizens."
ECF 24, at 14.

### 1. Likelihood of Success

It warrants repeating that to prevail on a motion for preliminary injunction, a plaintiff "must make a clear showing that he is likely to succeed at trial." *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351 (D. Md. 2021) (quoting *Di Biase*, 872 F.3d at 231), *aff'd*, No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd*, No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021).   Ordinarily, it is the plaintiff who bears the burden of demonstrating a likelihood of success on the merits. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 443 (1974). Yet in a challenge to a law infringing on the right to possess firearms, *Bruen* makes clear that courts are to apply a burden shifting framework. *Bruen*, 597 U.S. at 24–25.   That is to say that once a plaintiff establishes that the Second Amendment's plain text covers the conduct at issue, the Constitution presumptively protects that conduct and "the burden falls" on the government to show that the challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34.   Here, the parties do not contest that Plaintiffs met their initial burden to show that "the Second Amendment's plain text covers" Plaintiffs firearms-related conduct. *See* ECF 15-1, at 28 (bypassing the first step in a *Bruen* analysis and proceeding straight to demanding a historical analogue); ECF 24, at 12–22 (arguing only that history supports the regulation, thereby conceding the Second Amendment's "plain text covers"). Thus, Plaintiffs may demonstrate a likelihood of success on the merits by establishing that Defendants failed to establish that Maryland's RFL "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.   Stated differently, Plaintiffs do not bear the burden of definitively establishing that history *does not* support the challenged regulation; rather, Plaintiffs are tasked only with defeating Defendants' analogical rationale.

28

Admittedly, this is no small feat when analogical reasoning in this context can be challenging[15] and open to numerous interpretations. "[E]verything is similar in infinite ways to everything else," and one needs "some metric enabling the analogizer to assess which similarities are important and which are not." *Bruen*, 597 U.S. at 29 (internal citations and quotation marks omitted). *Heller* and *McDonald* "point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified." *Bruen*, 597 U.S. at 29. But these metrics are by no means exhaustive or exclusive. *See id.* ("[W]e do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment . . . .").

Additionally, the *Bruen* Court provided further guidance to courts performing the requisite analogical reasoning, noting that "[a]lthough [the Constitution's] meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28. Additionally, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30 (noting courts should not "uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted" (internal citation and quotation marks omitted) (cleaned up)).

---

[15] As the *Bruen* Court acknowledged, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 597 U.S. at 27. Nevertheless, "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'" *Id.* at 27–28 (quoting *McCulloch v. Maryland*, 17 U.S. 316 (1819)).

With this understanding of the law, the Court will first summarize the historical evidence Defendants present to support upholding PS § 5-601 et seq. Then, the Court will evaluate the merits of Plaintiffs' criticisms of Defendants' analytical reasoning. Ultimately, for the reasons outlined herein, the Court concludes that Defendants' analogues are cogent and a preliminary injunction is not warranted.

i.    *Defendants' Historical Case*

Defendants consult historian Dr. Saul Cornell, who attests that "[t]he history and tradition of restricting the use of dangerous weapons to prevent terror and protect civil order is grounded in centuries of English statutory and common law." ECF 24-1, at 7 ¶ 13. Dr. Cornell points first to the Statute of Northampton of 1328, which provided that "no Man . . . [shall] come before the King's Justices . . . with force and arms, nor bring no force in affray of the peace . . . ." *Id.* (quoting 2 Edw. 3, ch. 3 (1328)). The Statute of Northampton also forbade traveling armed in fairs and markets. *Id.* ("[I]f any person . . . shall be so bold as to go or ride Armed, by night or by day, in Fairs, Markets, or any other places . . . then any Constable . . . may take Such Armour from him . . . and may also commit him to the Gaol." (quoting Keble, An Assistance to the Justices of the Peace for the Easier Performance of Their Duty 224 (1683))). Defendants argue that this common law tradition provides some evidence of the background context in which the Founders were operating. ECF 24, at 15. One such foundational common law concept, according to Dr. Cornell, was the protection of the peace. ECF 24-1, at 7–8 ¶ 14 (explaining "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury" (quoting Joseph Backus, The Justice of the Peace 23 (1816))).

In the post-Revolutionary era, Dr. Cornell attests that "states began writing common law practices into statutory law, including the adoption of surety laws, which required individuals

deemed to be dangerous to post a surety or face imprisonment (and thereby disarmament as well)." *Id.* at 9 ¶ 16. Dr. Cornell concludes that "[t]hese laws were consistent with the authority still exercised by post-Revolutionary justices of the peace, which reached back to England and the British North American colonies." *Id.* ¶¶ 16–17 (citing 1801 Tenn. Laws 260-261 ch. 22, § 6, which stated: "That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law").

Defendants compare surety laws to Maryland's RFL because, as Dr. Cornell notes, "these laws *preemptively* forbade the offensive conduct and threatened imprisonment and, hence, disarmament for failure to comply." *See* ECF 24-1, at 9–10 ¶ 18 (emphasis in original) (citing Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. Davis L. Rev. 2545 (2022)). Additionally, Dr. Cornell notes that justices of the peace had the authority to restrict access to weapons for those offending the public peace. *Id.* at 10 ¶ 19 (noting that one influential justice of the peace manual noted, if any justice "find any person in arms, contrary to the form of the statute, he may seize the arms and commit the offender to prison" (quoting 1 Burn, The Justice of the Peace and Parish Officer 14 (1756))).

Next, Dr. Cornell points to a tradition of disarming individuals based upon suspicions that the individual is "dangerous." *See* ECF 24-1, at 12–19; *id.* at 12 ¶ 21 ("The history of the Constitution, the framing of the Bill of Rights in the First Congress and in legal practices in the

Founding era with respect to firearms were premised on the recognition of a broad authority to preserve the peace and if necessary, disarm those who were considered to be dangerous."). The "dangerous," Dr. Cornell notes, were not merely those who displayed a propensity for violence but also those who threatened public order. *See, e.g.*, ECF 24-1, at 12–14 ¶¶ 21–26 (noting a variety of early Continental laws disarming a variety of individuals deemed to be a threat to "peace and public safety," though recognizing that many of these categories "reflected racial animus impermissible under modern law").

As additional support for this general tradition of disarming individuals deemed to pose a high risk of dangerousness, Dr. Cornell points to proposed provisions from state constitutional ratification conventions in Pennsylvania, Massachusetts, and New Hampshire that sought to expressly permit the disarmament of such persons. *Id.* at 14–15 ¶¶ 27–28. While these proposals were not ultimately included in the final text of the Second Amendment, Dr. Cornell notes that "[t]he relevance of these texts in this context resides not in how their language shaped the final text of the Second Amendment, but rather in providing information about the relevant background assumptions that virtually all participants in the debate over ratification assumed when thinking about the meaning and scope of the right to bear arms." *Id.* at 16 ¶ 29. To support this extrapolation, Dr. Cornell points to a number of essays authored by Nicolas Collin in 1788, that purport to show "why Founding era disarmament statutes were unproblematic in the eyes of most Americans, including leading Anti-Federalists and Federalists."[16] *Id.* at 17–18 ¶ 31 ("If, . . . a

---

[16] Dr. Cornell avers that "[t]he Pennsylvania Dissenters and [Nicolas] Collins were focused on the scope of potential *federal* disarmament. The authority of the individual states to disarm individuals who posed a threat to public safety, or the social order was even less controversial." ECF 24-1, at 18 ¶ 33 (emphasis added). Dr. Cornell points to leading Anti-Federalist, Brutus, as evidence of the widespread recognition of state power to provide for the protection and defense of citizens against private violence and "the wrongs done or attempted by individuals to each other." *Id.*

suspected person may be secured, he may much more be disarmed. In such unhappy times it may be very expedient to disarm those who cannot conveniently be guarded, or whose conduct has been less obnoxious. Indeed to prevent by such a gentle measure, crimes and misery, is at once justice to the nation, and mercy to deluded wretches, who may otherwise, by the instigation of a dark and bloody ringleader, commit many horrid murders, for which they must suffer condign punishments." (quoting *Remarks on the Amendments to the Constitution . . . by a Foreign Spectator*, The Federal Gazette, and Philadelphia Evening Post (Pa.), Nov. 21, 1788)).

This tradition of protecting public peace and preventing terror to the people via firearm regulation continued, Dr. Cornell opines, through the late eighteenth, nineteenth, and twentieth centuries. ECF 24-1, at 19 ¶¶ 34–45. For instance, Dr. Cornell observes that "many states and localities prohibited firearms sales to or possession by intoxicated people and drug addicts, and minors, none of whom was considered fit to purchase or possess guns." ECF 24-1, at 20 ¶¶ 36–37 (collecting sources). Additionally, "[m]any Southern and Western states ratified constitutional provisions that framed the right to keep and bear arms as subject to state regulation, particularly to protect the peace and prevent crime." *Id.* at 22 ¶ 40 (noting the Texas Constitution stated that the "Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime" and Tennessee's Constitution stated the "Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime" (first quoting Tex. Const., art. I § 23 (1876); then quoting Tenn. Const., art. I, § 26 (1870))).

Pulling this historical narrative together, Defendants argue that PS § 5-601 et seq. is "relevantly similar" to these state provisions because "Maryland's laws governing ERPOs use the

---

(quoting Brutus, Essays of Brutus VII, *reprinted in* 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981)).

tradition of keeping firearms out of the hands of individuals deemed to be a danger to the public as their foundational analog." ECF 24, at 20. Additionally, Defendants argue the state's authority and responsibility for protecting the public peace and protecting people from being placed in imminent fear of harm is equally longstanding. ECF 24, at 18 ("[W]hether based on history or common sense (or both), this and other courts have recognized the proposition, grounded in Founding-era history, that governments may prohibit the possession of firearms by individuals who are dangerous or whose possession would otherwise be contrary to the public safety." (collecting pre-*Bruen* cases)).

Though Defendants recognize that the means for doing so may have changed, Defendants argue the burden on the right to bear arms imposed by Maryland's ERPO laws is comparably minimal. *See id.* at 20 ("Temporary disarmament of individuals who, after receiving due process, a higher level of due process than anything available in earlier periods of American history, imposes a far lower burden on Second Amendment rights than the preemptive and permanent disarmament of entire categories of people thought to be dangerous (without being given any due process) that is amply supported by the American historical tradition." (quoting ECF 24-1, at 26 ¶ 46)). An interim ERPO will deprive the respondent of the right to keep and bear firearms for purposes of self-defense for approximately two or three days. *See supra* Section I.A.1. A temporary ERPO will deprive the respondent of that right for approximately seven days. *See supra* Section I.A.2. An ERPO is not a criminal penalty and is instead a civil order designed to promote the public peace by preemptively acting to prevent deadly violence. *See supra* Section I.A. Therefore, Defendants argue the burden imposed by PS § 5-601 et seq. is certainly *no greater* than the burden imposed by the historical laws discussed above that seized firearms and imprisoned individuals based on perceived dangerousness and threats to the public peace. *See* ECF 24, at 20.

  *ii.  Plaintiffs' Critiques*

  Plaintiffs generally criticize the State's presentation of historical evidence by arguing that (1) Dr. Cornell is not reliable; (2) wartime laws are not appropriate historical analogues; and (3) surety laws and the like posed a lesser burden than those imposed by the RFL.

  First, Plaintiffs provide no legitimate reason that the Court should question Dr. Cornell's ability to accurately opine on the history of firearms regulations.  Defendants submitted a declaration from a historian to meet their burden of proof, *see* ECF 24-1, and Plaintiffs were welcome to do the same to rebut this historical evidence.  Instead, Plaintiffs chose to file a personal "declaration," written by their own counsel, that provides frequent criticism of Dr. Cornell as "an anti-Second Amendment ideologue" who has "never met a firearms regulation he didn't like." ECF 36-1, at 2 ¶ 5.  These attacks are unhelpful, if not inappropriate, and may strike some as little more than a tactic to creatively skirt the page limitations for arguments in Plaintiffs' reply brief by adding twenty-one (21) pages of additional argument that was not permitted by the Court. *See* Loc. R. 104.3 (D. Md. 2023) (limiting reply briefs to fifteen (15) pages).  Regardless, the attacks on Dr. Cornell's scholarship are neither persuasive nor helpful.

  Second, though the Court credits Plaintiffs' point that wartime laws are not the best indicator of the public's understanding of a right during peace times, *see* ECF 15-1, at 30–32, Defendants other evidence supporting a consistently held and well-recognized understanding that states have had the authority to regulate firearms for the public peace remains compelling. Evidence that justices of the peace would confiscate the arms of persons who carried them in a manner that spread fear or terror is particularly persuasive.  ECF 24, at 16 (citing James Davis, The Office and Authority of a Justice of Peace 5 (1774) [North Carolina]; William Waller Hening, The New Virginia Justice 18 (1795) [Virginia]; Act of Nov. 27, 1786, ch. 21, A Collection of all

such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force 33 (1794)).  As Dr. Cornell concludes, "regulation of firearms took various forms in the early republic. But as each type of statute makes plain, the legislatures have consistently exercised the authority to disarm individuals perceived to be dangerous." ECF 24-1, at 22 ¶ 41.

However, even accepting that legislatures have consistently exercised the authority to disarm the dangerous, "[w]hat matters is whether a conceptual fit exists between the old law and the new." *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023).  Plaintiffs argue that no such conceptual fit exists, stating that "wholesale disarmament of individuals did not occur outside of the military and wartime context during the relevant period." ECF 15-1, at 30.  Yet this overstates how much the RFL burdens the Second Amendment right to keep and bear arms for self-defense.  As chronicled above, the RFL permits the State, upon an *individualized* finding of dangerousness by a judicial officer, after *particularized* allegations of facts are made under penalty of perjury, to *temporarily* prohibit possession of firearms and ammunition in interim and temporary protective orders.  *See supra* Section I.A.  This is far from the wholesale disarmament Plaintiffs paint the RFL to be.  In fact, it is difficult to imagine a less intrusive law designed to accomplish the same ends.[17]

Third, Plaintiffs argue that other laws outside the military and wartime context are too distinguishable from Maryland's RFL because "no law forbade the disarmed individual from immediately acquiring new arms."[18] ECF 15-1, at 32 (citation omitted) (emphasis omitted).  This

---

[17] The point that it is difficult to imagine a less intrusive law that can accomplish this desired end is notable when the Supreme Court has made clear that the Second Amendment is not a "straightjacket" to all firearm regulations. *Bruen*, 597 U.S. at 30.

[18] Plaintiffs state "[t]he Supreme Court has explained that 1791 is the controlling time for interpreting the Second Amendment." ECF 15-1, at 29. This statement lacks some nuance. Justice Barrett denounced such a wholesale conclusion; writing separately in *Bruen* to underscore that this

point is also well taken. Traditionally, the laws in the historical narrative outlined above would permit forfeiture of particular firearms involved in offenses, as opposed to an outright ban, however temporary, on the possession of firearms. *Id.* (citing *Range v. Att'y Gen.*, 53 F.4th 262, 281 n.25 (3d Cir. 2023), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023), *and reversing and remanding on reh'g en banc*, 69 F.4th 96 (3d Cir. 2023)).

This difference could be a relevant, or it just as easily could not be. The different means of accomplishing the goal of protecting the public peace could be explained by the social and economic realities of the time: *i.e.*, there was no need to impose such a regulation when the risk of a disarmed individual quickly procuring another firearm was not a realistic or pressing concern. *See* ECF 24, at 21 ("[W]hile an absence of a history of identical regulations may be relevant to the Second Amendment inquiry, the Supreme Court does not treat such absence as dispositive. Legal, social, and technological factors readily explain the absence of historical laws targeting individuals subject to ERPOs." (citation omitted)); *see also* ECF 24-1, at 23–25 ¶¶ 42–45 (describing colonial approaches to domestic violence, and underscoring that, when only a small fraction of spousal homicides were committed with a firearm, the Founding generation had no reason to pass laws specifically targeting an abuser's right to possess firearms). Additionally, the Court is concerned that Plaintiffs' demand for a law with *identical* means of achieving the goal of protecting the public peace veers too close to a demand for a historical twin—something the *Bruen* Court did not require.

question was one the Supreme Court did not resolve. *Bruen*, 597 U.S. at 82 (Barrett, J., concurring) ("[T]he Court avoids an[] 'ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791."). Neither did the Supreme Court address this question in *Rahimi*. *See* 144 S. Ct. at 1929 n.4 (2024) (Jackson, J., concurring) (noting the Court "decline[d] to resolve [this] dispute today."). In any event, the Court need not express an opinion on the controlling time period at this point, as Plaintiffs do not substantively raise the issue. *See* ECF 15-1.

Case 1:23-cv-02299-BAH   Document 41   Filed 07/25/24   Page 38 of 41

*Bruen*, 597 U.S. at 30; *see also United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024) (holding the Fifth Circuit erred by requiring a "historical twin" rather than a "historical analogue" when the Fifth Circuit found 42 U.S.C. § 922(g)(8) violated the Second Amendment).

In the wake of *Bruen*, challenges to ERPO laws have been few and far between at both the state and federal level, and as of this writing, none of those challenges have been successful. *See Greco v. Grewal*, Civ. No. 19-19145, 2020 WL 7334194, at *7 (D.N.J. Dec. 11, 2020) (abstaining from reaching the constitutional arguments in a challenge to New Jersey's ERPO law, based on the *Younger* abstention doctrine), *aff'd sub. nom.*, *Greco v. Bruck*, No. 21-1035, 2021 WL 5276674 (3d Cir. Nov. 12, 2021), *aff'd on reh'g*, No. 21-1035, 2022 WL 1515375 (3d Cir. May 13, 2022), *cert. denied sub nom.*, *Greco v. Platkin*, 143 S. Ct. 735 (2023); *see also G.W. v. C.N.*, 181 N.Y.S.3d 432, 435 (N.Y. Sup. Ct. 2022) (finding New York's ERPO law unconstitutional primarily on due process grounds, given the fundamental Second Amendment rights at issue), *rev'd sub nom.*, *R.M. v. C. M.*, 207 N.Y.S.3d 634, 644 (N.Y. App. Div. 2024) (holding New York's ERPO law is constitutional as it is "consistent with the Nation's historical tradition of firearm regulation in keeping dangerous individuals from carrying guns"); *Haverstraw Town Police v. C.G.*, 190 N.Y.S.3d 588, 593–94 (N.Y. Sup. Ct. 2023) ("[T]he Red Flag Law . . . is a procedural mechanism by which a court may make an individualized determination to suspend one person's access to guns based on specific, evidentiary findings.[] There is nothing in the jurisprudence of *Heller* and *Bruen* to suggest that such proceedings are an affront to the Second Amendment. Indeed, such individualized assessments, which place the burden on the party seeking to remove the weapons, are exactly what *Bruen* embraces."); *Matter of P.L.*, No. A-2813-21, 2023 WL 4074022, at *7 (N.J. Super. Ct. App. Div. June 20, 2023) (denying a plaintiff's contention that *Heller*, *McDonald*, and *Bruen* require the enhanced clear and convincing evidence burden of proof for a final

restraining order when the plaintiff did not argue that New Jersey's ERPO law is unconstitutional); *Davis v. Gilchrist Cnty. Sheriff's Off.*, 280 So. 3d 524 (Fla. Dist. Ct. App. 2019) (holding, pre-*Bruen*, that Florida's ERPO law was not void for vagueness and not unconstitutional on substantive due process grounds); *Accord Dean v. Bevis*, 322 So. 3d 167, 170 (Fla. Dist. Ct. App. 2021) (ruling trial court erred in issuing a temporary protective order against alleged stalker and commanding the respondent to surrender his firearms, as this did not comply with Florida's red flag law which afforded respondents more due process); *San Diego Police Dep't v. Geoffrey*, 302 Cal. Rptr. 3d 545, 562 (Cal. Ct. App. 2022), *review denied* (Mar. 22, 2023) (rejecting challenge to California's ERPO law, where plaintiffs had not raised a Second Amendment challenge or a Due Process challenge and noting that even if the Due Process argument had been raised at the trial level the Appellate Court would still not find any due process violations). The lack of caselaw post-*Bruen* supporting Plaintiffs' constitutional challenge to PS § 5-601 et seq. further underscores that Plaintiffs have not made a "clear showing" that they are likely to succeed at trial.[19] *Ass'n of Am. Publishers, Inc.*, 586 F. Supp. 3d at 388.

At bottom, the goal of jurists today is to look to historical evidence that bears on what the founders and the public understood about the right enshrined in the Second Amendment at the time they enshrined it. *Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–35) (emphasis added in *Bruen*)). The decision of which evidence to consider, how much weight to afford it, and what level of abstraction or generality to draw from it, as the Supreme Court acknowledged, is often a complicated task. *See id.* at 30 ("[W]e acknowledge that 'applying

---

[19] This conclusion is only reinforced by the Supreme Court's holding in *United States v. Rahimi*. 144 S. Ct. at 1896 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms.").

constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.D.C. 2011) (Kavanaugh, J., dissenting))). The Court's inquiry then is to judge whether this modern law is one "that our ancestors would [] have accepted." *Bruen*, 597 U.S. at 30. The evidence Defendants provide persuasively suggest the RFL is among the kinds of regulations our ancestors would have accepted. *See* ECF 24-1. Ultimately, having reviewed the arguments and evidence presented by both parties, the Court cannot conclude that Plaintiffs have met the burden of demonstrating a likelihood of success on the merits for Count II.

    2. Remaining Prongs

In considering whether Plaintiffs have suffered irreparable harm, the Court notes again that Plaintiffs rely entirely upon the argument that a constitutional violation constitutes an irreparable harm. ECF 15-1, at 33–35. Because the Court concludes Plaintiffs have not demonstrated a likelihood of success on Count II, this argument fails as well.

As to Willey, the Court is no doubt sympathetic to the experience Willey endured as he described it. ECF 5, at 20–21 ¶¶ 73–75. Willey described the experience of being taken against his will to an involuntary medical evaluation and being subjected to testing as a "Kafkaesque experience."[20] *See Id.* ¶¶ 73–79. Willey's allegations that the ERPO issued against him constituted malicious use of process and his claim that the ERPO issued against him upon petition from a "code enforcement officer" constituted an illegal and unconstitutional violation of the RFL as

---

[20] Since Franz Kafka's work often included the theme of fighting losing battles against bureaucracy, the term "Kafkaesque" has been popularly used to describe nightmarish, illogical, or oppressive situations. *See* Claire Fallon, *What Does 'Kafkaesque' Mean, Anyway?*, HuffPost (July 1, 2016), https://perma.cc/Z4XD-DKDA. Willey no doubt uses the term to illustrate the stressful nature of his involuntary medical evaluation, and his "acute stress reaction" diagnosis. ECF 5, at 20 ¶ 79.

applied to Willey live on.[21]  However, malicious use of process is a reparable harm that can be fully rectified after trial. *See, e.g., One Thousand Fleet Ltd. P'ship v. Guerriero*, 694 A.2d 952 (Md. 1997) (outlining the elements of such a claim).  Plus, malicious use of process does not, as a matter of course, render the statute that was allegedly misused unconstitutional.

Finally, for the same reasons indicated above, *supra* Section III.A.2, the Court concludes the balance of equities and public interest support denying Plaintiffs' motion for preliminary injunction. The law may stand pending resolution of its constitutionality.

## IV.   CONCLUSION

Plaintiffs' motion for preliminary injunction is **DENIED**.  The Court **CERTIFIES** by separate Order questions of state law to the Supreme Court of Maryland and **DENIES** Brown's and Webb's motions to dismiss without prejudice to be re-filed pending resolution of those questions.

A separate implementing Order will issue.

Dated: <u>July 25, 2024</u>

<u>/s/</u>
Brendan A. Hurson
United States District Judge

---

[21] The Court expresses no opinion on the merits of this argument as it has denied the pending motions to dismiss without prejudice to re-file after a response to the certified questions by Maryland's highest court.  Plaintiffs do not argue in ECF 15 about Willey's as-applied challenge and instead focus solely on the facial challenge to the RFL.  Thus, the Court expresses no opinion on the likelihood of success of Willey's as-applied challenge.  However, even if this issue was considered "raised," the Court would, nevertheless, conclude that the public interest determination outlined *supra* Section III.A.3., and the speculative nature of Willey being subjected to another ERPO, supports denying the motion for preliminary injunction.